UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| CHERYL KATER, individually and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>     *v.*<br><br>CHURCHILL DOWNS INCORPORATED., a Kentucky corporation,<br><br>               Defendant. | No. C15-612<br><br><br>**COMPLAINT—CLASS ACTION**<br><br><br>**JURY DEMAND** |

Plaintiff Cheryl Kater brings this case, individually and on behalf of all others similarly situated, against Defendant Churchill Downs Incorporated ("Churchill Downs") to enjoin its operation of unlawful gambling devices. Plaintiff alleges as follows upon personal knowledge as to herself and her own acts and experiences, and upon information and belief, including investigation conducted by her attorneys, as to all other matters.

### NATURE OF THE ACTION

1.  Defendant Churchill Downs owns and operates a leading video game development company in the so-called "casual games" industry—that is, computer games designed to appeal to a mass audience of casual gamers. Amongst the games Defendant owns

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

1   and operates is a popular virtual casino under the name "Big Fish Casino."

2        2.      In Big Fish Casino, Defendant offers a multitude of electronic versions of casino

3   games, such as slot machines, roulette, and black jack to consumers. Big Fish Casino is available

4   on Android and Apple iOS devices along with traditional computers.

5        3.      Defendant provides a bundle of free "chips" to first-time visitors of its virtual

6   casino that can be used to wager on its games. After consumers inevitably lose their initial

7   allotment of chips, Churchill Downs attempts to sell them additional chips starting at $1.99 for

8   20,000 chips.

9        4.      Freshly topped off with additional chips, consumers wager to win more chips. The

10   chips won by consumers playing Defendant's games of chance are identical to the chips that

11   Defendant sells. Thus, by wagering 20,000 chips that were purchased for $1.99, consumers have

12   the chance to win hundreds of thousands of additional chips that they would otherwise have to

13   purchase.

14        5.      Consumers that win big can also cash out by selling their chips to other casino

15   patrons. In fact, Defendant facilitates and profits from the process by which consumers cash out

16   by charging a fee, typically $1.99 for each chip transfer. With a reliable method to exchange

17   chips for cash facilitated by Defendant, it's no surprise that secondary markets for chip transfers

18   have sprung up online as well.

19        6.      By operating its virtual casino, Defendant has violated Washington law, which

20   governs Plaintiff's and the Class's claims,[1] and illegally profited from tens of thousands of

21   consumers. Accordingly, Plaintiff Cheryl Kater, on behalf of herself and a Class of similarly

22   situated individuals, brings this lawsuit to recover their losses, as well as costs and attorneys'

23

---

24   [1]      Players visiting Defendant's Big Fish Casino for the first time agree to Defendant's "Big
25   Fish Terms of Use," a true and accurate copy is attached hereto as <u>Exhibit A</u>. In those terms,
players and Defendant agree, under the heading "Applicable Law and Jurisdiction," that "[t]hese
26   Terms of Use are governed by and shall be construed in accordance with the laws of the State of
Washington, USA, excluding its conflicts of law rules."

27

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

1  fees.

2  **PARTIES**

3  7.  Plaintiff Cheryl Kater is a natural person and a citizen of the state of Michigan.

4  8.  Defendant Churchill Downs Incorporated is a corporation incorporated under the

5  laws of the state of Kentucky with a principal place of business at 333 Elliott Avenue West, Suite

6  200, Seattle, Washington 98119. Defendant conducts business throughout this District,

7  Washington state, and the United States.

8  **JURISDICTION AND VENUE**

9  9.  Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because

10  (a) at least one member of the class is a citizen of a state different from Defendant, (b) the

11  amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the

12  exceptions under that subsection apply to this action.

13  10.  The Court has personal jurisdiction over Defendant because Defendant is licensed

14  to conduct business in this District, maintains its subsidiary's headquarters and principal place of

15  business in this District, conducts significant business transactions in this District, and because

16  the wrongful conduct occurred in and emanated from this District.

17  11.  Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial

18  part of the events giving rise to Plaintiff's claims occurred in this District, Defendant's

19  subsidiaries are licensed to conduct business in this District, and its subsidiary's headquarters

20  and principal place of business are maintained in this District.

21  **FACTUAL ALLEGATIONS**

22  **Free-to-Play and the New Era of Online Gambling**

23  12.  The proliferation of internet-connected mobile devices has led to the growth of

24  so-called "free-to-play" videogames. With free-to-play games, developers encourage consumers

25  to download and play games for free while selling many low-cost items within the game itself.

