# Exhibit 1

1
2
3
4
5
6
7
8
9
10

**BEFORE THE WASHINGTON STATE GAMBLING COMMISSION**

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In the Matter of the Petition of Big Fish Games, Inc. for a Declaratory Order

Matter No.:

**PETITION**

1.     Petitioner Big Fish Games, Inc. is headquartered at 333 Elliott Avenue West, Suite 200, Seattle, Washington 98119.

2.     The statutes brought into issue by this petition are RCW 9.46.0237 and RCW 9.46.0285.

**INTRODUCTION AND STATEMENT OF FACTS**

3.     Petitioner Big Fish Games, Inc., petitions the Washington State Gambling Commission for a declaratory order confirming that its Big Fish Casino suite of online video games ("BFC") does not constitute gambling within the meaning of the Washington Gambling Act, RCW 9.46.0237, and therefore is not subject to the Commission's regulatory or enforcement jurisdiction. As in many video games, players can play the games for free with virtual tokens that are received at the start of play and additional virtual tokens that are provided automatically at regular intervals, or can be purchased, for more play within the games. BFC's virtual tokens exist, and can be used, only within BFC's online games; they cannot be redeemed for money and have no real-world value, *i.e.* there is no usage outside the BFC virtual online games. That is why Petitioner, the public, the pertinent Commission guidance (*see* Declaration of Gary Rubman ("Rubman Decl.") ¶ 2, Exh. A),[1] and judicial precedent have consistently understood that playing such games is not gambling. Petitioner requests that the Commission resolve uncertainty that recently has arisen with respect to Washington's law by issuing a declaratory order that playing BFC games is not gambling under the Washington Gambling Act.

4.     BFC is an online suite of casino-themed video games where virtual tokens are called "chips." Declaration of Andy Vella ("Vella Decl.") ¶ 3. All new players currently receive 100,000 virtual chips automatically when they install BFC for free and create a username. *Id.* Since at least 2013, additional virtual chips are distributed automatically to players at various times within the games. *Id.* Players can obtain additional virtual chips through playing the game. *Id.* Players receive additional virtual chips automatically any day that they sign in to play; when they click or press to collect more after certain periods of time (*e.g.*, 30 minutes); when they join a social club within BFC, as of 2017; and

---

[1] This petition hereby incorporates by reference the declarations and their exhibits.

1  when Facebook friends install BFC.  *Id.*  Players also have the option to purchase additional virtual

2  chips.  *Id.*

3      5.    BFC's virtual chips cannot be exchanged or cashed out for money and they have no value

4  in the real world.  *Id.* ¶ 4.  Virtual chips may be used only within the games, including, for example, to

5  play the games or to acquire a virtual pet, cupcake, flag, or other virtual item.  *Id.*  BFC's terms of use

6  prohibit the sale or transfer "for commercial gain" of virtual chips,[2] and the game does not provide a

7  means for players to conduct such a transaction.[3]  *Id.* ¶¶ 5-6.

8      6.    For years, BFC's owners, players of the game, and state regulators have operated

9  pursuant to the understanding that BFC games do not constitute gambling within the meaning of the

10  Washington Gambling Act, consistent with the text, purpose, and history of the statute, and state court

11  precedent.  Recently, however, a federal court issued a ruling at the preliminary phase of a case that set

12  forth an interpretation that is in tension with that understanding and with the state's long-standing

13  application of the state statute.  *See* below at ¶ 27 (discussing *Kater v. Churchill Downs Inc.*, 886 F.3d

14  784, 787 (9th Cir. 2018)).[4]  A federal court's view of Washington state law is not, of course, binding on

15  the state of Washington, its courts, or agencies, because it is the state that is charged with interpreting

16  and enforcing state law.  *See, e.g.*, *In re Elliott*, 74 Wash. 2d 600, 602 (1968) ("state courts are not

17  bound by federal court interpretations of state statutes").

18      7.    The Washington legislature has vested this Commission with the responsibility of

19  enforcing the Washington Gambling Act and interpreting the statute.  *Ass'n of Wash. Bus. v. Dep't of*

---

[2] The Terms of Use provide, in relevant part: "Virtual items may not be transferred or resold for commercial gain in any manner, including, without limitation, by means of any direct sale or auction service.  Virtual items may not be purchased or sold from any individual or other company via cash, barter or any other transaction.  Virtual items have no monetary value, and cannot be used to purchase or use products or services other than within the applicable Big Fish Offering.  Virtual items cannot be refunded or exchanged for cash or any other tangible value."

[3] Since at least 2013, BFC allows a player to "gift" virtual chips to another player within the games through use of virtual gold bars that are obtained through play or purchased within the games.  Vella Decl. ¶ 6.  Neither the gifting player nor Big Fish Games receives any financial compensation when virtual chips are gifted.  *Id.*

[4] The *Kater* case is an action against Churchill Downs, Inc., a predecessor owner of Big Fish Games.

*Revenue*, 155 Wash. 2d 430, 440 (2005) (Washington state agency has authority to interpret statutes it enforces). The Washington legislature has charged the Commission with, among other things, the "power to enforce" the "penal laws of [the] state relating to the conduct of or participation in gambling activities." RCW 9.46.210(3).  The legislature also charged the Commission with "adopt[ing] such rules and regulations as are deemed necessary to carry out the purposes and provisions of" the Washington Gambling Act.  RCW 9.46.070(14).  This law enforcement authority of the Commission includes the authority to interpret the scope of Washington's gambling statute.  *See Ass'n of Wash. Bus.*, 155 Wash. 2d at 440.

8.      Washington State's governing legal principles of statutory construction, the state legislature's purpose in enacting the Washington Gambling Act, and Washington State judicial precedent compel the conclusion that playing BFC games, and similar online social games, does not constitute gambling within the meaning of state law.  The Commission should enter a declaratory order to that effect, consistent with the long-standing understanding and application of state law.

## THE PETITION SATISFIES THE REQUIREMENTS FOR THE ISSUANCE OF A DECLARATORY ORDER

9.      This Petition satisfies the requirements for issuance of a declaratory order.  The Commission's regulations provide that "[a]ny person may petition the commission for a declaratory order with respect to the applicability to specified circumstances of a rule, order, or statute enforceable by the agency."  Wash. Admin. Code § 230-17-180(1).  "The petition must . . . show:

(a)     That uncertainty necessitating resolution exists; and

(b)     That there is actual controversy arising from the uncertainty such that a declaratory order will not be merely an advisory option; and

(c)     That the uncertainty adversely affects the petitioner; and

(d)     That the adverse effect of uncertainty on the petitioner outweighs any adverse effects on others or on the general public that may likely arise from the order requested."

*Id.*

10.     Uncertainty exists necessitating resolution as to whether playing BFC games constitutes gambling within the meaning of the Washington Gambling Act.  Until recently, game owners and

players relied on the long-standing understanding, consistent with the enforcement practices and public

guidance of the Commission (including in a publication issued in 2014, *see* Rubman Decl. ¶ 2, Exh. A),

that BFC games and similar online games, *i.e.,* games where virtual tokens that are received by players

have no real-world value and cannot be cashed out, do not constitute gambling under Washington law.

In March 2018, however, a federal court, in attempting to interpret Washington state law, set forth a

reading of state law that creates uncertainty necessitating resolution for Petitioner concerning its BFC

games. *See https://www.wsgc.wa.gov/news/press-releases/directors-statement-regarding-ninth-circuit-court-appeals-published-decision* (describing uncertainty and confusion created by federal court

opinion).

11.     An actual controversy arises from this uncertainty such that the declaratory order

Petitioner seeks will not be merely an advisory opinion.  The actual controversy over whether BFC

games, owned by Petitioner, constitute gambling under the Washington Gambling Act, in light of the

specific factual circumstances that the BFC games present, can be addressed through a declaratory order

that applies to these specific factual circumstances.[5]

12.     The uncertainty adversely affects Petitioner Big Fish Games, which must determine steps

necessary for regulatory compliance associated with BFC games, as the owner of BFC.[6]

13.     The adverse effect of the uncertainty on Big Fish Games far outweighs any adverse

effects on others or on the general public that could arise from the order requested.  The public will

---

[5] *See*, in the context of the Washington Utilities and Transportation Commission applying its comparable regulations, *In re Sea Breeze Pac. Juan De Fuca Cable, LP*, 2005 WL 3529315 (Wash. UTC Nov. 3, 2005) ("The petition demonstrates an actual controversy, showing that resolution of the issue is needed to avoid regulatory confusion . . . ."); *compare In re Seatac Shuttle, LLC*, 2012 WL 6513392, at *2 (Wash. UTC Dec. 11, 2012) (petitioner's "request that we disregard [specific] facts and provide only generic guidance on [statutory] terms . . . seeks an advisory opinion" and fails actual controversy requirement).

[6]  *See In the Matter of Petition of Microsoft Corp. for Declaratory Order* (Wash. State Gambling Comm'n) (Nov. 14, 2014) (declaratory order entered to resolve uncertainty that adversely affected petitioner by preventing sale of certain online advertising); *see also*, in the context of the Washington Utilities and Transportation Commission applying its comparable regulations, *In re Bonneville Power Admin.*, 2007 WL 1472218 (Wash. UTC May 16, 2007) ("The uncertainty has an adverse effect on Bonneville by presenting a potential barrier to completion of the facilities."); *In re Pac. Power & Light Co.*, 2014 WL 345665, at *3 (Wash. UTC Jan. 29, 2014) ("the resulting uncertainty adversely affects the Company in the form of a potential enforcement action").

