The Honorable Ronald B. Leighton

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT TACOMA

| | |
|---|---|
| CHERYL KATER and SUZIE KELLY, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>*v.*<br><br>CHURCHILL DOWNS, INC., a Kentucky corporation, and BIG FISH GAMES, INC., a Washington corporation,<br><br>*Defendants*. | Case No. 15-cv-612-RBL<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiffs Cheryl Kater and Suzie Kelly, individually and on behalf of all others similarly situated, bring this case against Defendants Churchill Downs Incorporated ("Churchill Downs") and Big Fish Games, Inc. ("Big Fish") (together, "Defendants") seeking restitution and damages for Defendants' harmful operation of illegal online casino games. Plaintiffs allege as follows:

## NATURE OF THE ACTION

1.      Defendant Churchill Downs is the former owner, co-operator, and proprietor of "Big Fish Casino," a so-called "social casino" game developed and co-operated by Defendant Big Fish.

FAC—CLASS ACTION
Case No. 15-cv-612-RBL

- 1 -

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

2.     The Ninth Circuit recently held that Big Fish Casino "constitutes illegal gambling under Washington law." *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 785 (9th Cir. 2018).

3.     Through "Big Fish Casino" and other similar internet casinos, Defendants offer a multitude of electronic slot machine and other internet casino games to consumers. Consumers play Big Fish Casino and Defendants' other casino games on Apple iOS devices, Android Devices, and Facebook.

4.     Defendants provide a bundle of free "chips" to first-time visitors of their online casinos that can be used to wager on Defendants' games. After consumers inevitably lose their initial allotment of chips, Defendants attempt to sell them additional chips. Without additional chips, consumers cannot play Defendants' gambling games.

5.     Freshly topped off with additional chips, consumers wager to win more chips. The chips won by consumers playing Defendants' games of chance are identical to the chips that Defendants sell. Thus, by wagering chips that consumers purchase, consumers have the chance to win additional chips that they would otherwise have to purchase.

6.     By operating Big Fish Casino and other similar online gambling games, Defendants have violated Washington law and illegally profited from tens of thousands of consumers. Accordingly, Plaintiffs, on behalf of themselves and a Class of similarly situated individuals, bring this lawsuit to recover their losses.

## PARTIES

7.     Plaintiff Cheryl Kater is a natural person who is domiciled in the state of Michigan.

8.     Plaintiff Suzie Kelly is a natural person who is domiciled in the state of Texas.

9.     Defendant Big Fish Games, Inc., is a corporation organized and existing under the laws of the state of Washington, with its principal place of business at 906 Alaskan Way, Suite 700, Seattle Washington 98104. Big Fish Games, Inc. conducts business throughout this District, Washington State, and the United States.

10.     Defendant Churchill Downs Incorporated is a corporation incorporated under the

laws of the state of Kentucky with a principal place of business at 600 N. Hurstbourne Parkway, Suite 400, Louisville, KY 40222. Churchill Downs has conducted business throughout this District, Washington State, and the United States.

## JURISDICTION AND VENUE

11.     Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the Class is a citizen of a state different from Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

12.     The Court has personal jurisdiction over Defendants because Defendants conduct significant business transactions in this District, and because the wrongful conduct occurred in and emanated from this District.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

I.      **Free-to-Play and the New Era of Online Gambling**

14.     The proliferation of internet-connected mobile devices has led to the growth of what are known in the industry as "free-to-play" videogames. The term is a misnomer. It refers to a model by which the initial download of the game is free, but companies reap huge profits by selling thousands of "in-app" items that start at low prices but can quickly escalate to hundreds or even thousands of dollars.