26  Developers aim to recoup their costs (and make a profit) by selling thousands of "in-game" items

27  that start at $0.99 (purchases known as "micro-transactions") instead of charging an up-front fee.

COMPLAINT—CLASS ACTION
No. C15-612

- 3 -

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

13.     The free-to-play model has become particularly attractive to developers of games of chance (*e.g.*, poker, blackjack, and slot machine mobile videogames, amongst others), because it allows them to generate huge profits. In 2012, free-to-play games of chance generated over $1.6 billion in worldwide revenue, and they are expected to grow to more than $2.4 billion by the end of 2015.[2] Even "large land-based casino operators are looking at this new space" for "a healthy growth potential."[3]

14.     With free-to-play games of chance, developers have begun exploiting the same psychological triggers as casino operators. As one respected videogame publication put it:

> "If you hand someone a closed box full of promised goodies, many will happily pay you for the crowbar to crack it open. The tremendous power of small random packs of goodies has long been known to the creators of physical collectible card games and companies that made football stickers a decade ago. For some … the allure of a closed box full of goodies is too powerful to resist. Whatever the worth of the randomised [sic] prizes inside, the offer of a free chest and the option to buy a key will make a small fortune out of these personalities. For those that like to gamble, these crates often offer a small chance of an ultra-rare item."[4]

15.     Another stated:

> "Games may influence 'feelings of pleasure and reward,' but this is an addiction to the games themselves; micro-transactions play to a different kind of addiction that has existed long before video games existed, more specifically, an addiction

[2]     VentureBeat, *Report confirms that social casino games have hit the jackpot with $1.6B in revenue | GamesBeat | Games | by Dean Takahashi*, http://venturebeat.com/2012/09/11/report-confirms-that-social-casino-games-have-hit-the-jackpot-with-1-6b-in-revenue/ (last visited Apr. 9, 2015).

[3]     *Id.* Indeed, as explained more below, Defendant—the owner of five horse racing tracks, six casinos, myriad off-track betting facilities, and other gaming related businesses—purchased Big Fish Games and the Big Fish Casino in November 2014 for approximately $885 million. *Churchill Downs Incorporated To Acquire Big Fish Games | Churchill Downs Incorporated*, http://www.churchilldownsincorporated.com/bigfishannouncement (last visited Apr. 9, 2015).

[4]     PC Gamer, *Microtransactions: the good, the bad and the ugly*, http://www.pcgamer.com/microtransactions-the-good-the-bad-and-the-ugly/ (last visited Apr. 9, 2015).

COMPLAINT—CLASS ACTION
No. C15-612

- 4 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

similar to that which you could develop in casinos and betting shops."[5]

16.     The comparison to casinos doesn't end there. Just as with casino operators, free-to-play developers rely on a small portion of their players to provide the majority of their profits. These "whales," as they're known in casino parlance, account for just "0.15% of players" but provide "over 50% of mobile game revenue."[6]

17.     Game Informer, another respected videogame magazine, reported on the rise (and danger of) of micro-transactions in free-to-play games and concluded:

> "[M]any new mobile and social titles target small, susceptible populations for large percentages of their revenue. If ninety-five people all play a [free-to-play] game without spending money, but five people each pour $100 or more in to obtain virtual currency, the designer can break even. These five individuals are what the industry calls whales, and we tend not to be too concerned with how they're being used in the equation. While the scale and potential financial ruin is of a different magnitude, a similar profitability model governs casino gambling."[7]

18.     Academics have also studied the socioeconomic effect free-to-play games have on consumers. In one study, the authors compiled several sources analyzing free-to-play games of chance (called "casino" games below) and stated that:

> "[Researchers] found that [free-to-play] casino gamers share many similar sociodemographic characteristics (*e.g.*, employment, education, income) with online gamblers. Given these similarities, it is perhaps not surprising that a strong predictor of online gambling is engagement in [free-to-play] casino games. Putting a dark line under these findings, over half (58.3%) of disordered gamblers who were seeking treatment stated that social casino games were their first experiences with gambling."

---

[5]     The Badger, *Are micro-transactions ruining video games? | The Badger*, http://www.badgeronline.co.uk/micro-transactions-ruining-video-games/(last visited Apr. 9, 2015).

[6]     *Id.* (emphasis added).

[7]     Game Informer, *How Microtransactions Are Bad For Gaming - Features - www.GameInformer.com*, http://www.gameinformer.com/b/features/archive/2012/09/12/how-microtransactions-are-bad-for-gaming.aspx?CommentPosted=true&PageIndex=3 (last visited Apr. 9, 2015).