1 | benefit from the requested declaratory order.  It is in the public's interest to have uncertainty resolved as
2 | to BFC games, which are widely enjoyed by many players as a form of entertainment.  More than
3 | 865,000 installations of BFC have come from an IP address geo-located in the state of Washington, and
4 | there have been more than 100,000 such installations in the past twelve months.  Vella Decl. ¶ 7.  A
5 | stated purpose of the Washington Gambling Act is to "avoid restricting participation by individuals in
6 | activities and social pastimes, which . . . are more for amusement rather than for profit, do not
7 | maliciously affect the public, and do not breach the peace."  RCW 9.46.010.  Throughout the state of
8 | Washington, the social games industry (which includes a variety of online free-to-play video games with
9 | various virtual items of no real-world value) is estimated by the Entertainment Software Association to
10 | employ more than 6,000 people in Washington.  *See* Entertainment Software Association, *Video Games*
11 | *in the 21st Century, The 2017 Report*, at p. 13, Table C-3: "U.S. Game Company Employment by State;
12 | Top Seven States", http://www.theesa.com/wp-content/uploads/2017/02/
13 | ESA_EconomicImpactReport_Design_V3.pdf. (excerpt attached as Exh. B to Rubman Decl. ¶ 3)

### THE COMMISSION SHOULD ENTER A DECLARATORY ORDER THAT BIG FISH CASINO GAMES DO NOT CONSTITUTE GAMBLING WITHIN THE MEANING OF THE WASHINGTON GAMBLING ACT

16 |     14.    The Commission should enter a declaratory order that BFC games do not constitute
17 | gambling within the meaning of Washington law because BFC games can be played for free, the virtual
18 | tokens provided within the games cannot be redeemed for cash and have no real-world value and, thus,
19 | BFC games are not played for profit.  BFC games are a quintessential example of games played for
20 | entertainment.

21 |     15.    The Washington Gambling Act defines "gambling" to mean "staking or risking
22 | something of value upon the outcome of a contest of chance or a future contingent event not under the
23 | person's control or influence, upon an agreement or understanding that the person or someone else will
24 | *receive something of value* in the event of a certain outcome."  RCW 9.46.0237 (emphasis added).  The
25 | Act defines thing "of value" to mean "any money or property, any token, object or article exchangeable
26 | for money or property, or any form of credit or promise, directly or indirectly, contemplating transfer of
27 | money or property or of any interest therein, or involving extension of a service, entertainment or a
28 | privilege of playing at a game or scheme without charge."  RCW 9.46.0285.

16.     That statutory definition of thing "of value" includes four categories that are separately described as follows:  (1) "any money or property"; (2) "any token, object or article exchangeable for money or property"; and (3) "any form of credit or promise, directly or indirectly, contemplating transfer of money or property or any interest therein" or (4) "any form of credit or promise, directly or indirectly, . . . involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge." RCW 9.46.0285.

17.     The virtual tokens in BFC games do not fall within any of the four categories of that statutory definition of thing "of value."  First, they are not "money or property."  Second, they are not "exchangeable for money or property."  BFC's terms of use, to which game players must agree, explicitly state that "[v]irtual items cannot be refunded or exchanged for cash or any other tangible value."  *See*, note 2, *supra* (setting out other relevant terms of use); note 1, *supra* (incorporating by reference).  Third, the virtual tokens are not a form of credit "contemplating transfer of money or property or any interest therein."  The BFC terms of use explain that "[v]irtual items may not be transferred or resold for commercial gain in any manner, including, without limitation, by means of any direct sale or auction service." *Id.*  The terms of use further specify that "[v]irtual items may not be purchased or sold from any individual or other company via cash, barter or any other transaction." *Id.*  And the terms unequivocally state that "[v]irtual items have no monetary value, and cannot be used to purchase or use products or services other than within the applicable Big Fish Offering." *Id.*

18.     Fourth, BFC virtual tokens are not a "form of credit" involving "extension of . . . entertainment or a privilege of playing at a game or scheme without charge."  That textual qualification of "without charge" means that a "form of credit" is a thing of value *only if* it is a credit for playing at a game for which there would *otherwise be a "charge"* to play. But BFC games are free to play, they automatically provide virtual tokens at the commencement of play, they provide additional virtual tokens automatically at frequent, regular intervals, and the virtual tokens cannot be cashed out and they have no real-world value.  Thus, virtual tokens in BFC cannot somehow constitute an extension of entertainment or privilege of playing a game "without charge," because there is no "charge" required to play the games.  Virtual tokens in BFC therefore do not constitute a thing "of value" within the meaning of the Washington Gambling Act, RCW 9.46.0285, RCW 9.46.0237.

1    19.    Petitioner's understanding of the plain meaning of the statutory text is required by

2    Washington state law's fundamental principles of statutory interpretation.  Washington statutory

3    provisions must be interpreted according to the principle of *noscitur a sociis*, which means that one term

4    in a group must be interpreted within the context of the other terms in the group and precludes

5    interpretation of one of the terms in such a broad manner that it is inconsistent with the other terms.  *See*

6    *Wright v. Jeckle*, 158 Wash. 2d 375, 381 (2006) ("'[A] word is known by the company it keeps.'")

7    (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)); *State v. Roggenkamp*, 153 Wash. 2d 614,

8    623 (2005) ("[T]he meaning of words may be indicated or controlled by those with which they are

9    associated.") (citation omitted).

10    20.    This statutory interpretation doctrine means that the fourth category in the definition of

11    thing "of value" in RCW 9.46.0285 cannot be construed so broadly as to be inconsistent with the other

12    three categories.  The first three categories expressly include only things that are monetized in the real

13    world, *i.e.*, things that are, or may be exchanged or transferred for, "money," "property," or a property

14    interest.  Those categories all include only things of real-world value—things of worth outside the

15    virtual game being played.  As such, the fourth category, properly interpreted in the context of the first

16    three categories, is appropriately understood to be limited to things that have real-world value as well,

17    and not to extend to virtual tokens that cannot be redeemed for cash and have no real-world value, but

18    are of use only within a virtual game.  To extend the fourth category to include such virtual items would

19    be wholly inconsistent with the limitation to real-world value that underpins the value concept being

20    defined and would render the thing "of value" limitation meaningless.

21    21.    Washington statutory provisions must also be interpreted according to the principle of

22    *ejusdem generis*, which requires that general terms in a statute that are connected to specific terms in a

23    sequence are to be interpreted and given effect only to the extent that the general terms include items

24    that are similar to those included by the specific terms.  *See Davis v. Dep't of Licensing*, 137 Wash. 2d

25    957, 970, 977 P.2d 554 (1999) ("'[S]pecific terms modify or restrict the application of general terms

26    where both are used in sequence.'") (citation omitted) (quoting *Dean v. McFarland*, 81 Wash. 2d 215,

27    221 (1972); *see also In re Estate of Jones*, 152 Wash. 2d 1, 11 (2004).  Because the first three

28    categories listed in the statutory definition of thing "of value" are all directed to things of value in the

real world, this statutory interpretation doctrine means that the fourth category must be limited in similar fashion to exclude virtual tokens that are used only for entertainment within the online game itself, but cannot be cashed in for money and have no real-world value like money, property, or a property interest.

22.     Petitioner's interpretation of the statute supports "the legislative intent in the context of the *whole* statute and its general purpose." *City of Seattle v. State*, 136 Wash. 2d 693, 701 (1998) (citation omitted). The Washington state legislature specified that its intent when enacting the Washington Gambling Act was "to keep the criminal element out" of gambling, in particular "organized crime," and to restrain "professional" gambling, but "at the same time," to "avoid restricting participation by individuals in activities and social pastimes, which . . . are more for amusement rather than for profit, do not maliciously affect the public, and do not breach the peace." RCW 9.46.010.

23.     Petitioner's interpretation of the statute is further confirmed by the requirement of Washington law that any ambiguity in the statute be construed narrowly under the rule of lenity. The rule of lenity requires that any ambiguity in a Washington statute that imposes penal or criminal sanctions be interpreted in the manner most favorable to the party that may be accused of violating the law; in other words, in the manner that limits rather than expands potential criminal liability. *State v. Roberts*, 117 Wash. 2d 576, 586 (1991). The rule applies to any statute imposing penal or criminal sanctions, including in a case that is "civil in form." *Kahler v. Kernes*, 42 Wash. App. 303, 308 (1985) ("As it is a penal statute, although civil in form, we *must* adopt the interpretation most favorable to [the party facing penalty]." (emphasis added)). The statutory definitions of "gambling" and "[t]hing of value," RCW 9.46.0237, 9.46.0285, which are at issue here, give rise to criminal penalties under multiple provisions of the Washington Gambling Act that incorporate those definitions. *See, e.g.*, RCW 9.46.160 (prescribing "class B felony"), 9.46.198 (prescribing "gross misdemeanor"). Thus, these definitions must be interpreted narrowly, as set forth above, such that BFC games do not constitute gambling under the Washington Gambling Act. The Commission should avoid a broader interpretation that would greatly expand criminal liability under state law.

24.     The Washington Court of Appeals' interpretation of the Washington Gambling Act also supports this interpretation. In *Bullseye Distributing LLC v. State Gambling Commission*, the Court of Appeals ruled that playing the video slot machine at issue there was "gambling" because "[i]f a person

accumulate[d] a predetermined target number of prize points, he . . . won the game *and [could] redeem the prize target for cash or merchandise*." 127 Wash. App. 231, 236 (2005) (emphasis added).  In so holding, the Court of Appeals affirmed a declaratory order by the Commission that had reached the same conclusion.  *Id.* at 233-34; *In re Bullseye Distributing LLC*, No. 2002-GMB-0028 (Wash. State Gambling Comm'n 2003).  Here, the key fact that a prize be redeemable for cash or real-world merchandise does not exist.  Accordingly, because the virtual tokens in the BFC games cannot be redeemed for cash and have no real-world value, there is no thing "of value" within the meaning of the Washington Gambling Act, RCW 9.46.028; RCW 9.46.0237.