15.     The in-app purchase model has become particularly attractive to developers of games of chance (*e.g.*, poker, blackjack, and slot machine mobile videogames, amongst others), because it allows them to generate huge profits. In 2017, free-to-play games of chance generated over $3.8 billion in worldwide revenue, and they are expected to grow by ten percent annually.[1]

---

[1]     GGRAsia – Social casino games 2017 revenue to rise 7pct plus says report, http://www.ggrasia.com/social-casino-games-2017-revenue-to-rise-7pct-plus-says-report/ (last visited April 5, 2018)

FAC—CLASS ACTION
Case No. 15-cv-612-RBL

- 3 -

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1    Even "large land-based casino operators are looking at this new space" for "a healthy growth

2    potential."[2]

3         16.    With games of chance that employ the in-game purchase strategy, developers

4    have begun exploiting the same psychological triggers as casino operators. As one respected

5    videogame publication put it:

6         "If you hand someone a closed box full of promised goodies, many will happily
         pay you for the crowbar to crack it open. The tremendous power of small random

7         packs of goodies has long been known to the creators of physical collectible card
         games and companies that made football stickers a decade ago. For some … the

8         allure of a closed box full of goodies is too powerful to resist. Whatever the worth
         of the randomised [sic] prizes inside, the offer of a free chest and the option to

9         buy a key will make a small fortune out of these personalities. For those that like
         to gamble, these crates often offer a small chance of an ultra-rare item."[3]

10        17.    Another stated:

11         "Games may influence 'feelings of pleasure and reward,' but this is an addiction
         to the games themselves; micro-transactions play to a different kind of addiction

12        that has existed long before video games existed, more specifically, an addiction
         similar to that which you could develop in casinos and betting shops."[4]

13        18.    The comparison to casinos doesn't end there. Just as with casino operators,

14

15    mobile game developers rely on a small portion of their players to provide the majority of their

16    profits. These "whales," as they're known in casino parlance, account for just "0.15% of players"

17    but provide "over 50% of mobile game revenue."[5]

18        19.    Game Informer, another respected videogame magazine, reported on the rise (and

19    danger) of micro-transactions in mobile games and concluded:

20        "[M]any new mobile and social titles target small, susceptible populations for
         large percentages of their revenue. If ninety-five people all play a [free-to-play]

21        game without spending money, but five people each pour $100 or more in to
         obtain virtual currency, the designer can break even. These five individuals are

22        what the industry calls whales, and we tend not to be too concerned with how

23    ²    *Report confirms that social casino games have hit the jackpot with $1.6B in revenue | GamesBeat*,
     https://venturebeat.com/2012/09/11/report-confirms-that-social-casino-games-have-hit-the-jackpot-with-1-6b-in-

24    revenue/ (last visited April 5, 2018)

25    ³    PC Gamer, *Microtransactions: the good, the bad and the ugly*,
     http://www.pcgamer.com/microtransactions-the-good-the-bad-and-the-ugly/ (last visited Apr. 5, 2018).

26    ⁴    The Badger, *Are micro-transactions ruining video games? | The Badger*,
     http://thebadgeronline.com/2014/11/micro-transactions-ruining-video-games/ (last visited May 4, 2018).

27    ⁵    *Id.* (emphasis added).

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

they're being used in the equation. While the scale and potential financial ruin is of a different magnitude, a similar profitability model governs casino gambling."[6]

20.     Academics have also studied the socioeconomic effect games that rely on in-app purchases have on consumers. In one study, the authors compiled several sources analyzing so-called free-to-play games of chance (called "casino" games below) and stated that:

"[Researchers] found that [free-to-play] casino gamers share many similar sociodemographic characteristics (*e.g.*, employment, education, income) with online gamblers. Given these similarities, it is perhaps not surprising that a strong predictor of online gambling is engagement in [free-to-play] casino games. Putting a dark line under these findings, over half (58.3%) of disordered gamblers who were seeking treatment stated that social casino games were their first experiences with gambling."