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

…

"According to [another study], the purchase of virtual credits or virtual items makes the activity of [free-to-play] casino gaming more similar to gambling. Thus, micro-transactions may be a crucial predictor in the migration to online gambling, as these players have now crossed a line by paying to engage in these activities. Although, [sic] only 1–5% of [free-to-play] casino gamers make micro-transactions, those who purchase virtual credits spend an average of $78. Despite the limited numbers of social casino gamers purchasing virtual credits, revenues from micro-transactions account for 60 % of all [free-to-play] casino gaming revenue. Thus, a significant amount of revenue is based on players' desire to purchase virtual credits above and beyond what is provided to the player in seed credits."[8]

19.     The same authors looked at the link between playing free-to-play games of chance and gambling in casinos. They stated that "prior research indicated that winning large sums of virtual credits on social casino gaming sites was a key reason for [consumers'] migration to online gambling," yet the largest predictor that a consumer will transition to online gambling was "micro-transaction engagement." In fact, "the odds of migration to online gambling were approximately *eight times greater* among people who made micro-transactions on [free-to-play] casino games compared to [free-to-play] casino gamers who did not make micro-transactions."[9]

20.     The similarity between free-to-play games of chance and games of chance found in casinos has caused governments across the world to intervene to limit their availability.[10]

---

[8]     Hyoun S. Kim, Michael J. A. Wohl, *et al.*, *Do Social Casino Gamers Migrate to Online Gambling? An Assessment of Migration Rate and Potential Predictors*, Journal of gambling studies / co-sponsored by the National Council on Problem Gambling and Institute for the Study of Gambling and Commercial Gaming (Nov. 14, 2014), *available at* http://link.springer.com/content/pdf/10.1007%2Fs10899-014-9511-0.pdf (citations omitted).

[9]     *Id.* (emphasis added).

[10]    In late August 2014, South Korea began regulating "social gambling" games, including games similar to Big Fish Casino, by "ban[ning] all financial transactions directed" to the games. PokerNews.com, *Korea Shuts Down All Facebook Games In Attempt To Regulate Social Gambling | PokerNews*, http://www.pokernews.com/ news/2014/09/korea-shuts-down-facebook-games-19204.htm (last visited Apr. 9, 2015). Similarly, " the Maltese Lotteries and Gambling

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

1   Unfortunately, such games have eluded regulation in the United States. As a result, and as

2   described below, Defendant's Big Fish Casino has thrived and thousands of consumers have

3   spent millions of dollars unwittingly playing Defendant's unlawful games of chance.

4   **A Brief Introduction to Defendant and its Big Fish Casino**

5   21.     Churchill Downs began in 1875 when it opened the famous horseracing track of

6   the same name. Since then, Churchill Downs has amassed additional racetracks and begun

7   expanding into casino gaming. In 2007, Churchill Downs created TwinSpires.com, a pari-mutuel

8   betting website with revenues exceeding $180 million per year.

9   22.     And in an effort to extend its online gaming presence, Churchill Downs acquired

10  Big Fish Games, "the world's largest producer of casual games," in 2014 for $885 million.[11] For

11  the last twelve months, Defendant's Big Fish subsidiary posted over $312 million in "annual

12  bookings," with much of the "bookings" coming from "Big Fish Casino," the "top revenue

13  producing social casino app on [Apple's iOS devices] last year."[12]

14  23.     In addition to Apple iOS devices, Big Fish Casino is available for consumers to

15  play through Facebook, web browsers, and on phones or tablets running the Android mobile

16  operating system. The casino is very popular—millions of people play at the casino every month.

17  24.     Churchill Downs stated in its recent SEC filings that "the Company acquired Big

18  Fish Games to leverage its casino and casual game experience." Defendant describes the Big

19  Fish Casino games as being "free to download through PC and mobile devices. Game options

20  include casino-style games such as blackjack, poker, slots, craps, and roulette. There is

21  monetization through purchase of in-game virtual goods to enhance the game-playing

22

23  Authority (LGA) invited the national Parliament to regulate all digital games with prizes by the
    end of 2014." *Id.*

24  [11]    *Big Fish Games to be acquired for $885 million by racetrack operator Churchill Downs
25  – GeekWire*, http://www.geekwire.com/2014/churchill-downs-acquires-big-fish/ (last visited
    Apr. 9, 2015).