    25.    Petitioner's requested statutory interpretation also is consistent with the long-standing enforcement practices of the Commission as well as Commission guidance, published in 2014, which sets forth the interpretation discussed above and makes clear that games like BFC games do not constitute gambling under Washington law.  Since March, 2014, the pertinent brochure, entitled *Online Social Gaming: When is it legal? What to Consider*, has provided the authoritative direction to game players and owners with respect to permissible conduct under Washington law.  *See* Rubman Decl. ¶ 2, Exh. A.  The brochure covers a broad swath and ever-expanding range of online video games, "from tending a farm to playing a soldier in combat."  The brochure makes clear that games that "give free virtual money to begin play," and allow additional virtual items to be purchased to continue or enhance play, are not gambling under Washington law where such virtual items cannot be cashed in or redeemed for "'real' money or prizes." *Id.*  The brochure states that such games are "OK To Play." *Id.*  The issuance of the brochure followed a public Commission hearing the previous year where there was a presentation that reviewed features of several games, including BFC.

    26.    Petitioner Big Fish Games, game players, owners of similar games, and others have relied for years on the above-described interpretation and enforcement practices by the State.

    27.    The federal court opinion that created the uncertainty here poses no barrier to this petition because it does not control the interpretation of state law by this Commission.  *See In re Elliott*, 74 Wash. 2d at 602.  And the interpretation set forth in the opinion, *Kater v. Churchill Downs*, 866 F.3d 784 (9th Cir. 2018) is, in any event, flawed for the reasons set forth in this petition.  That court's interpretation was premised on a limited record at the motion to dismiss stage, and the court declined to

consider the fact that game users receive additional chips automatically at various points that allow

gameplay without cost; the court viewed the record at that point not to include such an allegation.  The

trial court whose dismissal of the complaint was reversed on that basis, had viewed the record

differently and correctly applied state law to conclude that the virtual chips in BFC games are not things

"of value" under the Washington Gambling Act. *Kater v. Churchill Downs,* No. C15-612, 2015 WL

9839755 (W.D. Wash. Nov. 19, 2015).

## PRAYER FOR RELIEF

28.     For the reasons set forth above, Big Fish Games respectfully requests the Commission

enter a declaratory order confirming that BFC games do not constitute gambling within the meaning of

the Washington Gambling Act, RCW 9.46.0237, because virtual tokens in the games cannot be

redeemed for cash and have no value in the real world, and thus the games are not subject to the

Commission's regulation or enforcement jurisdiction.[7]

Respectfully submitted, this 3rd day of July 2018.

By:     /s/ Matthew R. Berry

Beth Brinkmann (DC Bar No. 477771)[8]        Matthew R. Berry (WSB No. 37364)
Gary M. Rubman (DC Bar No. 474964)           SUSMAN GODFREY LLP
COVINGTON & BURLING LLP                      1201 Third Avenue, Suite 8300
One CityCenter                               Seattle, WA 98101
850 10th Street, NW                          mberry@susmangodfrey.com
Washington, DC 20001-4956                    Tel (206) 373-7394
bbrinkmann@cov.com                           Fax (206) 516-3883
grubman@cov.com

---

[7] Alternatively, if the Commission is not prepared to issue a declaratory order based on the petition at this time, Petitioner requests a hearing and opportunity for briefing on the matter.  Petitioner can make itself available, at the Commission's request, to present a demonstration of BFC games.

[8] Ms. Brinkmann and Mr. Rubman are appearing pursuant to WAC 230-17-045(3) (allowing appearances by attorneys "entitled to practice before the highest court of record of any other state, if Washington attorneys are permitted to appear before administrative agencies of the other state, and if not otherwise prohibited by our state law").

1   Tel (202) 662-5312
    Fax (202) 778-5312
2                                       *Counsel for* BIG FISH GAMES, INC.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**VERIFICATION**

2    1.    I am counsel for Petitioner Big Fish Games, Inc. in this matter.

3    2.    I have reviewed the foregoing petition and on my own personal knowledge, except those

4    facts set forth in the accompanying Declaration of Andy Vella, I know that the facts therein are true.

5    I certify that the foregoing statements made by me are true.  I certify that if any of the foregoing

6    statements made by me are willfully false, I am subject to punishment.

7

8                                        COVINGTON & BURLING LLP

9

10                            By:   ___/s/ Beth Brinkmann_____

11                                  Beth Brinkmann
                                    One CityCenter
12                                  850 10th Street, NW
                                    Washington, DC 20001-4956
13                                  bbrinkmann@cov.com
                                    Tel (202) 662-5312
14                                  Fax (202) 778-5312

15                                  *Counsel for*
                                    BIG FISH GAMES, INC.
16

17    Dated:  July 3, 2018

18

19

20

21

22

23

24

25

26

27

28

1    **BEFORE THE WASHINGTON STATE GAMBLING COMMISSION**

2

3    In the Matter of the Petition of Big Fish Games,          Matter No.:
4    Inc. for a Declaratory Order
                                                               **DECLARATION OF GARY RUBMAN IN**
5                                                              **SUPPORT OF BIG FISH GAMES, INC.'S**
                                                               **PETITION FOR A DECLARATORY**
6                                                              **ORDER**

7

8

9    I, Gary Rubman, hereby declare as follows:

10          1.      I am a partner at the law firm of Covington & Burling LLP, counsel to Big Fish

11   Games, Inc. ("BFG"). I make this declaration based on my personal knowledge.

12          2.      Attached as Exhibit A is a true and correct copy of a brochure published by the

13   Washington State Gambling Commission, entitled *Online Social Gaming: When is it legal, What to*

14   *Consider.* The brochure bears the mark "GC5-027 (3/14)" and my understanding is that it was

15   published in 2014 and was available on the website of the Washington State Gambling Commission

16   until recently.

17          3.      Attached as Exhibit B is a true and correct copy of an excerpt of a report

18   published by the Entertainment Software Association ("ESA"), entitled *Video Games in the 21st*

19   *Century, The 2017 Report.* The full report is available on the ESA's website at

20   http://www.theesa.com/wp-content/uploads/2017/02/ESA_EconomicImpactReport_Design_V3.pdf (last

21   accessed July 3, 2018).

22

23          I declare under the penalty of perjury under the laws of the United States that the

24   foregoing is true and correct. This declaration is executed this 3rd day of July, 2018, in Washington,

25   DC.

26

27                                                              Gary Rubman

28

DECLARATION OF GARY RUBMAN IN SUPPORT OF BIG FISH GAMES, INC.'S PETITION FOR A DECLARATORY ORDER

# Exhibit A



**Get the facts to know the way to go.**
Warning signs you may be playing on, or operating, an illegal Social Gaming website in Washington State:

- There is no way to play for free.

- The prize can be sold or redeemed for "real" money.

- Players must:
  - Pay "real" money to play.

  - Give banking information to collect a prize.

  - Call to start play.

  - Disclose personal information, such as a credit card number, social security number, etc.



## Washington State Gambling Commission

### Who We Are
- The Commission was created in 1973 to regulate and control authorized and illegal gambling activities (RCW 9.46).
- We are a law enforcement, regulatory and licensing agency.

### What We Do
- We license and regulate all authorized gambling in the state, except for horse racing and the State Lottery.
- We investigate and control unauthorized and illegal gambling activities.

### Our Mission
Protect the Public By Ensuring That Gambling is Legal and Honest.

Learn more about us at wsgc.wa.gov

 WAGambling



*This brochure gives general guidance.*
You should contact an attorney if you have questions or are unsure whether a game has the *3 elements* of gambling.

You may also contact us at:
(360) 486-3463
(800) 345-2529, ext. 3463
FAX (360) 486-3631
E-mail: AskUs@wsgc.wa.gov
Mail:  P.O. Box 42400, Olympia, WA 98504-2400

Photos are ©iStockphoto by the following artists: *Cover* MerveKarahan / *Laptop user* gremlin, / *blindfolded man* DNY59, / *@coin* geopaul, / *no cash value coin* DNY59, / *treasure chest* bphillips.

GC5-027 (3/14)



# Online Social Gaming

### When is it legal?
### What to Consider

## Let's play a game



### What is Social Gaming?

The Oxford dictionary defines **Social Gaming** as the activity or practice of playing an online game on a social media platform, with a major emphasis on friends and community involvement.

Social Gaming ranges from tending a farm to playing a soldier in combat. Ideas for new games are constantly thought up. Some popular social games involve:
- Role playing;
- Adventure;
- Arcade style games; and
- Casino style games.

Social Gaming is growing at an unprecedented rate and with it comes questions. This brochure gives general guidance to help you determine if you are playing on, or operating, a legal Social Gaming website in Washington State.

*"Real" money = Legal tender, U.S. Currency.*



### Is Social Gaming Legal in Washington?
Social Gaming is legal in Washington State if no gambling takes place.

### What is Gambling?
Gambling involves *3 elements:*
1. Prize;
2. Consideration (something of value, wager, fee to play); and
3. Chance.

*Legal*: If one of the *3 elements* of gambling is removed, the game is not gambling.
Things to keep in mind, to keep it legal:
- There must be a way to play for free.
- If "real" money can be used to enhance or extend play, there must be no prize.

*Illegal*: If a Social Game has the *3 elements* of gambling, it is illegal and cannot be played, or operated, in Washington State. It is illegal to solicit Washington residents to play illegal Social Games.