…

"According to [another study], the purchase of virtual credits or virtual items makes the activity of [free-to-play] casino gaming more similar to gambling. Thus, micro-transactions may be a crucial predictor in the migration to online gambling, as these players have now crossed a line by paying to engage in these activities. Although, [sic] only 1–5% of [free-to-play] casino gamers make micro-transactions, those who purchase virtual credits spend an average of $78. Despite the limited numbers of social casino gamers purchasing virtual credits, revenues from micro-transactions account for 60 % of all [free-to-play] casino gaming revenue. Thus, a significant amount of revenue is based on players' desire to purchase virtual credits above and beyond what is provided to the player in seed credits."[7]

21.     The same authors looked at the link between playing free-to-play games of chance and gambling in casinos. They stated that "prior research indicated that winning large sums of virtual credits on social casino gaming sites was a key reason for [consumers'] migration to online gambling," yet the largest predictor that a consumer will transition to online gambling was "micro-transaction engagement." In fact, "the odds of migration to online gambling were approximately *eight times greater* among people who made micro-transactions on [free-to-play] casino games compared to [free-to-play] casino gamers who did not make micro-transactions."[8]

[6]     Game Informer, *How Microtransactions Are Bad For Gaming - Features - www.GameInformer.com*, http://www.gameinformer.com/b/features/archive/2012/09/12/how-microtransactions-are-bad-for-gaming.aspx?CommentPosted=true&PageIndex=3 (last visited April 5, 2018)
[7]     Hyoun S. Kim, Michael J. A. Wohl, *et al.*, *Do Social Casino Gamers Migrate to Online Gambling? An Assessment of Migration Rate and Potential Predictors*, Journal of gambling studies / co-sponsored by the National Council on Problem Gambling and Institute for the Study of Gambling and Commercial Gaming (Nov. 14, 2014), *available at* http://link.springer.com/content/pdf/10.1007%2Fs10899-014-9511-0.pdf (citations omitted).
[8]     *Id.* (emphasis added).

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1  22.    The similarity between micro-transaction based games of chance and games of

2  chance found in casinos has caused governments across the world to intervene to limit their

3  availability.[9] Unfortunately, such games have eluded regulation in the United States. As a result,

4  and as described below, Defendants' online gambling games have thrived and thousands of

5  consumers have spent millions of dollars unwittingly playing Defendants' unlawful games of

6  chance.

7  **II.    A Brief Introduction to Churchill Downs and Big Fish**

8  23.    Churchill Downs was established in 1875 when it opened the famous horseracing

9  track of the same name. Since then, Churchill Downs has amassed additional racetracks, physical

10  casinos, and digital casino operations.

11  24.    In 2014, Churchill Downs acquired Big Fish for $885 million.[10] Big Fish is a

12  developer of slot machine-based "Social Casino" games. Its marquee product is Big Fish Casino.

13  On information and belief, Big Fish Casino drives annual revenues in excess of $100 million,

14  and Big Fish's overall "social casino" portfolio drives annual revenues in excess of $200 million.

15  25.    Big Fish and its founders have reaped substantial profits through a series of

16  mergers and acquisitions by some the largest gambling companies in the world, including when,

17  in 2018, Churchill Downs sold Big Fish to foreign slot machine manufacturer, Aristocrat

18  Leisure, for approximately $990 million.[11]

19

20

21  [9]    In late August 2014, South Korea began regulating "social gambling" games, including games similar to Defendants', by "ban[ning] all financial transactions directed" to the games. PokerNews.com, *Korea Shuts Down All Facebook Games In Attempt To Regulate Social Gambling | PokerNews*,

22  https://www.pokernews.com/news/2014/09/korea-shuts-down-facebook-games-19204 htm (last visited Apr. 5, 2018). Similarly, "the Maltese Lotteries and Gambling Authority (LGA) invited the national Parliament to regulate

23  all digital games with prizes by the end of 2014." *Id.*

24  [10]    Big Fish Games to be acquired for $885 million by racetrack operator Churchill Downs – GeekWire,

25  http://www.geekwire.com/2014/churchill-downs-acquires-big-fish/ (last visited Apr. 9, 2015).

26  [11]    *Churchill Downs Incorporated Announces Closing of the Sale of Big Fish Games, Inc. to Aristocrat Technologies, Inc. for US$990 million*, Churchill Downs, Inc., https://globenewswire.com/news-release/2018/01/09/1286371/0/en/Churchill-Downs-Incorporated-Announces-Closing-of-the-Sale-of-Big-Fish-

27  Games-Inc-to-Aristocrat-Technologies-Inc-for-US-990-million.html (last visited Dec. 18, 2018).

1  **III.    Consumers Do Not Consent To Any Terms Of Service Before Playing Big Fish**

2         26.     Consumers can play Big Fish Casino and its various slot machines and casino

3  games—as well as Defendants' other social casino games—by downloading Big Fish's app on

4  an Apple iOS device, on an Android device, or by playing the online casino games on Facebook.