26  [12]    *Id.*

27

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

1    experience."

2         25.    Selling "in-game virtual goods" (*i.e.*, virtual casino chips) has been immensely

3    profitable for Defendant. In 2014, Defendant recognized revenues of more than $260 *million*

4    from its Big Fish Games videogames, likely generating more than 50% of total revenue just by

5    selling chips in its Big Fish Casino.[13] As explained further below, however, the revenue

6    Defendant receives from its Big Fish Casino games are the result of operating unlawful games of

7    chance camouflaged as innocuous videogames.

8    **III.     Defendant's Virtual Casino Contains Unlawful Games of Chance**

9         26.    Consumers visiting Defendant's virtual casino for the first time are awarded

10    100,000 free chips. Ostensibly, Defendant gives away 100,000 chips to each consumer to ensure

11    that they "buy in" to Defendant's casino over alternatives.

12         27.    After they begin playing, consumers quickly lose their initial allotment chips.

13    Immediately thereafter, Defendant informs them via a "pop up" screen that they have

14    "Insufficient Cash" to place a wager, which prevents them from additional play. *See* <u>Figure 1</u>.

15

16

17

18    

19

20

21

22

23         (**<u>Figure 1.</u>**)

24         28.    Concurrently with that warning, Defendant Churchill Downs provides a link to

25    ---

    [13]    *Nearly 50% of Big Fish's revenue came from mobile in 2013 – GeekWire*,

26    http://www.geekwire.com/2014/half-big-fishs-revenue-came-mobile-2013-50-one-year-prior/

27    (last visited Apr. 9, 2015).

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

1  consumers, telling them to "GET CHIPS" at its electronic store where the price for chips ranges

2  from prices of $1.99 for 20,000 chips to $249.00 for 10,000,000 chips. *See* Figure 2.



16  (**Figure 2**, showing Defendant's chip prices during a "3X Sale.")

17      29.      The decision to sell chips by the thousands isn't an accident. Rather, Defendant

18  attempts to lower the perceived cost of the chips (costing just a fraction of a penny per chip)

19  while simultaneously maximizing the value of the award (awarding millions of chips in

20  jackpots), further inducing consumers to bet on its games.

21      30.      To begin wagering, players select the "BET/LINE" (*i.e.*, bet per played line) that

22  will be used for a spin, as illustrated in Figure 3, which shows one of Defendant's games.

23  Defendant allows players to multiply their bet by changing the number of "lines" (*i.e.*,

24  combinations) on which the consumer can win, shown in Figure 3 as the "LINE" button.

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

1

2

3

4

5

6

7

8

9

10

11

12

13



14          (**Figure 3.**)

15          31.     The bet amount multiplied by the number of lines comprises the "Total Bet"

16  shown in the bottom left of <u>Figure 3</u>. Thus, in the example shown in <u>Figure 3</u>, the player is

17  attempting to bet "10,000" chips, or approximately $1.00, for one spin of the slot machine.

18          32.     Once a consumer spins the slot machine by pressing a button (the brown lever

19  labeled "SPIN" circled on the right of <u>Figure 3</u>), none of Defendant's games allow (or call for)

20  any additional user action. Instead, the consumer's computer or mobile device communicates

21  with and sends information (such as the "Total Bet" amount) to Defendant's servers. Defendant's

22  servers then execute the game's algorithms that determine the spin's outcome. Notably, none of

23  Defendant's games depend on any amount of skill to determine their outcomes—all outcomes

24  are based entirely on chance.

25          33.     <u>Figure 4</u> shows the outcome of a 10,000-chip bet where the player won 100,000

26  chips. Absent the win, the 100,000 chips would have cost the player approximately $9.95 to buy.

27  Now, however, the newly won chips provide the player with ten additional free plays at the

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

1   10,000-chip bet level.

2
3
4
5
6
7
8   
9
10
11
12

13              (**Figure 4.**)

14        34.        Consumers can continue playing with the chips that they won, or they can exit the

15   game and return at a later time to play because Defendant maintains win and loss records and

16   account balances for each consumer. Indeed, once Defendant's algorithms determine the

17   outcome of a spin and Defendant displays the outcome to the consumer, Defendant adjusts the

18   consumer's account balance. Defendant keeps records of each wager, outcome, win, and loss for

19   every Big Fish Casino player and allows the players to view their total winnings or losses from

20   Defendant's casino. *See* Figure 5.

21
22
23
24
25
26
27

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

1
2
3
4
5
6
7
8
9
10
11
12



(**Figure 5.**)

13      35.     Consumers that win can also cash out by selling chips on the secondary market.