*Website's Rules of Play:*
- If you are thinking about participating in a Social Game, read the website's Rules or Terms of Use to determine if one of the *3 elements* of gambling is removed.
- Website operators should clearly state in their Rules that virtual money, points, and other items cannot be sold or redeemed for "real" money or prizes.

Washington State law defines gambling as:

"staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence, upon an agreement or understanding that the person or someone else will receive something of value in the event of a certain outcome." (RCW 9.46.0237)

### No Prize = No Gambling = OK To Play

*Buying virtual money:*
Many Social Gaming websites give free virtual money to begin play, with an option to buy more virtual money with "real" money to continue play. All play uses this virtual money. 

Legal Social Gaming websites will not let players cash in their virtual winnings or points for "real" money or prizes.

 Because there is no prize, these games are **not** gambling. However, if the virtual money can be sold or redeemed for "real" money or a prize, the game is illegal.

*Buying virtual prizes, avatars & tools:*
If a player spends "real" money for a virtual prize, avatar or tool to assist with game play and these items cannot be sold or redeemed for "real" money or a prize, it's **not** gambling.

For example, let's say a player uses "real" money to purchase a key to open a chest containing a rare item that the player's character can use to advance their position in the game.

Even though "real" money is used to buy a key to get a rare item, neither the key or rare item have any real-world value because they cannot be sold or redeemed for "real" money. Because there is no prize, it's **not** gambling.

# Exhibit B




esa — entertainment software association

# VIDEO GAMES
## IN THE 21ˢᵀ CENTURY

**THE 2017 REPORT**

**BY STEPHEN E. SIWEK**

www.theESA.com

© 2017 Entertainment Software Association

# EXECUTIVE SUMMARY

*Video Games in the 21st Century: The 2017 Report* measures the economic contributions made by the U.S. entertainment software industry to the American economy. *The 2017 Report* updates and expands upon earlier studies that quantified the economic benefits provided by the entertainment software industry to the U.S economy as a whole[12]. *The 2017 Report* concludes that:

- Total video game software sales exceeded **$24.5 billion in 2016.**
- In 2015, there were **2,457 video game companies operating at 2,858 locations in all 50 states.**
- The total direct employment by the U.S. game industry now exceeds **65,000 employees.**
- The total employment that depends on the game software industry **now exceeds 220,000.**
- Between 2012 and 2014, the number of game company locations **grew at an annual rate of 14.1%.**
- Between 2013 and 2015, direct employment in the U.S. game company industry **grew at an annual rate of 2.9%.**
- In 2015, the average annual compensation per employee (wages, salaries and employer contributions for pensions, insurance and government social insurance) **was about $97,000.**
- The U.S. game company industry's value added to U.S. GDP was more than **$11.7 billion in 2015**.
- The real annual growth rate of the U.S. game software industry's **value added was 3.7%** for the period 2013-2015.

---

[1] Siwek, Stephen E., *Video Games in the 21st Century: Economic Contributions of the U.S. Entertainment Software Industry,* Entertainment Software Association (2007).

[2] Siwek, Stephen E., *Video Games in the 21st Century: The 2010 Report,* Entertainment Software Association (2010).

# INTRODUCTION

The U.S. industry that develops and publishes video game software continues to create wholly new forms of entertainment for consumers worldwide. The industry also generates sales in the billions of dollars and creates thousands of American jobs.

This publication, *Video Games in the 21st Century: The 2017 Report*, presents a number of statistical measures that quantify the economic contributions of the video game industry. This report is the third economic impact study prepared for the Entertainment Software Association ("ESA"), the trade association that represents the U.S. video game industry.[3] The basic methods used in this report were originally described in one or both of the previous ESA studies. In this study however, there is a significant change in the underlying data used to measure the economic impact of the video game industry. Unlike previous ESA studies, the source references used in this analysis were compiled directly from game company data bases and social media websites. While the basic structure of the economic impact study has not materially changed, the inclusion of data from the ESA Geographic Impact Report has had more dramatic effects on the overall estimates presented here. ESA obtained this information from multiple different data bases/websites, including Steam, Kickstarter, International Game Developers Association, Giant Bomb, and LinkedIn.

ESA's reliance on multiple research sources is commendable. Since its origin, the video game industry has not been subject to extensive regulation of its companies or its employees. With less regulation, there have been fewer demands for the industry to gather and publish industry data and studies. For these reasons, neither the federal government nor the industry itself has invested in creating a comprehensive data base of video game companies. However, with the publication of the ESA's Geographic Impact Report, that condition has changed.

ESA's Geographic Impact Report quantifies industry statistics on geographic volume, employment and growth. The study identifies 2,457 game companies that function at 2,858 locations. Approximately 80% of these companies were game developers while nearly 95% were founded in the United States. Significantly, video game companies are located in all 50 states.

---

[3] The previous studies were: Siwek, Stephen E., *Video Games in the 21st Century: Economic Contributions of the U.S. Entertainment Software Industry*, Entertainment Software Association (2007) and Siwek, Stephen E., *Video Games in the 21st Century: The 2010 Report*, Entertainment Software Association.

In addition to the data collected by ESA, many of the statistical measures included in this report either were taken directly from U.S. government sources, such as the U.S. Census Bureau or Bureau of Economic Analysis, or were derived using public data from those sources. A basic difficulty that continues to arise when using U.S. government data is that many (but not all) of the most relevant statistics measure only aggregated industry groupings such as software publishing. Largely for this reason, certain estimates presented in this report were derived using statistical data for broader industry groupings than video game publishing. Subsequently, where possible, these broader measures were adjusted to better reflect the known characteristics of the video game industry.



# III. U.S. EMPLOYMENT IN GAME PUBLISHING AND DEVELOPMENT

Employees in the U.S. video game industry may work in small game developer shops or in large game publishing companies with thousands of employees. They may be employed as programmers, arts and animation specialists, game designers, game production experts, quality assurance personnel, audio specialists, legal staff members or business and marketing personnel. Developers may specialize in games for specific types of platforms including mobile, handheld and online media.

In the video game industry, online company data bases and social media sites are available to researchers seeking to access or create their own data compilations. In this analysis, ESA used a variety of such tools to compile its own data base of video game companies. Within that data base, ESA collected data that focused on industry companies and employment. ESA's video game statistics were also collected at the levels of U.S. states, congressional districts and Metropolitan Statistical Areas ("MSAs").

The video game data compiled in the ESA Geographic Impact Report proved to be an important resource for the measurement of video game contributions to the U.S. economy. Data on U.S.-based publisher and developer locations from ESA's Geographic Impact Report data bases were used to estimate the number of workers now employed in the industry.

As shown in Table C-1, in the United States, there are at least 2,332 game developer locations across all 50 states plus the District of Columbia. There are also 526 publisher locations across 44 states. In total, there are at least 2,858 game company locations.

## TABLE C-1: U.S. GAME COMPANY DEVELOPERS AND PUBLISHERS

| TYPE OF COMPANY | LOCATIONS | STATES |
|-----------------|-----------|--------|
| DEVELOPER | 2,322 | 51 |
| PUBLISHER* | 526 | 44 |
| ALL COMPANIES | 2,858 | 51 |

\* Publishers also include Hardware/Software Manufacturers, Service Providers, and Distributors.

Source: ESA Mapping Project Data.

Table C-2 shows the number of workers employed by these companies. As reported in Table C-2, there are now at least 65,678 workers directly employed at game software publisher and developer locations in the United States.[5] Of this total, 28,556 workers are directly employed at game publishing companies while 37,122 people now work directly for U.S.-located game developer firms.

## TABLE C-2: U.S. GAME COMPANY DIRECT EMPLOYMENT BY TYPE OF COMPANY

| TYPE OF COMPANY | LOCATIONS | STATES |
|---|---|---|
| DEVELOPER | 37,122 | 1,331 |
| PUBLISHER** | 28,556 | 351 |
| ALL COMPANIES | 65,678 | 1,682 |

\* 1,176 locations do not report employment data.

\*\* Publishers also include Hardware/Software Manufacturers, Service Providers, and Distributors.

Source: ESA Mapping Project Data.

The employee data shown in Table C-2 can also be disaggregated on a state-by-state basis. The total number of workers directly employed at game software publisher and developer firms in the industries' top seven states are shown in Table C-3. The states of California, Washington, Texas, New York, Illinois, Florida, and Massachusetts collectively employ 55,915 workers, or 85% of the total direct employment for the U.S. game software industry as a whole.

---

[5] Of the 2,858 game company locations included in the ESA data reported in Table C-1, 1,176 locations do not report employment data. This leaves 1,682 locations, as reported in Table C-2.



## TABLE C-3: U.S. GAME COMPANY EMPLOYMENT BY STATE
### TOP SEVEN STATES

| STATE | REPORTED EMPLOYMENT* | PERCENTAGE OF ALL EMPLOYEES |
|---|---|---|
| CALIFORNIA | 35,325 | 54% |
| WASHINGTON | 6,166 | 9% |
| TEXAS | 4,883 | 7% |
| NEW YORK | 4,675 | 7% |
| ILLINOIS | 1,727 | 3% |
| FLORIDA | 1,676 | 3% |
| MASSACHUSETTS | 1,463 | 2% |
| TOP 7 STATES | 55,915 | 85% |
| ALL OTHER STATES | 9,763 | 15% |
| ALL STATES | 65,678 | 100% |

*1,176 locations do not report employment data.

Source: ESA Mapping Project Data.