5         **A.     Mobile App Users**

6         27.     As is—for whatever reason—standard practice in the "Social Casino" industry,

7  consumers who download the Big Fish Casino app and then purchase chips on their mobile

8  devices are neither required to create an account with Big Fish nor asked to agree to or consent to

9  any terms of service before playing Big Fish games.

10        28.     For example, Apple iOS users navigate to the App Store to download the Big Fish

11 Casino mobile app. They are never presented with terms of any kind before downloading the

12 app. *See* Figure 1.

13              (**Figure 1.**)                              (**Figure 2.**)




FAC—CLASS ACTION
Case No. 15-cv-612-RBL

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1

2     29.     When a consumer launches the Big Fish mobile app, they are first presented with

3 a loading screen while the player connects to Big Fish's servers. *See* Figure 2.

4               (**Figure 3.**)                                    (**Figure 4.**)

 

21    30.     Big Fish first offers consumers an allotment of free chips through one "Daily Spin"

22 and a "Return Bonus," as shown in Figure 3. Then, Big Fish presents consumers with various

23 offers to purchase chips with real money at a discount. (Figures 4-5). As shown in Figure 4 above,

24 Big Fish announces a "Limited Time Offer!" for "95% Off" a 2,200,000 chip package for "only

25 $4.99."

26    31.     Consumers can either accept Big Fish's offers to purchase discounted chips or

27 they can dismiss these offers and play Big Fish's casino games, as shown in Figure 6.

(<u>**Figure 5.**</u>)                    (<u>**Figure 6.**</u>)

   

32.     Consumers are never asked to consent to Big Fish's terms before playing these games or before paying real money for Defendants' virtual casino chips.

**B.     Facebook Users**

33.     Consumers can also play Big Fish's casino games via Facebook. Like with Big Fish's mobile version, and consistent with the rest of the "social casino industry," Facebook-based Big Fish Casino players are neither required to create an account with Big Fish to play its various casino games or to purchase chips, nor are they asked to consent to Big Fish's terms.

34.     Consumers first login to their Facebook account and upon searching for and

FAC—CLASS ACTION
Case No. 15-cv-612-RBL

- 9 -

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600  •  Fax: 206.682.2992

1  | clicking to play Big Fish Casino are redirected to Big Fish's games without ever having been
2  | presented with any terms of service. *See* <u>Figures 7-8.</u>
3  |
4  |
5  |
6  |
7  |
8  |              
9  |
10 |
11 |
12 |
13 |              (**<u>Figure 7</u>**<u>, partially </u>redacted for privacy)
14 |
15 |
16 |
17 |
18 |              
19 |
20 |
21 |
22 |
23 |
24 |              (**<u>Figure 8</u>**, partially redacted for privacy)
25 |      35.    Once the consumer connects to Big Fish's game servers, Big Fish offers an
26 | allotment of free chips through a "Return Bonus" and one "Daily Spin." *See* <u>Figure 9</u>.
27 |

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1

2

3

4

5

6

7

8

9

10



(**Figure 9,** partially redacted for privacy)

11   36.   Finally, the consumer can play Big Fish's casino games by selecting one of its

12 many slot machines. *See* Figure 10.

13

14

15

16

17

18

19

20

21

22

23   (**Figure 10,** partially redacted for privacy)

24   37.   Consumers are never asked to consent to Big Fish's terms before playing these

25 games or before paying real money for Defendants' virtual casino chips.

26

27

FAC—CLASS ACTION
Case No. 15-cv-612-RBL

- 11 -

1  **IV.    Defendants' Online Casinos Contains Unlawful Games of Chance**

2            38.    Consumers visiting Defendants' online casinos for the first time are awarded free

3  chips. These free sample chips offer a taste of gambling and are designed to encourage players to

4  get hooked and buy more chips for real money.