14   For example, a Big Fish Casino player listed millions of chips for sale on an online "black

15   market."[14] Once players sell chips using the online black market, they follow Defendant's

16   instructions on how to transfer chips from one player to another, as shown in Figure 6. In fact,

17   Defendant itself charges (and profits from) a transaction fee priced in "gold" (which is available

18   for purchase starting at prices of $1.99 for eight "bars of gold").

19   Before you can exchange or gift gold for chips, your account must be at least 72 hours old based on the hour the account
     was created. There are also different levels that you must reach, by , in order to unlock certain gift amounts:

20   • To give 10K chips, you must reach Level 6.

21   • To give 50K chips, you must reach Level 11.

     • To give 500K and 2.5mil chips, you must reach Level 16.

22   You can use gold to give chips to a friend, or yourself! Just open your profile, or click on a friend's profile, and press the
     Give Chips button.

23   (**Figure 6.**)[15]

24

25   ---
     [14]     *[WTS] Big Fish Casino Chips (Fast Delivery, Legit). - Sythe*, http://www.sythe.org/other-
     games/1734327-wts-big-fish-casino-chips-fast-delivery-legit.html (last visited Apr. 9, 2015).

26   [15]     *Earning and Using Gold | Big Fish Blog*, http://www.bigfishgames.com/blog/earning-
     and-using-gold/ (last visited Apr. 9, 2015).

27

COMPLAINT—CLASS ACTION
No. C15-612

- 12 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

36.     As such, Defendant undoubtedly is aware that its players regularly cash out their winnings—it facilitates the process itself. Unfortunately, if Defendant's reported revenues are any indication, the number of losers vastly outnumbers the number of winners at Defendant's unlawful Big Fish Casino. As such, Plaintiff Kater, on behalf of herself and a putative Class, seeks to recover Defendant's ill-gotten losses.

**Plaintiff Kater's Experience**

37.     In or around January 2013, Plaintiff Kater began playing Big Fish Casino through her Android device. After Plaintiff lost the balance of her initial allocation of free chips, Plaintiff Kater began purchasing chips from Defendant for use in the Big Fish Casino.

38.     Thereafter, Plaintiff Kater continued playing various slot machines and other games of chance within Defendant's casino where she would wager chips for the chance of winning additional chips. From January 2013 to March 2015, Plaintiff Kater wagered and lost (and Defendant Churchill Downs therefore won) over $1,000 at Defendant's games of chance.

CLASS ALLEGATIONS

39.     **Class Definition**: Plaintiff Kater brings this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of herself and a Class of similarly situated individuals, defined as follows:

> All persons in the United States who created Big Fish Casino accounts on or before March 23, 2015 and lost purchased chips by wagering at Defendant's Big Fish Casino.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

1   and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such

2   excluded persons.

3       40.     **Numerosity**: On information and belief, tens of thousands of consumers fall into

4   the definition of the Class. Members of the Class can be identified through Defendant's records,

5   discovery, and other third-party sources.

6       41.     **Commonality and Predominance**: There are many questions of law and fact

7   common to Plaintiff's and the Class's claims, and those questions predominate over any

8   questions that may affect individual members of the Class. Common questions for the Class

9   include, but are not necessarily limited to the following:

10          a.      Whether Defendant's virtual casino games are "gambling devices" as

11                  defined by RCW § 9.46.0241;

12          b.      Whether Plaintiff and each member of the Class lost money to Defendant

13                  by gambling as defined by RCW § 9.46.0237;

14          c.      Whether Defendant violated the Washington Consumer Protection Act,

15                  RCW 19.86.010 *et seq.*; and

16          d.      Whether Defendant has been unjustly enriched as a result of its conduct.

17      42.     **Typicality**: Plaintiff's claims are typical of the claims of other members of the

18  Class in that Plaintiff's and the members of the Class sustained damages arising out of

19  Defendant's wrongful conduct.

20      43.     **Adequate Representation**: Plaintiff will fairly and adequately represent and

21  protect the interests of the Class and has retained counsel competent and experienced in complex

22  litigation and class actions. Plaintiff's claims are representative of the claims of the other

23  members of the Class, as Plaintiff and each member of the Class lost money playing Defendant's

24  games of chance. Plaintiff also has no interests antagonistic to those of the Class, and Defendant

25  has no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously

26  prosecuting this action on behalf of the Class and have the financial resources to do so. Neither

27  Plaintiff nor her counsel have any interest adverse to the Class.

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

44.     **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies that Plaintiff challenges apply and affect members of the Class uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff. The factual and legal bases of Defendant's liability to Plaintiff and to the other members of the Class are the same.