The employment figures presented in these tables refer to employees who work *directly* for entertainment software developers and publishers. However, any estimate of the number of workers who are directly employed in a given industry will not capture the full impact of that industry on the economy as a whole. The U.S. economy functions as an interlocking system where changes in supply and demand for one industry affect supply and demand in other industries as well.

The U.S. video game industry creates products that combine the skills of the industry's employees with other inputs of goods and services purchased from other industries. For example, a game developer may need to acquire a specific type of graphic design software from another firm in order to produce the game under development. Revenue from that purchase can be used to compensate employees at the firm that makes the graphic design software product. There would also be similar linkages to suppliers of the graphic design software firm and further linkages to those suppliers and on through the economy.

The U.S. government has developed a widely accepted mathematical model, known as the Regional Input-Output Modeling System ("RIMS II") that uses input-output relationships throughout the economy to capture these interlocking affects. The input-output relationships are industry specific and take the form of "multipliers." In this analysis, employment multipliers for the software publishing industry were obtained from the U.S. Bureau of Economic Analysis ("BEA") for all states where game software publishing employment had been located. These multipliers were applied to the direct game industry employee counts on a state-by-state basis. The weighted average multiplier across all states was 3.355. As shown in Table C-4, in 2015 the total direct and indirect employment for the U.S. video game industry as a whole was 220,332 people. 190,706 of these people were located in the top seven states shown in Table C-4, including 123,408 employees in California alone.

## TABLE C-4: U.S. GAME COMPANY DIRECT AND INDIRECT EMPLOYMENT BY STATE

| STATE | REPORTED DEVELOPER EMPLOYMENT | REPORTED PUBLISHER EMPLOYMENT** | REPORTED DIRECT EMPLOYMENT* | DIRECT + INDIRECT EMPLOYMENT |
|-------|-------------------------------|---------------------------------|------------------------------|-------------------------------|
| CALIFORNIA | 16,719 | 18,606 | 35,325 | 123,408 |
| WASHINGTON | 3,960 | 2,206 | 6,166 | 19,815 |
| TEXAS | 4,159 | 724 | 4,883 | 17,867 |
| NEW YORK | 1,916 | 2,759 | 4,675 | 13,522 |
| ILLINOIS | 1,547 | 180 | 1,727 | 5,917 |
| FLORIDA | 646 | 1,030 | 1,676 | 5,607 |
| MASSACHUSETTS | 1,270 | 193 | 1,463 | 4,570 |
| TOP 7 STATES | 30,217 | 25,698 | 55,915 | 190,706 |
| ALL OTHER STATES | 6,905 | 2,858 | 9,763 | 29,626 |
| ALL STATES | 37,122 | 28,556 | 65,678 | 220,332 |

* 1,176 locations do not report employment data.

** Publishers also include Hardware/Software Manufacturers, Service Providers, and Distributors.

Source: ESA Mapping Project Data.

**BEFORE THE WASHINGTON STATE GAMBLING COMMISSION**

| | |
|---|---|
| In the Matter of the Petition of Big Fish Games, Inc. for a Declaratory Order | Matter No.: |
| | **DECLARATION OF ANDY VELLA IN SUPPORT OF BIG FISH GAMES, INC.'S PETITION FOR A DECLARATORY ORDER** |

I, Andy Vella, hereby declare as follows:

1.      I am a Vice President and General Manager at Big Fish Games, Inc. ("BFG"). My responsibilities as General Manager include running all business and development operations for the video game Big Fish Casino ("BFC"). Prior to BFG, I worked as a Lead Engineer at Self Aware Games, the studio that created the suite of online video games that today make up BFC. For the past 6 years, my work has been dedicated to developing and enhancing BFC. I have extensive knowledge about BFC's engineering and operations, and I am deeply familiar with gameplay protocols and player user data. I make this declaration based on my personal knowledge and review of business records maintained in the ordinary course of my employment at BFG.

2.      BFC contains a suite of online video games that are casino-themed including, for example, virtual blackjack, poker, and roulette.

3.      Players use virtual tokens to play BFC, which are termed "chips" per the casino theme. Players may accumulate virtual chips in various ways. All new players currently receive 100,000 virtual chips automatically when they install BFC for free and create a username. Since at least 2013, additional virtual chips are distributed automatically to players at various times within the games. For example, players can obtain additional virtual chips through playing the game. Players receive additional virtual chips automatically on any day that they sign in to play. They receive additional virtual chips after they are logged into BFC for certain periods of time (*e.g.*, 30 minutes) and click or press to collect more virtual chips automatically. Players also receive additional virtual chips when their

Facebook friends install BFC, or, as of 2017, by joining a social club within BFC. Players may also purchase additional virtual chips.

4. Players cannot, and have never been able to, exchange or cash out BFC virtual chips for money, and the virtual chips have no value in the real world. Virtual chips can be used only within the games, such as to play the games or to obtain a virtual pet, cupcake, flag, or other virtual item.

5. Attached as Exhibit A is a true and correct copy of the Terms of Use that currently govern the use of BFC, dated November 30, 2017. The Terms of Use expressly forbid any transfer or sale of virtual items, including virtual chips, "for commercial gain."

6. BFC does not provide any mechanism for players to sell virtual chips to each other. Since at least 2013, BFC allows a player to "gift" virtual chips to another player within the game through the use of virtual "gold bars" that are obtained through play or purchased within the games. Neither the gifting player nor BFG receives any financial compensation when virtual chips are gifted.

7. BFG is headquartered in Seattle, Washington. More than 865,000 installations of BFC have come from an IP address geo-located in the State of Washington, and there have been more than 100,000 such installations in the past twelve months.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct. This declaration is executed this 3rd day of July, 2018, in Oakland, California.

Andy Vella

DECLARATION OF ANDY VELLA IN SUPPORT OF BIG FISH GAMES, INC.'S PETITION FOR A DECLARATORY ORDER

# EXHIBIT A

# Big Fish Terms of Use

Last modified: November 30, 2017

## AGREEMENT AND SERVICES

PLEASE READ THESE TERMS OF USE CAREFULLY, INCLUDING THE MANDATORY ARBITRATION PROVISION IN THE SECTION TITLED "DISPUTE RESOLUTION BY BINDING ARBITRATION," WHICH REQUIRES THAT DISPUTES ARE RESOLVED BY FINAL AND BINDING ARBITRATION ON AN INDIVIDUAL AND NOT A CLASS-WIDE OR CONSOLIDATED BASIS. IF YOU DO NOT WISH TO BE SUBJECT TO ARBITRATION, YOU MAY OPT OUT OF THE ARBITRATION PROVISION BY FOLLOWING THE INSTRUCTIONS PROVIDED AT THE END OF THE SECTION TITLED "DISPUTE RESOLUTION BY BINDING ARBITRATION."

BY ACCESSING OR USING ANY BIG FISH OFFERING, YOU AGREE TO BE BOUND BY THESE TERMS OF USE AND ALL TERMS INCORPORATED BY REFERENCE. IF YOU DO NOT AGREE TO THESE TERMS OF USE IN THEIR ENTIRETY, DO NOT USE ANY BIG FISH OFFERINGS.

Big Fish Games, Inc. and/or its Affiliates provide access to the Big Fish Offerings subject to the conditions set forth in these Terms of Use. For purposes of these Terms of Use, the term **"Affiliates"** means, with respect to any party, any person or entity which controls, is controlled by, or is under common control with, such party, and the term **"Big Fish Offerings"** means the web sites of Big Fish, including www.bigfishgames.com, any other sites on which these Terms of Use are posted, and any other Big Fish application, service or product licensed, downloaded or otherwise accessed by you through third party sites or sources, including the products and services available through any of the foregoing.

THESE TERMS OF USE ARE ENTERED INTO BETWEEN YOU AND BIG FISH GAMES, INC. THE TERM **"BIG FISH"** MEANS BIG FISH GAMES, INC. ALONG WITH ITS AFFILIATES. Your use of the Big Fish Offerings constitutes your express acceptance without reservation of these Terms of Use.

Use of the Big Fish Offerings is also governed by our Privacy Policy and any other terms of use applicable to services you register to use within a Big Fish Offering, including any amendments or updates thereto.

Use of the Big Fish Software, as hereafter defined, is governed by the Big Fish Games, Inc. End User license.

Without limiting the foregoing, each of your Big Fish Offering account(s) (each a "Big Fish account"), if applicable, and participation in any Big Fish Offerings are governed by these Terms of Use. The Big Fish Offerings are always evolving, so it is important that you periodically check these Terms of Use, as well as the specific rules for any games or activities in which you

choose to participate, for updates. Big Fish reserves the right to change or modify these Terms of Use at any time and in our sole discretion. If Big Fish makes changes to these Terms of Use, we will provide notice of such changes, such as (by way of example only) by providing notice through the Big Fish Offerings or updating the "Last Modified" date at the top of these Terms of Use. If we revise these Terms of Use, such revision(s) will take effect immediately such notice. Your continued access or use of any Big Fish Offering constitutes your acceptance of the revised Terms of Use. We encourage you to frequently review these Terms of Use to ensure that you understand the terms and conditions that apply to your use of the Big Fish Offerings. If you do not agree to any of these Terms of Use, you should discontinue using or participating in any and all Big Fish Offerings. If there is a conflict between these Terms of Use and any other rules or instructions posted within a Big Fish Offering, these Terms of Use will control.

## ACCOUNT REGISTRATION

If you create a Big Fish account within any Big Fish Offering, you must provide truthful and accurate information to us in creating such account. If Big Fish has reasonable grounds to suspect that you have provided any information that is inaccurate, not current or incomplete, Big Fish may suspend or terminate your ability to use or access a Big Fish Offering, and refuse any and all current or future use of or access to any or all Big Fish Offerings (or any portion thereof).