5            39.    After they begin playing, consumers quickly lose their initial allotment of chips.

6  Immediately thereafter, Big Fish informs them via a "pop up" screen that they have "Insufficient

7  Cash" to place a wager, which prevents them from additional play. *See* <u>Figure 11.</u>

8

9

10

11

12                    

13

14

15

16

17

18                    (**<u>Figure 11</u>**)

19            40.    Concurrently with that warning, Big Fish provides a link to consumers, telling

20  them to "GET CHIPS" at the electronic store where the price for chips ranges from prices of $1

21  to **<u>at least $999.99</u>**. Big Fish's offer to purchase chips with real money is substantially the same

22  on its mobile app and on Facebook. Once players run out of their allotment of free chips, they

23  cannot continue to play the game without buying more chips for real money.

24            41.    Even during the check-out process when consumers purchase chips with real

25  money, Big Fish does not show consumers its Terms. *See* <u>Figures 12-13.</u>

26

27

FAC—CLASS ACTION
Case No. 15-cv-612-RBL

- 12 -

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1
2
3
4
5
6
7
8
9
10
11
12
13



14      (**Figure 12,** the chip purchase page on iOS, partially redacted for privacy.)

15
16
17
18
19
20
21
22
23
24
25

26      (**Figure 13,** showing the chip purchase page on Facebook.)

27

FAC—CLASS ACTION
Case No. 15-cv-612-RBL

- 13 -

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

42.     When purchasing chips via Facebook, the consumer is presented with a link only to Facebook's terms, in Facebook's capacity as the transaction processor. The consumer is not presented with terms for Big Fish Casino or Big Fish Games.

43.     To begin wagering, players select the "BET" that will be used for a spin, as illustrated in <u>Figure 14</u>, which shows one of Defendants' slot machine games in Big Fish Casino. Big Fish allows a player to increase or decrease the amount he or she can wager and ultimately win (or lose).



(**Figure 14.**)

44.     Once a consumer spins the slot machine by pressing the "SPIN" button, no action on his or her part is required. Indeed, none of Defendants' online casino games allow (or call for) any additional user action. Instead, the consumer's computer or mobile device communicates with and sends information (such as the "BET" amount) to Big Fish's servers. Big Fish's servers then execute the game's algorithms that determine the spin's outcome.

45.     Consumers can continue playing with the chips that they won, or they can exit the game and return at a later time to play because Big Fish maintains win and loss records and balances for each consumer. Indeed, once Big Fish's algorithms determine the outcome of a spin and Big Fish displays the outcome to the consumer, Big Fish adjusts the consumer's balance. Big Fish keeps records of each wager, outcome, win, and loss for every player.

**FACTS SPECIFIC TO PLAINTIFFS**

46.     In or around January 2013, Plaintiff Kater began playing Big Fish Casino through her Android device. After losing the balance of her initial allocation of free chips, Kater began purchasing chips from Defendants for use in the Big Fish Casino. Overall, Kater has wagered and lost more than $1,000 at Defendants' games of chance.

FAC—CLASS ACTION
Case No. 15-cv-612-RBL

- 14 -

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

47.     In or around May 2014, Plaintiff Kelly began playing Big Fish Casino on her

iPhone after seeing a Big Fish Casino TV commercial advertising that she could "play for fun,

play for free." After losing the balance of her initial allocation of free chips, Kelly began

purchasing chips from Defendants for use in the Big Fish Casino. Kelly quickly became addicted

to Big Fish Casino and, over the following years, lost more than $400,000 at Defendants' games

of chance.

## CLASS ALLEGATIONS

48.     **Class Definitions**: Plaintiffs bring this action pursuant to Fed. R. Civ. P.

23(b)(3) on behalf of a Class of similarly situated individuals, defined as follows:

> **Class**: All persons in the United States who began playing Big Fish Casino or
> other similar Big Fish Games "casino games" on or before March 23, 2015, and
> lost purchased chips by wagering at Defendants' casino games.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over

this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents,

successors, predecessors, and any entity in which the Defendants or its parents have a controlling

interest and its current or former employees, officers and directors; (3) persons who properly

execute and file a timely request for exclusion from the Class; (4) persons whose claims in this

matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel

and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such

excluded persons.