45.     **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The harm suffered by the individual members of the Class is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress Defendant's wrongful conduct. Absent a class action, it would be difficult if not impossible for the individual members of the Class to obtain effective relief from Defendant. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

46.     Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

1

**FIRST CAUSE OF ACTION**

2

**Violations of RCW § 4.24.070**

3

**(on behalf of Plaintiff and the Class)**

4        47.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

5        48.    Plaintiff, members of the Class, and Defendant are all "persons" as defined by

6 RCW 9.46.0289.

7        49.    The state of Washington's "Recovery of money lost at gambling" statute, RCW

8 4.24.070, provides that "all persons losing money or anything of value at or on any illegal

9 gambling games shall have a cause of action to recover from the dealer or player winning, or

10 from the proprietor for whose benefit such game was played or dealt, or such money or things of

11 value won, the amount of the money or the value of the thing so lost."

12        50.    "Gambling," defined by RCW 9.46.0237, "means staking or risking something of

13 value upon the outcome of a contest of chance or a future contingent event not under the person's

14 control or influence."

15        51.    "Gambling Devices" are defined by RCW 9.46.0241 as being "(1) Any device or

16 mechanism the operation of which a right to money, credits, deposits or other things of value

17 may be created, in return for a consideration, as the result of the operation of an element of

18 chance, including, but not limited to slot machines, video pull-tabs, video poker, and other

19 electronic games of chance . . . In the application of this definition, a pinball machine or similar

20 mechanical amusement device which confers only an immediate and unrecorded right of replay

21 on players thereof, which does not contain any mechanism which varies the chance of winning

22 free games or the number of free games which may be won or a mechanism or a chute for

23 dispensing coins or a facsimile thereof, and which prohibits multiple winnings depending upon

24 the number of coins inserted and requires the playing of five balls individually upon the insertion

25 of a nickel or dime, as the case may be, to complete any one operation thereof, shall not be

26 deemed a gambling device."

27

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

1       52.     Defendant's Big Fish Casino games are "Gambling Devices," because they are

2  devices where players provide consideration (*e.g.*, purchase chips and wager the chips) and by an

3  element of chance (*e.g.*, by spinning a virtual slot machine or virtual roulette table) create a right

4  to credits and/or other things of value (*e.g.*, additional chips that would otherwise be purchased

5  for cash, that can be sold for cash, and that award additional replays).

6       53.     As such, Plaintiff and the Class gambled when they purchased chips to wager at

7  Defendant's gambling devices. Plaintiff and each member of the Class staked money, in the form

8  of chips purchased with money, at Defendant's games of chance (*e.g.*, Defendant's slot machines

9  within Big Fish Casino) for the chance of winning additional things of value (*e.g.*, chips that

10  grant additional free plays and that can be sold on the secondary market for cash).

11       54.     In addition, Defendant's Big Fish Casino games are not "pinball machine[s] or

12  similar mechanical amusement device[s]" as contemplated by the statute because:

13            a.     the games are electronic rather than mechanical;

14            b.     the games confer replays but they are recorded and can be redeemed on

15                separate occasions (*i.e.*, they are not "immediate and unrecorded"); and

16            c.     the games contain electronic mechanisms that vary the chance of winning

17                free games or the number of free games which may be won (*e.g.*, the games allow

18                for different wager amounts and some allow for the player to win on multiple

19                "lines").

20       55.     RCW 9.46.0285 states that a "'Thing of value,' as used in this chapter, means any

21  money or property, any token, object or article exchangeable for money or property, or any form

22  of credit or promise, directly or indirectly, contemplating transfer of money or property or of any

23  interest therein, or involving extension of a service, entertainment or a privilege of playing at a

24  game or scheme without charge."

25       56.     The "chips" Plaintiff and the Class had the chance of winning in Defendant's Big

26  Fish Casino games are "things of value" under Washington law because they are credits that

27  involve the extension of entertainment and a privilege of playing a game without charge.