Big Fish requires all users to be over the age of thirteen (13). If you are between the ages of thirteen (13) and eighteen (18), you may create a Big Fish account or use the Big Fish Offerings only under the supervision of a parent or legal guardian who agrees to be bound by these Terms of Use.

Big Fish reserves the right to limit the number of accounts a user can establish. This limit may change over time in our sole discretion.

You are solely responsible for all activity on any and all of your Big Fish account(s) and for the security of your computer system. You should not reveal your username or password to any other person. Big Fish will not ask you to reveal your password. If you forget your password, you can request to have a new password sent to your registered e-mail address. You agree to indemnify and hold Big Fish and their respective employees, contractors, officers, directors, shareholders, agents, representatives, vendors, and content providers harmless for any improper or illegal use of any of your Big Fish account(s). This includes illegal or improper use by someone to whom you have given permission to use your Big Fish account(s) or whom you have negligently allowed to access your Big Fish account(s). Big Fish reserves the right to terminate your Big Fish account(s) if any activity that occurs with respect to such account(s) violates these Terms of Use.

## ELECTRONIC COMMUNICATIONS

When you access a Big Fish Offering, send e-mails or electronically chat with Big Fish, you are communicating with us electronically. You consent to receive communications from us electronically. We will communicate with you by e-mail or by posting notices in the Big Fish

Offerings. You agree that all agreements, notices, disclosures and other communications that Big Fish provides to you electronically satisfy any legal requirement that such communications be in writing.

# VIRTUAL ITEMS

Certain Big Fish Offerings may provide you with the opportunity to license a variety of virtual items such as virtual currency, virtual goods, additional levels and content packs ("virtual items") that can be used while playing the Big Fish Offering. You may be required to pay a fee to obtain virtual items. When you use virtual items within a Big Fish Offering, any virtual items that you have purchased will be deemed used before any virtual items that you have earned.

You have no property interest in any virtual items. Any purchase of virtual items, and virtual items accumulated through any applicable Big Fish Offering membership benefits, are purchases of a limited, non-transferable, revocable license to use those virtual items within the applicable Big Fish Offering. Virtual items may not be transferred or resold for commercial gain in any manner, including, without limitation, by means of any direct sale or auction service. Virtual Items may not be purchased or sold from any individual or other company via cash, barter or any other transaction. Virtual items have no monetary value, and cannot be used to purchase or use products or services other than within the applicable Big Fish Offering. Virtual items cannot be refunded or exchanged for cash or any other tangible value.

Big Fish may manage, regulate, control, modify or eliminate your virtual items in our sole discretion, and Big Fish will have no liability to you or anyone for exercising those rights. In addition, all virtual items are unconditionally forfeited if your Big Fish Offering account is terminated or suspended for any reason, in Big Fish's sole discretion, or if Big Fish discontinues any Big Fish Offering or any portion or feature of any Big Fish Offering.

Big Fish has no liability for hacking or loss of your virtual items. Big Fish has no obligation to, and will not, reimburse you for any virtual items lost due to your violation of these Terms of Use. Big Fish reserves the right, without prior notification, to limit the order quantity on any virtual items and/or to refuse to provide you with any virtual items. Price and availability of virtual items are subject to change without notice.

# SOCIAL NETWORK SITES

If you access a Big Fish Offering via a third party social networking site (a "**Social Game**"), you should be aware that Social Games are only available to individuals who have registered with the social networking site through which s/he accesses Social Games. You agree that your social networking site account information is accurate, current and complete.

If Big Fish has reasonable grounds to suspect that you have provided any information that is inaccurate, not current or incomplete, Big Fish may suspend or terminate your ability to use or access Social Games and refuse any and all current or future use of or access to Social Games (or any portion thereof).

# REVIEWS, COMMUNICATIONS AND SUBMISSIONS

## Generally

Without limiting the scope of these Terms of Use, you agree to comply with our Forum FAQ and Review Guidelines when you submit reviews, forum posts and other content via any Big Fish Offering. Inappropriate, obscene, defamatory, offensive language, crude or explicit sexual content, discussions of any matters which are explicitly or by inference illegal in any way, discussions of illegal or any other drugs, and racially and ethnically offensive speech are examples of unsuitable content that are not permitted within the Big Fish Offerings. Content standards may vary depending on where you are within a Big Fish Offering and the expectations of the relevant game community. Some game play may involve use of stronger language than others, including mild expletives. You should always use your best and most respectful and conservative judgment in interacting as part of any game play, and submitting any content, such as a review or post to any forums or message boards, within a Big Fish Offering.

We expressly reserve the right, but have no obligation, to: (a) monitor any communications within the Big Fish Offerings, including, without limitation, to ensure that appropriate standards of online conduct are being observed, and (b) immediately or at any time remove any content that we deem objectionable or unsuitable in our sole discretion. Big Fish does not endorse, approve, or prescreen any content that you or other users post or communicate on or through any Big Fish Offerings. Big Fish does not assume any responsibility or liability for any content that is generated, posted or communicated by any user on or through the Big Fish Offerings. You agree to indemnify Big Fish and each of their respective employees, contractors, officers, directors, shareholders, agents, representatives, vendors, and content providers from any liability or damages arising out of or resulting from any content you post or communicate on or through the Big Fish Offerings.

Without limiting the generality of these policies and standards, the following actions are examples of behavior that violate these Terms of Use and may result in any or all of your Big Fish account(s) being immediately suspended or terminated:

- Posting, transmitting, promoting, or distributing any content that is illegal
- Harassing or threatening any other user of a Big Fish Offering or any employee or contractor of Big Fish
- Impersonating another person, indicating that you are a Big Fish employee or a representative of Big Fish (if you are not), or attempting to mislead users by indicating that you represent Big Fish in any way
- Attempting to obtain a password, other account information, or other private information from any other user of a Big Fish Offering
- Uploading any software, files, photos, images or any other content to a Big Fish Offering that you do not own or have the legal right to freely distribute, or that contain a virus or corrupted data, or any other malicious or invasive code or program
- Posting messages for any purpose other than personal communication, including without limitation advertising, promotional materials, chain letters, pyramid schemes, political

campaigning, soliciting funds, mass mailings and sending "spam", or making any commercial use of any Big Fish Offering.
- Disrupting the normal flow of dialogue, or otherwise acting in a manner that negatively affects or disrupts other users.
- Improperly using any game support functions or complaint buttons, or making false complaints or other reports to Big Fish representatives.
- Posting or communicating any player's real-world personal information within a Big Fish Offering or by or through a Big Fish Offering or any related bulletin board.
- Uploading or transmitting, or attempting to upload or transmit, any material that acts as a passive or active information collection or transmission mechanism, including, without limitation, gifs, 1x1 pixels, web bugs, and other similar devices.
- Using or launching any automated system, including, without limitation, any spider, bot, cheat utility, scraper or offline reader that accesses a Big Fish Offering, or using or launching any unauthorized script or other software.
- Using a false e-mail address or otherwise disguising the source of any content that you submit within a Big Fish Offering, or using tools which anonymize your internet protocol address.
- Interfering or circumventing any Big Fish Offering security feature or any feature that restricts or enforces limitations on use of or access to a Big Fish Offering.
- Attempting to sell any part of a Big Fish Offering, including, without limitation, any virtual items (if applicable), Big Fish accounts and access to them in exchange for real currency or items of monetary or other value.
- Engaging in cheating or any other activity that Big Fish deems to be in conflict with the spirit of a Big Fish Offering.

## Public Nature of Communications

You acknowledge and agree that your submitted content, including your reviews and your communications with other users via online messaging, private messaging, forums or bulletin boards, and any other similar types of communications and submissions on or through any Big Fish Offering, are non-confidential, public communications, and you have no expectation of privacy concerning your use of or participation in any Big Fish Offerings (other than with respect to the information you provide to us in establishing your Big Fish account(s), if applicable). You acknowledge that personal information that you communicate publicly within any Big Fish Offering may be seen and used by others and may result in unsolicited communications. Big Fish is not liable for any information that you choose to submit or communicate to other users on or through any Big Fish Offerings, or for the actions of any other users of any Big Fish Offering.

You represent and warrant that you have all necessary rights in and to any materials that you post within any Big Fish Offering, that such materials do not infringe any proprietary or other rights of third parties, that all such content is accurate and will not cause injury to any person or entity, and that you will indemnify Big Fish and their respective employees, contractors, officers, directors, shareholders, agents, representatives, vendors, and content providers for all claims resulting from your submitted and posted content. If any such materials incorporate the name, voice, likeness and/or image of any individual, you represent and warrant that you have the right

to grant Big Fish permission to use any such name, voice, likeness and/or image of such individual appearing in the materials you post throughout the world in perpetuity. Once you post or communicate any content or materials on or through a Big Fish Offering, you expressly grant Big Fish the complete, worldwide, fully sublicensable and irrevocable right to quote, re-post, use, reproduce, modify, adapt, publish, translate, create derivative works from, display, distribute, transmit, and broadcast such content or materials, including without limitation the name you submit in connection with such content or materials, in any form, with or without attribution to you, and without any notice or compensation to you of any kind. We reserve the right to immediately remove any content that may be considered, in our sole discretion, in violation of the rights of any third party.

### Commercial Activity and Unsolicited E-mail

You may not use any portion of the Big Fish Offerings to collect information, including login names, about other users, and use of such information to send unsolicited e-mail or for any other purpose is strictly prohibited. You may not advertise any goods or services on any Big Fish Offerings, or otherwise exploit your participation on or through any Big Fish Offerings for any commercial purpose.