49.     **Numerosity**: On information and belief, tens of thousands of consumers fall into

the definition of the Class. Members of the Class can be identified through Defendants' records,

discovery, and other third-party sources.

50.     **Commonality and Predominance**: There are many questions of law and fact

common to Plaintiffs' and the Class' claims, and those questions predominate over any questions

that may affect individual members of the Class. Common questions for the Class include, but

are not necessarily limited to the following:

FAC—CLASS ACTION
Case No. 15-cv-612-RBL

- 15 -

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

a.      Whether Defendants' online casino games are "gambling" as defined by
RCW § 9.46.0237;

b.      Whether Defendants are the proprietors for whose benefit the online
casino games are played;

c.      Whether Defendants violated the Washington Consumer Protection Act,
RCW § 19.86.010, *et seq.*; and

d.      Whether Defendants have been unjustly enriched.

51.     **Typicality**: Plaintiffs' claims are typical of the claims of other members of the
Class in that Plaintiffs' and the members of the Class sustained damages arising out of
Defendants' wrongful conduct.

52.     **Adequate Representation**: Plaintiffs will fairly and adequately represent and
protect the interests of the Class and have retained counsel competent and experienced in
complex litigation and Class actions. Plaintiffs' claims are representative of the claims of the
other members of the Class, as Plaintiffs and each member of the Class lost money playing
Defendants' games of chance. Plaintiffs also have no interests antagonistic to those of the Class,
and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed
to vigorously prosecuting this action on behalf of the Class and have the financial resources to do
so. Neither Plaintiffs nor their counsel have any interests adverse to the Class.

53.     **Superiority**: This case is also appropriate for certification because Class
proceedings are superior to all other available methods for the fair and efficient adjudication of
this controversy. The harm suffered by the individual members of the Class is likely to have been
relatively small compared to the burden and expense of prosecuting individual actions to redress
Defendants' wrongful conduct. Absent a Class action, it would be difficult for the individual
members of the Class to obtain effective relief from Defendants. Even if members of the Class
themselves could sustain such individual litigation, it would not be preferable to a Class action
because individual litigation would increase the delay and expense to all parties and the Court
and require duplicative consideration of the legal and factual issues presented. By contrast, a

FAC—CLASS ACTION
Case No. 15-cv-612-RBL

- 16 -

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

Class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

54.     Plaintiffs reserve the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

**FIRST CAUSE OF ACTION**
**Violations of Revised Code of Washington § 4.24.070**
**(On behalf of Plaintiffs and the Class)**

55.     Plaintiffs incorporates the foregoing allegations as if fully set forth herein.

56.     Plaintiffs, members of the Class, and Defendants are all "persons" as defined by RCW § 9.46.0289.

57.     Washington's "Recovery of money lost at gambling" statute, RCW 4.24.070, provides that "all persons losing money or anything of value at or on any illegal gambling games shall have a cause of action to recover from the dealer or player winning, or from the proprietor for whose benefit such game was played or dealt, or such money or things of value won, the amount of the money or the value of the thing so lost."

58.     "Gambling," defined by RCW § 9.46.0237, "means staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence."

59.     Defendants' "chips" sold for use in their online gambling games are "thing[s] of value" under RCW § 9.46.0285.

60.     Defendants' online gambling games are illegal gambling games because they are online games at which players wager things of value (the chips) and by an element of chance (*e.g.*, by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional chips).

61.     Defendants are the proprietors for whose benefit the online gambling games are played because they own the online gambling games and operates those games for their own profit.

FAC—CLASS ACTION
Case No. 15-cv-612-RBL

- 17 -

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

62.     Plaintiffs and the Class gambled when they purchased chips to wager at Defendants' online gambling games. Plaintiffs and each member of the Class staked money, in the form of chips purchased with money, at Defendants' games of chance (*e.g.*, Defendants' slot machines) for the chance of winning additional things of value (*e.g.*, chips that extend gameplay without additional charge).