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

1   Moreover, the chips can be sold on the secondary market for cash and can be transferred to other

2   Big Fish Casino players in exchange for cash.

3       57.     Defendant's Big Fish Casino games are "Contest[s] of chance," as defined by

4   RCW 9.46.0225, because they are "contest[s], game[s], gaming scheme[s], or gaming device[s]

5   in which the outcome[s] depend[] in a material degree upon an element of chance,

6   notwithstanding that skill of the contestants may also be a factor therein." Defendant's games

7   within the Big Fish Casino are programmed to have outcomes that are determined entirely upon

8   chance and a contestant's skill does not affect the outcomes.

9       58.     RCW 9.46.0201 defines "Amusement games" as games where "The outcome

10   depends in a material degree upon the skill of the contestant," amongst other requirements.

11   Defendant's Big Fish Casino games are not "Amusement games" because their outcomes are

12   dependent entirely upon chance and not upon the skill of the player and because the games are

13   contests of chance, as defined by RCW 9.46.0225.

14       59.     As a direct and proximate result of Defendant's operation of its gambling devices,

15   Plaintiff Kater and each member of the Class have lost money wagering at Defendant's games of

16   chance. Plaintiff Kater, on behalf of herself and the Class, seeks an order (1) requiring Defendant

17   to cease the operation of its gambling devices; and/or (2) awarding the recovery of all lost

18   monies, interest, and reasonable attorneys' fees, expenses, and costs to the extent allowable.

19

20
**SECOND CAUSE OF ACTION**

21
**Violations of the Washington Consumer Protection Act, RCW 19.86.010 *et seq.***

22
**(on behalf of Plaintiff and the Class)**

23       60.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

24       61.     Washington's Consumer Protection Act, RCW § 19.86.010 *et seq.* ("CPA"),

25   protects both consumers and competitors by promoting fair competition in commercial markets

26   for goods and services.

27

Law Offices of
**Clifford A. Cantor, P.C.**
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

62.     To achieve that goal, the CPA prohibits any person from using "unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce . . ." RCW § 19.86.020.

63.     The CPA states that "a claimant may establish that the act or practice is injurious to the public interest because it . . . violates a statute that contains a specific legislative declaration of public interest impact."

64.     Defendant violated RCW § 9.46.010, *et seq.*, which declares that:

"The public policy of the state of Washington on gambling is to keep the criminal element out of gambling and to promote the social welfare of the people by limiting the nature and scope of gambling activities and by strict regulation and control.

It is hereby declared to be the policy of the legislature, recognizing the close relationship between professional gambling and organized crime, to restrain all persons from seeking profit from professional gambling activities in this state; to restrain all persons from patronizing such professional gambling activities; to safeguard the public against the evils induced by common gamblers and common gambling houses engaged in professional gambling; and at the same time, both to preserve the freedom of the press and to avoid restricting participation by individuals in activities and social pastimes, which activities and social pastimes are more for amusement rather than for profit, do not maliciously affect the public, and do not breach the peace."

65.     Defendant has violated RCW § 9.46.010 *et seq.* because its Big Fish Casino games are unlawful "gambling devices" defined by RCW 9.46.0241. Defendant's Big Fish Casino games are gambling devices because they are devices where players provide consideration (*e.g.*, by purchasing chips and wagering the chips) and by an element of chance (*e.g.*, by spinning a virtual slot machine or virtual roulette table) create a right to credits and/or other things of value (*e.g.*, additional chips that would otherwise be purchased for cash, that can be sold for cash, and that award additional replays).

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

66.     Defendant's acts and practices constitute unfair methods of competition or are unfair or deceptive because (a) they offend public policy as it has been established by law; (b) are unethical, oppressive, or unscrupulous; and (c) cause substantial injury to consumers; and also (d) have the capacity to deceive a substantial portion of the public to whom they are directed and to whom Defendant holds itself out as operating legally and in accordance with applicable law.

67.     Defendant's wrongful conduct occurred in the conduct of trade or commerce— *i.e.*, while Defendant was engaged in the operation of making computer games available to the public.

68.     Defendant's acts and practices were and are injurious to the public interest because Defendant, in the course of its business, continuously advertised to and solicited the general public in Washington state and throughout the United States to play its unlawful Big Fish Casino games of chance. This was part of a pattern or generalized course of conduct on the part of Defendant, and many consumers have been adversely affected by Defendant's conduct and the public is at risk.

69.     Defendant has profited immensely from its operation of unlawful games of chance, amassing hundreds of millions of dollars from the losers of its games of chance.