### Customer Reviews

You may submit reviews of certain Big Fish Offerings. Use of the reviews feature is for your personal, non-commercial use and is at your own option and risk, and you must comply with the policies set forth in these Terms of Use and the Review Guidelines.

When you post a review, we will display your rating of the Big Fish Offering, along with your user name and certain other information you may provide, such as your city and state location, skill level, favorite game and favorite genres. By submitting a review, you are consenting to the release of all information that you provide in that review to a public forum. If you do not want any such information to be shared in a public forum, do not use the review feature.

### BIG FISH SOFTWARE

We may require that you download certain software from Big Fish, its principals or its licensors onto your computer ("**Big Fish Software**"). Subject to your compliance with these Terms of Use, Big Fish grants to you a non-exclusive, non-transferable, non-sublicensable, revocable, limited license to use the Big Fish Software to participate in the Big Fish Offerings. The Big Fish Software is for your personal use, and may not be reproduced, duplicated, copied, resold, sublicensed, or otherwise used in whole or in part by you for commercial purposes. You may not modify, translate, reverse-engineer, reverse-compile or decompile, disassemble or create derivative works from any of the Big Fish Software.

NEITHER BIG FISH GAMES, INC. NOR ITS LICENSORS IS LIABLE FOR ANY DAMAGES IN CONNECTION WITH YOUR USE OF ANY BIG FISH SOFTWARE (INCLUDING LIABILITY FOR ANY CONSEQUENTIAL OR INCIDENTAL DAMAGES OR DAMAGE TO YOUR COMPUTER HARDWARE OR SOFTWARE), AND THE ENTIRE

RISK OF USE, INCLUDING, WITHOUT LIMITATION, ANY DAMAGE TO YOUR
COMPUTER HARDWARE OR SOFTWARE, RESULTING FROM ANY USE OF THE BIG
FISH SOFTWARE, RESIDES WITH YOU.

# THIRD PARTY LINKS and THIRD PARTY CONTENT AND SERVICES

Any and all software, content and services (including advertising) within a Big Fish Offering that
are not owned by Big Fish are **"third party content and services."** Big Fish acts merely as an
intermediary service provider of, and accepts no responsibility or liability for, third party content
and services. In addition and without limiting the generality of the foregoing, certain Big Fish
Offerings may include links to sites operated by third parties, including advertisers and other
content providers. Those sites may collect data or solicit personal information from you. Big Fish
does not control such sites, and is not responsible for their content, policies, or collection, use or
disclosure of any information those sites may collect.

# VIOLATION OF THESE TERMS OF USE

If you violate our Terms of Use, Big Fish reserves the right, in its sole discretion, to immediately
terminate your participation in any or all Big Fish Offerings, including any and all Big Fish
accounts you have established. You acknowledge that Big Fish is not required to notify you prior
to terminating any such account.

# TERMINATION OF ANY BIG FISH ACCOUNT

Big Fish and you each have the right to terminate or cancel any of your Big Fish account(s), if
applicable, at any time for any reason. You understand and agree that cancellation of your Big
Fish account(s) and/or ceasing use of any and all Big Fish Offerings are your sole right and
remedy with respect to any dispute with Big Fish. This includes, but is not limited to, any dispute
arising out of or directly or indirectly related to: (a) any provision contained in these Terms of
Use or any other agreement between you and Big Fish, including, without limitation, the Privacy
Policy, or Big Fish's enforcement or application of these Terms of Use or any other such
agreement, including, without limitation, the Privacy Policy, (b) the content available on or
through the Big Fish Offerings, or any change in or to such content, (c) your ability to access
and/or use any Big Fish Offerings, or (d) the amount or type of any fees, surcharges, applicable
taxes, billing methods, or any change to the fees, applicable taxes, surcharges or billing methods,
in each case imposed or implemented by Big Fish on or through any Big Fish Offering.

Big Fish reserves the right to collect fees, surcharges or costs incurred before you cancel your
Big Fish account(s) or a particular subscription. In the event that your Big Fish account or a
particular subscription is terminated or cancelled, no refund will be granted, no online time or
other credits (e.g., points in an online game) will be credited to you or converted to cash or other
form of reimbursement, and you will have no further access to your account or anything
associated with it (such as points, tokens or in-game items). Any delinquent or unpaid accounts

must be settled before Big Fish may allow you to create any new or additional accounts. All virtual items are unconditionally forfeited if your Big Fish account is terminated or suspended for any reason, in Big Fish's sole discretion, or if Big Fish discontinues any Big Fish Offering that includes virtual items.

Without limiting the foregoing provisions, if you violate these Terms of Use, Big Fish may issue you a warning regarding the violation, or, in Big Fish's sole discretion, immediately terminate any and all Big Fish accounts that you have established with any Big Fish Offering, with or without notice.

# INTELLECTUAL PROPERTY RIGHTS

The names and logos, and other graphics, logos, icons, and service names associated with the Big Fish Offerings are trademarks, registered trademarks or trade dress of Big Fish or its licensors or principals in the United States and/or other countries. Big Fish's trademarks and trade dress may not be used in connection with any product or service that is not owned or operated by or on behalf of Big Fish, or in any manner that is likely to cause confusion among consumers or that disparages or discredits Big Fish or any Big Fish Offering. The compilation of all content on the Big Fish Offerings is the exclusive property of Big Fish and is protected by United States and international copyright laws. You may not use, copy, transmit, modify, distribute, or create any derivative works from any content from the Big Fish Offerings unless we have expressly authorized you to do so in writing. All other trademarks not owned by Big Fish that appear on the Big Fish Offerings are the property of their respective owners, who may or may not be affiliated with or connected to Big Fish. If you fail to adhere to these Terms of Use, other content owners may take criminal or civil action against you. In the event legal action is taken against you for your acts and/or omissions with regard to any content on the Big Fish Offerings, you agree to indemnify and hold harmless Big Fish and its employees, contractors, officers, directors, shareholders, agents, representatives, vendors, and content providers.

# LIMITATIONS ON WARRANTIES AND LIABILITY

YOU EXPRESSLY AGREE THAT THE USE OF ANY BIG FISH OFFERING, BIG FISH SOFTWARE AND THE INTERNET IS AT YOUR SOLE RISK. ALL BIG FISH OFFERINGS AND BIG FISH SOFTWARE ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS FOR YOUR USE, WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, UNLESS SUCH WARRANTIES ARE LEGALLY INCAPABLE OF EXCLUSION. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, BIG FISH DOES NOT GUARANTEE THAT YOU WILL BE ABLE TO ACCESS OR USE THE BIG FISH OFFERINGS OR BIG FISH SOFTWARE AT ANY PARTICULAR TIMES OR LOCATIONS, OR THAT THE BIG FISH OFFERINGS, BIG FISH SOFTWARE, NEWSLETTERS, E-MAILS OR OTHER COMMUNICATIONS SENT FROM BIG FISH ARE FREE FROM VIRUSES OR OTHER HARMFUL COMPONENTS.

YOU ACKNOWLEDGE AND AGREE THAT YOUR SOLE AND EXCLUSIVE REMEDY FOR ANY DISPUTE WITH BIG FISH IS TO STOP USING THE BIG FISH OFFERINGS AND BIG FISH SOFTWARE, AND TO CANCEL ANY AND ALL OF YOUR BIG FISH ACCOUNTS, IF APPLICABLE. YOU ACKNOWLEDGE AND AGREE THAT BIG FISH IS NOT LIABLE FOR ANY ACT OR FAILURE TO ACT ON ITS OWN PART, OR FOR ANY CONDUCT OF, OR COMMUNICATION OR CONTENT POSTED WITHIN A BIG FISH OFFERING BY, ANY BIG FISH OFFERING USER. IN NO EVENT SHALL BIG FISH'S OR ITS EMPLOYEES', CONTRACTORS', OFFICERS', DIRECTORS' OR SHAREHOLDERS' LIABILITY TO YOU EXCEED THE AMOUNT THAT YOU PAID TO BIG FISH FOR YOUR PARTICIPATION IN ANY BIG FISH OFFERING. IN NO CASE SHALL BIG FISH OR ITS EMPLOYEES, CONTRACTORS, OFFICERS, DIRECTORS OR SHAREHOLDERS BE LIABLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING FROM YOUR USE OF ANY BIG FISH OFFERING OR BIG FISH SOFTWARE. BECAUSE SOME STATES OR JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR THE LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, IN SUCH STATES OR JURISDICTIONS, SUCH LIABILITY SHALL BE LIMITED TO THE FULL EXTENT PERMITTED BY LAW.

YOU FURTHER SPECIFICALLY ACKNOWLEDGE THAT BIG FISH IS NOT LIABLE, AND YOU AGREE NOT TO SEEK TO HOLD BIG FISH LIABLE, FOR THE CONDUCT OF THIRD PARTIES, INCLUDING OTHER USERS OF BIG FISH OFFERINGS AND OPERATORS OF SOCIAL NETWORKING AND OTHER EXTERNAL SITES, AND THAT THE RISK OF USING OR ACCESSING BIG FISH OFFERINGS AND BIG FISH SOFTWARE, SOCIAL NETWORKING SITES AND OTHER EXTERNAL SITES, AND OF INJURY FROM THE FOREGOING, RESTS ENTIRELY WITH YOU.

# INDEMNIFICATION

You agree to defend, indemnify and hold harmless Big Fish and their respective employees, contractors, officers, directors, shareholders, agents, representatives, vendors, and content providers from and against any and all liabilities, claims and expenses, including attorneys' fees, that arise from a breach of these Terms of Use for which you are responsible or in connection with your transmission of any content to, on or through any Big Fish Offering. Without limiting your indemnification obligations described herein, Big Fish reserves the right, at its own expense, to assume the exclusive defense and control of any matter otherwise subject to indemnification by you.