63.     In addition, Defendants' online gambling games are not "pinball machine[s] or similar mechanical amusement device[s]" as contemplated by the statute because:

    a.     the games are electronic rather than mechanical;

    b.     the games confer replays but they are recorded and can be redeemed on separate occasions (*i.e.*, they are not "immediate and unrecorded"); and

    c.     the games contain electronic mechanisms that vary the chance of winning free games or the number of free games which may be won (*e.g.*, the games allow for different wager amounts).

64.     RCW § 9.46.0285 states that a "'Thing of value,' as used in this chapter, means any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise, directly or indirectly, contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge."

65.     The "chips" Plaintiffs and members of the Class had the chance of winning in Defendants' online gambling games are "thing[s] of value" under Washington law because they are credits that involve the extension of entertainment and a privilege of playing a game without charge.

66.     Defendants' online gambling games are "Contest[s] of chance," as defined by RCW § 9.46.0225, because they are "contest[s], game[s], gaming scheme[s], or gaming device[s] in which the outcome[s] depend[] in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein." Defendants' online

FAC—CLASS ACTION
Case No. 15-cv-612-RBL

- 18 -

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1  gambling games are programmed to have outcomes that are determined entirely upon chance and

2  a contestant's skill does not affect the outcomes.

3       67.    RCW § 9.46.0201 defines "Amusement game[s]" as games where "The outcome

4  depends in a material degree upon the skill of the contestant," amongst other requirements.

5  Defendants' online gambling games are not "Amusement game[s]" because their outcomes are

6  dependent entirely upon chance and not upon the skill of the player and because the games are

7  "contest[s] of chance," as defined by RCW § 9.46.0225.

8       68.    As a direct and proximate result of Defendants' gambling games, Plaintiffs and

9  each member of the Class have lost money wagering at Defendants' games of chance. Plaintiffs,

10  on behalf of themselves and the Class, seek to recover all lost monies, interest, and reasonable

11  attorneys' fees, expenses, and costs to the extent allowable.

12  **SECOND CAUSE OF ACTION**
**Violations of the Washington Consumer Protection Act, RCW § 19.86.010, *et seq.***

13  **(On behalf of Plaintiffs and the Class)**

14       69.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

15       70.    Washington's Consumer Protection Act, RCW § 19.86.010 *et seq.* ("CPA"),

16  protects both consumers and competitors by promoting fair competition in commercial markets

17  for goods and services.

18       71.    To achieve that goal, the CPA prohibits any person from using "unfair methods of

19  competition or unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ."

20  RCW § 19.86.020.

21       72.    The CPA states that "a claimant may establish that the act or practice is injurious

22  to the public interest because it . . . Violates a statute that contains a specific legislative

23  declaration of public interest impact."

24       73.    Defendants violated RCW § 9.46.010, *et seq.* which declares that:

25  "The public policy of the state of Washington on gambling is to keep the criminal
element out of gambling and to promote the social welfare of the people by limiting

26  the nature and scope of gambling activities and by strict regulation and control.

27  It is hereby declared to be the policy of the legislature, recognizing the close

    - 19 -

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

relationship between professional gambling and organized crime, to restrain all persons from seeking profit from professional gambling activities in this state; to restrain all persons from patronizing such professional gambling activities; to safeguard the public against the evils induced by common gamblers and common gambling houses engaged in professional gambling; and at the same time, both to preserve the freedom of the press and to avoid restricting participation by individuals in activities and social pastimes, which activities and social pastimes are more for amusement rather than for profit, do not maliciously affect the public, and do not breach the peace."

74.     Defendants have violated RCW § 9.46.010, *et seq.*, because Defendants' online games are illegal online gambling games.

75.     Defendants' wrongful conduct occurred in the conduct of trade or commerce—*i.e.*, while Defendants were engaged in the operation of making computer games available to the public.

76.     Defendants' acts and practices were and are injurious to the public interest because Defendants, in the course of their business, continuously advertised to and solicited the general public in Washington State and throughout the United States to play their unlawful online gambling games of chance. This was part of a pattern or generalized course of conduct on the part of Defendants, and many consumers have been adversely affected by Defendants' conduct and the public is at risk.