70.     Further, Defendant's Big Fish Games subsidiary is headquartered in Washington; Defendant's strategies, decision-making, and commercial transactions for Big Fish Casino originate in Washington; many of its key employees reside, work, and make company decisions (including the decision to engage in the challenged conduct) in Washington; Defendant and many of its employees are domiciled in Washington; and Plaintiff and each member of the Class agreed to Defendant's Terms of Use that specified that the "Applicable Law" is that "of the State of Washington, USA." The conduct that Plaintiff challenges directly or indirectly affects the people of the State of Washington.

COMPLAINT—CLASS ACTION
No. C15-612

- 20 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

71.     As a result of Defendant's conduct, Plaintiff and the Class members were injured in their business or property—*i.e.*, economic injury—in that they lost money wagering on Defendant's unlawful games of chance.

72.     Defendant's unfair or deceptive conduct proximately caused Plaintiff's and the Class members' injury because, but for the challenged conduct, Plaintiff and the Class members would not have lost money wagering at or on Defendant's games of chance, and they did so as a direct, foreseeable, and planned consequence of that conduct.

73.     Plaintiff, on her own behalf and on behalf of the Class, seeks to enjoin further violation and recover actual damages and treble damages, together with the costs of suit, including reasonable attorneys' fees.

### THIRD CAUSE OF ACTION

### Unjust Enrichment

### (on behalf of Plaintiff and the Class)

74.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

75.     Plaintiff and the Class have conferred a benefit upon Defendant in the form of the money Defendant received from them for the purchase of chips to wager at Defendant's Big Fish Casino.

76.     The purchase of the chips to wager at Defendant's Big Fish Casino is and was beyond the scope of any contractual agreement between Defendant and Plaintiff and members of the Class. To wit, Defendant's terms of service do not mention that the Big Fish Casino video game includes unlawful games of chance. Furthermore, the terms of service specifically prohibit the "discussions of any matters which are explicitly or by inference illegal in any way."

77.     Defendant appreciates and/or has knowledge of the benefits conferred upon it by Plaintiff and the Class.

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

78.     Under principles of equity and good conscience, Defendant should not be permitted to retain the money obtained from Plaintiff and the members of the Class, which Defendant has unjustly obtained as a result of its unlawful operation of slot machines and/or gambling devices. As it stands, Defendant has retained millions of dollars in profits generated from its unlawful games of chance and should not be permitted to retain those ill-gotten profits.

79.     Accordingly, Plaintiff and the Class seek full disgorgement and restitution of any money Defendant has retained as a result of the unlawful and/or wrongful conduct alleged herein.

### PRAYER FOR RELIEF

Plaintiff Cheryl Kater, individually and on behalf of all others similarly situated, respectfully requests that this Court enter an Order:

a)     Certifying this case as a class action on behalf of the Class defined above, appointing Cheryl Kater as representative of the Class, and appointing her counsel as class counsel;

b)     Declaring that Defendant's conduct, as set out above, violates the CPA;

c)     Entering judgment against Defendant, in the amount of the losses suffered by Plaintiff and each member of the Class;

d)     Enjoining Defendant from continuing the challenged conduct;

e)     Awarding damages to Plaintiff and the Class members in an amount to be determined at trial, including trebling as appropriate;

f)     Awarding restitution to Plaintiff and Class members in an amount to be determined at trial, and requiring disgorgement of all benefits that Defendant unjustly received;

g)     Awarding reasonable attorney's fees and expenses;

h)     Awarding pre- and post-judgment interest, to the extent allowable;

i)     Entering judgment for injunctive and/or declaratory relief as necessary to protect the interests of Plaintiff and the Class; and

j)     Awarding such other and further relief as equity and justice require.

COMPLAINT—CLASS ACTION
No. C15-612

- 22 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

**JURY DEMAND**

Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully Submitted,

Dated: April 17, 2015

*s/ Cliff Cantor*
By: Cliff Cantor, WSBA # 17893
LAW OFFICES OF CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA 98074
Tel:    425.868.7813
Fax:    425.732.3752
Email: cliff.cantor@outlook.com

EDELSON PC
Rafey S. Balabanian*
Benjamin H. Richman*
Amir C. Missaghi*
Courtney C. Booth*
350 North LaSalle Street, Suite 1300
Chicago, IL 60654
Tel:    312.589.6370
Fax:    312.589.6378
Email: rbalabanian@edelson.com
          brichman@edelson.com
          amissaghi@edelson.com
          cbooth@edelson.com

*Pro hac vice* admission to be sought.

Counsel for Plaintiff

COMPLAINT—CLASS ACTION
No. C15-612

- 23 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752