# IMPORT TAXES AND FEES

When you buy physical goods (e.g. CD-ROM) through any Big Fish Offering for delivery outside the United States, you are considered an importer and, as between you and Big Fish, you will be responsible for payment of all taxes, duties, fees or other charges that may be applicable to such importation, including VAT, and you must comply with all laws and regulations of the country in which you are receiving the goods. Your privacy is important to us and we know that you care about how information about your order is used and shared. We would like our

international customers and customers dispatching products internationally to be aware that cross-border deliveries are subject to opening and inspection by customs authorities.

# EXPORT CONTROL LAWS

Certain Big Fish Offerings may be subject to United States and international export controls. By accessing Big Fish Offerings, you warrant that you are not located in any country, or exporting any Big Fish Offerings, to any person or place to which the United States, European Union or any other jurisdiction has embargoed goods. You agree to abide by all applicable export control laws and further agree not to transfer or upload, by any means electronic or otherwise, any Big Fish Offerings that may be subject to restrictions under such laws to a national destination prohibited by such laws without obtaining and complying with any required governmental authorizations.

# OTHER LEGAL TERMS

You agree that these Terms of Use are not intended to confer and do not confer any rights or remedies upon any third party. If any part of these Terms of Use are held invalid or unenforceable, that portion shall be construed in a manner consistent with applicable law to reflect, as nearly as possible, the original intentions of the parties, and the remaining portions shall remain in full force and effect. If any provision of these Terms of Use is found to be illegal or unenforceable, these Terms of Use will be deemed modified to the extent necessary to make them legal and enforceable, and will remain, as modified, in full force and effect. These Terms of Use, including all terms and policies referenced herein, contain the entire understanding, and supersede all prior agreements, between you and Big Fish relating to this subject matter, and cannot be changed or terminated orally.

# PRIVACY

Big Fish respects the privacy of Big Fish Offerings users. Please review our Privacy Policy, which also governs your access to and use of the Big Fish Offerings, to understand our policies and practices with respect your personal information.

# APPLICABLE LAW, JURISDICTION, AND VENUE

These Terms of Use and the rights of the parties hereunder shall be governed by and construed in accordance with the laws of the State of Washington, exclusive of conflict or choice of law rules.

The parties acknowledge that these Terms of Use evidence a transaction involving interstate commerce. Notwithstanding the provision in the preceding paragraph with respect to applicable substantive law, any arbitration conducted under these Terms of Use shall be governed by the Federal Arbitration Act (9 U.S.C., §§ 1-16).

You and Big Fish irrevocably consent to the exclusive jurisdiction and venue of the state or federal courts located in King County, Washington, for all disputes arising out of or relating to these Terms of Use, the subject matter of these Terms of Use, or your access to and use of any Big Fish Offering, that are heard in court (not arbitration).

# DISPUTE RESOLUTION BY BINDING ARBITRATION

**PLEASE READ THIS "DISPUTE RESOLUTION BY BINDING ARBITRATION" PROVISION CAREFULLY, BECAUSE IT REQUIRES YOU TO ARBITRATE DISPUTES WITH BIG FISH AND IT LIMITS THE MANNER IN WHICH YOU CAN SEEK RELIEF.**

THIS PROVISION PRECLUDES YOU FROM BRINGING ANY CLASS, COLLECTIVE, OR REPRESENTATIVE ACTION AGAINST BIG FISH. IT ALSO PRECLUDES YOU FROM PARTICIPATING IN OR RECOVERING RELIEF UNDER ANY CURRENT OR FUTURE CLASS, COLLECTIVE, OR REPRESENTATIVE ACTION AGAINST BIG FISH BY SOMEONE ELSE. IN ADDITION, ARBITRATION PRECLUDES YOU FROM SUING IN COURT OR FROM HAVING A JURY TRIAL.

WHETHER TO AGREE TO ARBITRATION IS AN IMPORTANT DECISION. IT IS YOUR DECISION TO MAKE AND YOU SHOULD NOT RELY SOLELY ON THE INFORMATION PROVIDED IN THIS AGREEMENT, AS IT IS NOT INTENDED TO CONTAIN A COMPLETE EXPLANATION OF THE CONSEQUENCES OF ARBITRATION. YOU SHOULD TAKE REASONABLE STEPS TO CONDUCT FURTHER RESEARCH AND TO CONSULT WITH OTHERS REGARDING THE CONSEQUENCES OF YOUR DECISION. YOU MAY OPT OUT OF THIS ARBITRATION PROVISION BY FOLLOWING THE INSTRUCTIONS BELOW.

**Scope of Arbitration Provision.** You and Big Fish agree that any dispute, claim or controversy arising out of or relating to your access to or use of any Big Fish Offering or to these Terms of Use (including without limitation any dispute concerning the breach, enforcement, construction, validity, interpretation, enforceability, or arbitrability of these Terms of Use) (a **"Dispute"**), shall be determined by arbitration, except that you and Big Fish are NOT required to arbitrate any Dispute in which either party seeks equitable and other relief for the alleged unlawful use of copyrights, trademarks, trade names, logos, trade secrets, or patents.

**Location of Arbitration and Applicable Rules.** You and Big Fish agree that such arbitration shall occur in King County, Washington. You may request to appear in such proceedings telephonically. You and Big Fish agree that such arbitration shall be conducted by a single arbitrator in accordance with the rules of the Judicial Arbitration and Mediation Service ("JAMS"), as modified by these Terms of Use.

**Authority of Arbitrator.** With the exception of class procedures and remedies as discussed below under "Waiver of Class Relief," the arbitrator shall have the authority to grant any remedy that would otherwise be available in court.

**Confidentiality.** You and Big Fish shall maintain the confidential nature of the arbitration proceedings and the arbitration award, including the arbitration hearing, except as may be necessary to prepare for or conduct the arbitration hearing on the merits, or except as may be necessary in connection with a court application for a preliminary remedy, a judicial challenge to an award or its enforcement, or unless otherwise required by law or judicial decision

**Allocation of Arbitration Fees.** If you assert a Dispute as a consumer, you will only be required to pay arbitration fees of $250 of the fees charged by JAMS in connection with any arbitration under this section, and Big Fish will bear all other costs charged by JAMS or the arbitrator, including any remaining JAMS Case Management Fee and all professional fees for the arbitrator's services. You will still be responsible for paying your own attorneys' fees.

**WAIVER OF CLASS RELIEF.** WHETHER THE DISPUTE IS HEARD IN ARBITRATION OR IN COURT, YOU AGREE THAT YOU AND BIG FISH WILL NOT COMMENCE AGAINST THE OTHER A CLASS ACTION, CLASS ARBITRATION OR OTHER REPRESENTATIVE ACTION OR PROCEEDING. YOU AND BIG FISH ARE EACH WAIVING RESPECTIVE RIGHTS TO A TRIAL BY JURY OR TO PARTICIPATE IN A CLASS ACTION.

**Procedure to Opt Out of Arbitration Provision.** You may opt out of this arbitration provision only by written Notice via U.S. Mail, or by any nationally recognized delivery service (e.g., UPS, Federal Express, etc.) to Big Fish, Attn: Legal Department, at 333 Elliott Avenue West, Suite 200, Seattle, WA, 98119. **You must send such Notice within thirty (30) days of your acceptance of these Terms of Use.** You must sign and date the Notice, and include in it your name, address, and a clear statement that you do not wish to resolve disputes with Big Fish through arbitration. If you do not follow this procedure by your thirty (30) day deadline to do so, then you and Big Fish shall both be bound by the terms of this section entitled Dispute Resolution by Binding Arbitration.

If any portion of this section entitled "Dispute Resolution by Binding Arbitration" is determined by a court to be inapplicable or invalid, then the remainder shall still be given full force and effect.

# STATUTE OF LIMITATIONS

You and Big Fish agree that regardless of any statute or law to the contrary, any claim or cause of action arising out of or related to use of a Big Fish Offering, these Terms of Use or the Privacy Policy, must be filed within ONE (1) YEAR after such claim or cause of action arose, and is thereafter forever barred.

# SEVERABILITY

If any part of these Terms of Use is determined by a court to be inapplicable or invalid, then the remainder shall still be given full force and effect.

# CONTACT US

Big Fish Games, Inc.
Attn: Legal Department
333 Elliott Avenue West, Suite 200
Seattle, Washington 98119
USA

# DIGITAL MILLENNIUM COPYRIGHT ACT

The Digital Millennium Copyright Act provides recourse to copyright owners who believe that their rights under the United States Copyright Act have been infringed by acts of third parties over the Internet. If you believe that your copyrighted work has been copied without your authorization and is available on or in a Big Fish Offering in a way that may constitute copyright infringement, you may provide notice of your claim to Big Fish's Designated Agent listed below. For your notice to be effective, it must include the following information:

(i) A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed;

(ii) A description of the copyrighted work that you claim has been infringed upon;

(iii) A description of where the material that you claim is infringing is located within the Big Fish Offering;

(iv) Information reasonably sufficient to permit Big Fish to contact you, such as address, telephone number, and, if available, an e-mail address at which you may be contacted;

(v) A statement by you that you have a good-faith belief that the disputed use is not authorized by the copyright owner, its agent, or the law; and

(vi) A statement that the information in the notification is accurate and, under penalty of perjury, that you are authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

(vii) Big Fish's Designated Agent is:

Big Fish Games, Inc.
Attn: Legal Department
333 Elliott Avenue West, Suite 200
Seattle, Washington 98119
USA