77.     Defendants have profited immensely from their operation of unlawful games of chance, amassing hundreds of millions of dollars from the losers of their games of chance.

78.     As a result of Defendants' conduct, Plaintiffs and the Class members were injured in their business or property—*i.e.*, economic injury—in that they lost money wagering on Defendants' unlawful games of chance.

79.     Defendants' unfair or deceptive conduct proximately caused Plaintiffs' and the Class members' injuries because, but for the challenged conduct, Plaintiffs and the Class members would not have lost money wagering at or on Defendants' games of chance, and they did so as a direct, foreseeable, and planned consequence of that conduct.

80.     Plaintiffs, on their own behalf and on behalf of the Class, seeks to recover actual damages and treble damages, together with the costs of suit, including reasonable attorneys' fees.

FAC—CLASS ACTION
Case No. 15-cv-612-RBL

- 20 -

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

## THIRD CAUSE OF ACTION
### Unjust Enrichment
### (On behalf of Plaintiffs and the Class)

81.     Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

82.     Plaintiffs and the Class have conferred a benefit upon Defendants in the form of the money Defendants received from them for the purchase of chips to wager at Defendants' online gambling games.

83.     Defendants appreciate and/or have knowledge of the benefits conferred upon them by Plaintiffs and the Class.

84.     Under principles of equity and good conscience, Defendants should not be permitted to retain the money obtained from Plaintiffs and the members of the Class, which Defendants have unjustly obtained as a result of their unlawful operation of unlawful online gambling games. As it stands, Defendants have retained hundreds of millions of dollars in profits generated from their unlawful games of chance and should not be permitted to retain those ill-gotten profits.

85.     Accordingly, Plaintiffs and the Class seek disgorgement and restitution of any money Defendants have retained as a result of the unlawful and/or wrongful conduct alleged herein.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court:

a)     Enter an Order certifying this case as a Class action on behalf of the Class defined above, appointing Plaintiffs as representatives of the Class, and appointing their counsel as Class counsel;

b)     Enter judgment against Defendants;

c)     Enter an Order awarding damages to Plaintiffs and the Class members in an amount to be determined at trial, including trebling and/or punitive damages as appropriate;

FAC—CLASS ACTION
Case No. 15-cv-612-RBL

- 21 -

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1    d)    Enter an Order awarding restitution to Plaintiffs and the Class members in an

2  amount to be determined at trial, and requiring disgorgement of all benefits that Defendants

3  unjustly received;

4    e)    Awarding reasonable attorney's fees and expenses;

5    f)    Awarding pre- and post-judgment interest, to the extent allowable;

6                                  **JURY DEMAND**

7    Plaintiffs requests a trial by jury of all claims that can be so tried.

8                                  Respectfully Submitted,

9                                  **CHERYL KATER AND SUZIE KELLY**,
                                   individually and on behalf of all others similarly
10                                 situated,

11

12  Dated: March 20, 2019          By: */s/ Janissa A. Strabuk*

13

14                                 TOUSLEY BRAIN STEPHENS PLLC
                                   Janissa A. Strabuk, WSBA #21827
15                                 Cecily C. Shiel, WSBA # 50061
                                   1700 Seventh Avenue, Suite 2200
16                                 Seattle, Washington 98101-4416
                                   Tel:    206.682.5600
17                                 Fax:    206.682.2992
                                   Email: jstrabuk@tousley.com
18                                 Email: cshiel@tousley.com

19                                 EDELSON PC
                                   Rafey Balabanian*
20                                 rbalabanian@edelson.com
                                   Todd Logan*
21                                 tlogan@edelson.com
                                   123 Townsend Street, Suite 100
22                                 San Francisco, California 94107
                                   Tel: 415.212.9300
23                                 Fax: 415.373.9435

24

25                                 *Pro hac vice.

26                                 *Attorneys for Plaintiffs and the Putative Class*

27

FAC—CLASS ACTION                          - 22 -
Case No. 15-cv-612-RBL