1
2
3
4
5
6

The Honorable Robert S. Lasnik

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

7
8
9
10
11
12
13
14

CHERYL KATER and SUZIE KELLY,
individually and on behalf of all others similarly
situated,

*Plaintiffs*,

*v.*

CHURCHILL DOWNS INCORPORATED, a
Kentucky corporation, and BIG FISH GAMES,
INC., a Washington corporation.

*Defendants.*

No. 15-cv-00612-RSL

**PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF CLASS ACTION
SETTLEMENT AGREEMENT**

Noting Date: January 15, 2021

15
16
17
18
19
20
21
22
23
24
25

MANASA THIMMEGOWDA, individually and
on behalf of all others similarly situated,

*Plaintiffs*,

*v.*

BIG FISH GAMES, INC., a Washington
corporation; ARISTOCRAT TECHNOLOGIES
INC., a Nevada corporation; ARISTOCRAT
LEISURE LIMITED, an Australian corporation;
and CHURCHILL DOWNS INCORPORATED,
a Kentucky corporation,

*Defendants.*

No. 19-cv-00199-RSL

**PLAINTIFF'S MOTION FOR FINAL
APPROVAL OF CLASS ACTION
SETTLEMENT AGREEMENT**

Noting Date: January 15, 2021

26
27

Motion for Final Approval
CASE NOS. 15-CV-612 & 19-CV-199 - i

1

## TABLE OF CONTENTS

2
INTRODUCTION ............................................................................................................... 1

3
BACKGROUND ................................................................................................................. 2

4
I.      Class Counsel's 2015 Social Casino Lawsuits, Including *Kater*. ................................ 3

5
II.     Class Counsel Appeals The *Kater* Dismissal And The Ninth Circuit Reverses. .......... 4

6
III.    Class Counsel's Post-Appeal Litigation Conduct Before This Court. ......................... 5

7
IV.     Class Counsel's Litigation-Adjacent Efforts On Behalf Of The Class. ....................... 9

8
V.      The Settlement Now Before The Court. ..................................................................... 12

9
THE TERMS OF THE SETTLEMENT AGREEMENT ................................................. 12

10
        A.      Settlement Class Definition ........................................................................... 12

11
        B.      Monetary Benefits ......................................................................................... 12

12
        C.      Prospective Relief .......................................................................................... 13

13
        D.      Release ........................................................................................................... 13

14
        E.      Attorneys' Fees and Expenses Requests & Incentive Award Requests .......... 14

15
ARGUMENT .................................................................................................................... 14

16
I.      The Court Need Not Revisit Class Certification. ...................................................... 14

17
II.     Notice Was Successful And Satisfied Due Process. .................................................. 14

18
III.    The Court Should Finally Approve The Settlement. ................................................. 17

19
        A.      Class Counsel and the Class Representatives have adequately
                represented the Class and support the Settlement. ........................................ 18

20
        B.      The Settlement was negotiated at arm's length. ............................................ 19

21
        C.      The amount offered in Settlement is adequate, taking into account the
                strength of Plaintiffs' case, and the risks inherent in further litigation. ........ 20

22
                i.      The Settlement Class would have faced significant delay before it
                        could have recovered anything on the merits ................................... 20

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

         ii.      **Given the risks involved with further litigation, the amount offered in Settlement is outstanding.** ....................................................22

  **D.**      **The Settlement treats Settlement Class Members equitably.** ..........................24

  **E.**      **Class Counsel had completed sufficient discovery to reach an informed judgment about the benefits of settling, and the quality of the Settlement.**....26

  **F.**      **The reaction of the Settlement Class has been favorable.** ...............................27

**CONCLUSION** .....................................................................................................................28

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

1

## <u>TABLE OF AUTHORITIES</u>

2

**United States Supreme Court Cases**

3

*Eisen v. Carlisle & Jacquelin,*
 417 U.S. 156 (1974) .................................................................... 14

*Frank v. Gaos,*
 139 S. Ct. 1041 (2019) ........................................................... 2, 23

**United States Circuit Court of Appeals Cases**

*Churchill Vill., L.L.C. v. Gen. Elec.,*
 361 F.3d 566 (9th Cir. 2004) ............................................... 17, 28

*Hanlon v. Chrysler Corp.,*
 150 F.3d 1011 (9th Cir. 1998) .................................................. 14

*In re Bluetooth Headset Prod. Liab. Litig.,*
 654 F.3d 935 (9th Cir. 2011) ......................................... 17, 19, 20

*In re Equity Funding Corp. of Am. Securities Litig.,*
 603 F.2d 1353 (9th Cir. 1979) .................................................. 25

*In re Google Referrer Header Privacy Litig.,*
 869 F.3d 737 (9th Cir. 2017) ............................................... 2, 23

*Juris v. Inamed Corp.,*
 685 F.3d 1294 (11th Cir. 2012) ............................................... 14

*Kater v. Churchill Downs,*
 886 F.3d 784 (9th Cir. 2018) ............................................. 4, 5, 21

*Mason v. Mach. Zone, Inc.,*
 851 F.3d 315 (4th Cir. 2017) ..................................................... 4

*Mullins v Direct Digital LLC,*
 795 F.3d 654 (7th Cir. 2015) .................................................... 14

*Rodriguez v. W. Publ'g Corp.,*
 563 F.3d 948 (9th Cir. 2009) ......................................... 19, 22, 28

**United States District Court Cases**

*Aikens v. Panatte, LLC*,
    No. 2:17-cv-01519 (W.D. Wash. Feb 5, 2019) ................................................................. 14

*Bayat v. Bank of the West*,
    No. C-13-2376 EMC, 2015 WL 1744342 (N.D. Cal. Apr. 15, 2015) ............................... 20

*Benson v. DoubleDown Interactive, LLC*,
    No. 18-cv-525 (W.D. Wash. June 17, 2020) ..................................................................... 21

*Clemans v. New Werner Co.*,
    No. 3:12-cv-5186, 2013 WL 12108739 (W.D. Wash. Nov. 22, 2013) ............................. 28

*Dupee v. Playtika Santa Monica, et al.*,
    No. 15-cv-01021 (N.D. Ohio) ............................................................................................ 4

*Gragg v. Orange CAB Co., Inc.*,
    No. 12-cv-0576 RSL, 2017 WL 785170 (W.D. Wash. Mar. 1, 2017) .............................. 19

*Helde v. Knight Transp., Inc.*,
    No. 2:12-cv-00904 RSL (W.D. Wash. May 24, 2017) ...................................................... 19

*Ikuseghan v. Multicare Health Sys.*,
    No. 3:14-cv-05539 BHS, 2016 WL 3976569 (W.D. Wash. July 25, 2016) ............... 22, 27

*In re Anthem, Inc. Data Breach Litig.*,
    327 F.R.D. 299 (N.D. Cal. 2018) ..................................................................................... 23

*In re Apple In-App Purchase Litigation*,
    No. 5:11-CV-01758 EJD, 2013 WL 1856713 (N.D. Cal. May 2, 2013) ...................... 2, 22

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) ........................................................................... 19

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
    No. 16-MD-02752-LHK, 2020 WL 4212811 (N.D. Cal. July 22, 2020) .......................... 23

*Kim v. Tinder, Inc.*,
    No. CV 18-3093-JFW(ASX), 2019 WL 2576367 (C.D. Cal. June 19, 2019) ................. 23

*Kater v. Churchill Downs Inc.*,
    No. 15-cv-612 (W.D. Wash) ...................................................................................*passim*

*Mason v. Mach. Zone, Inc.*,
    No. 15-cv-01107 (D. Md.) ............................................................................................ 3, 4

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

*Pelletz v. Weyerhouser Corp.*,
  255 F.R.D. 537 (W.D. Wash. 2009) ................................................................28

*Phillips v. Double Down Interactive LLC*,
  No. 15-cv-04301 (N.D. Ill.) ...........................................................................4

*Rinky Dink Inc. v. World Bus. Lenders, LLC*,
  No. C14-0268-JCC, 2016 WL 4052588 (W.D. Wash. Feb. 3, 2016) .........................26, 27

*Ristic v. Mach. Zone, Inc.*,
  No. 15-cv-08996 (N.D. Ill.) .............................................................................4

*Schneider v. Wilcox Farms, Inc.*,
  No. 07-CV-01160-JLR, 2009 WL 10726662 (W.D. Wash. Jan. 12, 2009) ..................28

*Thimmegowda v. Big Fish Games*,
  No. 19-cv-199 (W.D. Wash.) ...........................................................................6

*Walters v. Target Corp.*,
  No. 3:16-cv-1678-L-MDD, 2020 WL 6277436 (S.D. Cal. Oct. 26, 2020) ..................18

*Wilson v. Huuuge, Inc.*,
  No. 18-cv-05276 (W.D. Wash.) .......................................................................6

**Miscellaneous Authority**

2 McLaughlin on Class Actions
  § 6.23 (17th ed. 2020)..................................................................................25

9 U.S.C. § 16 ..................................................................................................21

*Addicted to losing: How casino-like apps have drained people of millions*,
  NBC NEWS (Sept. 14, 2020), *available at* https://nbcnews.to/39Lo1X1 ..................12

Dean Takahashi, *13 predictions for the future of the $3.4B social casino games market*,
  GAMESBEAT (Oct. 19, 2015, 6:00 AM), *available at* https://bit.ly/37TPao9..................2

Federal Judicial Center, *Judges' Class Action Notice & Claims Process Checklist & Plain
  Language Guide* 3 (2010), *available at*
  https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf..............................14

Fed. R. Civ. P. 23 ..................................................................................*passim*

*Harpooned by Facebook*,
  REVEAL-CENTER FOR INVESTIGATIVE REPORTING (Aug. 3, 2019), *available at*
  https://bit.ly/39NIdri....................................................................................11

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

H.B. 2041, 66th Leg., Reg Sess. (Wash. 2019) ............................................................... 10

H.B. 2720, 66th Leg., Reg. Sess. (Wash. 2020) .................................................... 10, 11, 21

*How social casinos leverage Facebook user data to target vulnerable gamblers*,
    PBS Newshour (Aug. 13, 2019), *available at* https://to.pbs.org/3lPRd1m .................... 11

Melissa Santos, *'Free' casino apps prey on addiction, users say, and WA lawmakers are considering a crackdown*,
    Crosscut (Feb. 7, 2020), *available at* https://bit.ly/3hfFxDl ......................................... 11

Phillip Conneller, *Washington State Social Gaming Legislation Could Rescue Big Fish Casino From Legal Trouble*,
    Casino.org (Jan. 29, 2020), *available at* https://bit.ly/39dKtWM ..................... 10, 11, 21

S.B. 5886, 66th Leg., Reg. Sess. (Wash. 2019) ............................................................... 10

S.B. 6568, 66th Leg., Reg. Sess. (Wash. 2020) ............................................................... 10

Edelson PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

**INTRODUCTION**

In 2015, Cheryl Kater initiated the first ever case alleging that social casino apps are illegal gambling under Washington law. Since that time, and joined by Suzie Kelly and Manasa Thimmegowda, Plaintiffs have vigorously litigated these cases before this Court, the Ninth Circuit (twice), the Washington State Gambling Commission, and even the Washington Legislature. After a 12-hour marathon mediation with the Honorable Layn R. Phillips (ret.), Plaintiffs and Defendants Churchill Downs, Big Fish Games, Aristocrat Technologies, and Aristocrat Leisure reached a class settlement, the cornerstone of which is the establishment of a non-reversionary $155 million common fund. At that level of recovery every class member who has ever lost money playing Defendants' social casino games can get a substantial portion of their losses back, and those with higher levels of losses are entitled to recover increasingly higher percentages of their losses. Utilizing data from the Platform Providers—the entities through which Class Members purchased chips to gamble at Defendants' social casinos—the Court-approved Notice Plan has been successfully implemented.

The reaction of the class to date has been exceptional: more than 50,000 Class Members have already submitted claims and the claims deadline is still several weeks out. By contrast, one class member has so far requested exclusion and there are currently no objections. Given the life-changing relief afforded, this volume of claims is not surprising and is consistent with the projections at preliminary approval. Participating Class Members stand to recover substantial portions of their losses with those that have lost the most standing to recover more than half of their gambling losses. *See* Declaration of Steven Weisbrot, Dkt. 219 ¶¶ 50-53. By way of example, Class Representatives Thimmegowda, Kater, and Kelly, who have previously estimated their losses at approximately $4,000, $40,000, and $400,000, are according to those estimates projected to recover $500-$1,000 (Thimmegowda), $10,000-$20,000 (Kater), and $200,000-$300,000 (Kelly). *Id.* Equally as important, the Settlement requires Defendants to provide addiction-related resources within their social casino games and create and honor a self-exclusion policy likes those at Washington brick-and-mortar casinos.

1    Given the novelty of Plaintiffs' claim, Professor William B. Rubenstein (author of

2    influential treatise NEWBERG ON CLASS ACTIONS) describes the recovery as an "astounding

3    accomplishment" and calls the relief provided "historic." And although there are no truly

4    comparable settlements, it dwarfs its nearest factual equivalent, *In re Apple In-App Purchase*

5    *Litigation.*, No. 5:11-CV-01758 EJD, 2013 WL 1856713, at *1 (N.D. Cal. May 2, 2013)

6    (providing $5 to users of apps that "compel children playing them to purchase large quantities"

7    of in-game currency, "amounting to as much as $100 *per purchase* or more") (emphasis added)

8    and far surpasses the typical consumer privacy class settlement, which often provides *cy pres*

9    relief with no individual payments, *see In re Google Referrer Header Privacy Litig.*, 869 F.3d

10   737, 740 (9th Cir. 2017), *vacated on other grounds by Frank v. Gaos*, 139 S. Ct. 1041 (2019).

11   For the reasons that follow, this settlement is fair, reasonable, and adequate and the Court

12   should not hesitate to grant final approval.

## BACKGROUND

14   For the Court's convenience, the "Background" section from Class Counsel's

15   contemporaneously-filed motion for attorneys' fees, expenses, and incentive awards is replicated

16   below.

17   In 2014, Class Counsel began investigating the burgeoning social casino industry. *See*

18   Declaration of Todd Logan ("Logan Decl.") ¶ 3. The results of that investigation were startling:

19   multinational gambling corporations like Churchill Downs, International Game Technology, and

20   Scientific Games had found a way to smuggle slot machines onto consumers' smart phones

21   without complying with any federal or state gambling laws. *Id.* ¶ 4. By 2015, social casino

22   games like "Big Fish Casino" were capturing more than $3 billion in annual revenues.[1] Those

23   revenues, just like those of Vegas casinos, were disproportionately derived from gambling

24   addicts who just couldn't stop themselves from buying chips and spinning the slots. Moreover,

---

[1]    *See* Dean Takahashi, *13 predictions for the future of the $3.4B social casino games market*, GAMESBEAT
(Oct. 19, 2015, 6:00 AM), *available at* https://bit.ly/37TPao9.

1    those revenues—at least in Class Counsel's judgment—were entirely ill-gotten gains under a

2    variety of state gambling laws. *See* Logan Decl. ¶ 4.

3            Based on that investigation, in 2015 Class Counsel initiated a nationwide, multi-forum

4    campaign against the social casino industry. As Professor William B. Rubenstein, the sole author

5    of NEWBERG ON CLASS ACTIONS, summarizes that campaign (and its results):

> Prior to entering academia, I was a lawyer at the national office of the
> American Civil Liberties Union (ACLU) for nearly a decade, during which
> time I pursued civil rights campaigns on behalf of minority groups. Based
> on that experience, it strikes me that what Class Counsel have pursued here
> is closer in form to a civil rights litigation campaign than it is to a series of
> discrete class action settlements. Class Counsel saw an injustice – a thinly
> disguised form of gambling preying on those most vulnerable to addictive
> gambling – and they sought to fix it. Their goal was not to win a case but to
> reform an entire industry, much like a civil rights campaign might aim to
> reform a particular type of discriminatory practice across an entire
> employment sector. To accomplish this end, Class Counsel went far beyond
> what lawyers pursuing a simple class action case would normally do. Class
> Counsel pursued multiple cases. Class Counsel pursued multiple
> defendants. Class Counsel filed actions in multiple forums. Class Counsel
> tested various state laws. Class Counsel built websites to help app users
> avoid forced arbitration clauses, lobbied legislators and regulators, and took
> their efforts to the media. When Class Counsel lost, they did not give up,
> but changed tactics or forums and kept going. And they did all of this with
> their own funds, risking millions of dollars of their own money to end this
> practice. What they have achieved so far, with these initial settlements, is
> an astounding accomplishment that begins to chip away at the pernicious
> underlying social casinos.

18   Declaration of Professor William B. Rubenstein ("Rubenstein Decl.") ¶ 2.

19           Because the extraordinary settlement here is but a part of Class Counsel's efforts carrying

20   the banner nationwide for victims of the social casino industry, a summary of Class Counsel's

21   efforts both before this Court and otherwise is provided below.

22   **I.      Class Counsel's 2015 Social Casino Lawsuits, Including *Kater*.**

23           Having concluded that social casinos constitute gambling, between April and October of

24   2015, Class Counsel filed five (5) proposed class action lawsuits, in four (4) different courts,

25   alleging class claims under five (5) different sets of state gambling laws. *See* **(1)** *Mason v. Mach.*

26   *Zone, Inc*., No. 15-cv-01107 (D. Md. Apr. 17, 2015) (alleging claims under California and

27   Illinois gambling laws); **(2)** *Kater v. Churchill Downs Inc.*, No. 15-cv-612 (W.D. Wash. Apr. 17,

1   2015) (alleging claims under Washington gambling law); **(3)** *Dupee v. Playtika Santa Monica, et*

2   *al.*, No. 15-cv-01021 (N.D. Ohio May 21, 2015) (alleging claims under Ohio and Nevada

3   gambling laws); **(4)** *Phillips v. Double Down Interactive LLC*, No. 15-cv-04301 (N.D. Ill.)

4   (removed May 14, 2015) (alleging claims under Illinois gambling laws); **(5)** *Ristic v. Mach.*

5   *Zone, Inc.*, No. 15-cv-08996 (N.D. Ill. Oct. 9, 2015) (alleging claims under Illinois gambling

6   laws).

7   Each federal district court initially presented with Class Counsel's theory of these

8   cases—*i.e.*, that social casinos are illegal gambling and consequently must return to consumers

9   their ill-gotten gains—squarely rejected it. *See Mason v. Mach. Zone, Inc.*, 851 F.3d 315, 316

10  (4th Cir. 2017); *Kater v. Churchill Downs Inc.*, No. C15-612 MJP, 2015 WL 9839755, at *3

11  (W.D. Wash. Nov. 19, 2015), *rev'd*, 886 F.3d 784 (9th Cir. 2018); *Dupee v. Playtika Santa*

12  *Monica*, No. 15-cv-01021, 2016 WL 795857, at *1 (N.D. Ohio Mar. 1, 2016); *Phillips v. Double*

13  *Down Interactive LLC*, 173 F. Supp. 3d 731, 739 (N.D. Ill. 2016); *Ristic v. Mach. Zone, Inc.*, No.

14  15-CV-8996, 2016 WL 4987943, at *4 (N.D. Ill. Sept. 19, 2016). In representative fashion,

15  Judge Pechman's dismissal order in *Kater* concluded that "Big Fish Casino does not award

16  something of value satisfying the requisite prize element, and therefore the game is not 'illegal

17  gambling' under Washington law." *Kater*, 2015 WL 9839755, at *3.

18  **II.    Class Counsel Appeals The *Kater* Dismissal And The Ninth Circuit Reverses.**

19  Following Judge Pechman's dismissal order in *Kater*, Class Counsel appealed. Merits

20  briefing before the Ninth Circuit concluded in September 2016, and oral argument was held in

21  February 2018. Along the way, Defendant Churchill Downs moved to substitute Big Fish

22  Games, Inc. as the real party in interest, on grounds that as a result of an impending sale it would

23  "soon lack any interest in either Big Fish Games, Inc., or Big Fish Casino." *Kater v. Churchill*

24  *Downs*, No. 16-35010, Dkt. 48 at 6 (9th Cir. 2018). Class Counsel opposed that motion. *See id.*,

25  Dkt. 50 at 3 ("Ms. Kater alleges that Churchill Downs—not Big Fish Games—retained the

26  benefit of what she lost gambling at the Big Fish Casino.")

27  In March 2018, the Ninth Circuit reversed:

> In this appeal, we consider whether the virtual game platform "Big Fish Casino" constitutes illegal gambling under Washington law. Defendant–Appellee Churchill Downs, the game's owner and operator, has made millions of dollars off of Big Fish Casino. However, despite collecting millions in revenue, Churchill Downs, like Captain Renault in *Casablanca*, purports to be shocked—shocked!—to find that Big Fish Casino could constitute illegal gambling. We are not. We therefore reverse the district court and hold that because Big Fish Casino's virtual chips are a "thing of value," Big Fish Casino constitutes illegal gambling under Washington law.

*Kater*, 886 F.3d 784, 785 (9th Cir. 2018). In that opinion, the Ninth Circuit dispensed with a variety of the arguments that had persuaded district courts nationwide to initially dismiss the social casino cases. For example, the Court rejected the argument that social casino chips "do not extend gameplay, but only enhance it." *Id.* at 787. The Circuit also rejected Big Fish's argument that the Washington State Gambling Commission ("WSGC") had determined that social casino games aren't gambling, concluding that "these documents do not indicate that the Commission adopted a formal position on social gaming platforms." *Id.* at 788. And the Ninth Circuit explicitly rejected "the reasoning of other federal courts that have held that certain 'free to play' games are not illegal gambling." *Id.*

The Ninth Circuit also denied Churchill Down's motion to be substituted out of the case. *See Kater*, No. 16-35010, Dkt. 55 at 10-11 n.4 (denying Churchill Downs' Rule 43(b) motion). Class Counsel's insistence that Churchill Downs remain in the case benefited the Class enormously, as Churchill Downs ultimately contributed $124 million of the $155 million settlement now before the Court.

## III.    Class Counsel's Post-Appeal Litigation Conduct Before This Court.

Upon remand, *Kater* was reassigned to Judge Leighton. Dkt. 59.[2] Churchill Downs promptly moved to compel Kater's case to arbitration, arguing that Kater had previously agreed to Big Fish Games' Terms of Use (and its mandatory arbitration provision). Dkt. 60. Kater opposed, arguing *inter alia* that Churchill Downs had waived any right to compel arbitration by seeking a dismissal on the merits in 2015. *See generally* Dkt. 68. In November 2018 Judge

---

[2]        Unless otherwise indicated, all "Dkt." citations are to *Kater*, No. 15-cv-612 (W.D. Wash. Apr. 17, 2015).

EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

1   Leighton agreed, denying Churchill Downs' motion because "Churchill Downs waived its right

2   to arbitration when it took its first bite of the apple and chewed thoroughly for over three years."

3   Dkt. 75 at 11. Churchill Downs then answered Kater's complaint in November 2018. Dkt. 76.

4   In February 2019, the Parties began disputing the propriety of adding additional parties

5   into the case. The results of these disputes were two-fold: first, Class Counsel filed an amended

6   complaint in *Kater* adding Suzie Kelly as a Class Representative and adding Big Fish Games as a

7   defendant, *see* Dkt. 85; and second, Class Counsel filed the *Thimmegowda* action as a

8   companion case that expanded the temporal scope of the classes that Class Counsel sought to

9   represent. *See Thimmegowda v. Big Fish Games*, No. 19-cv-199 (W.D. Wash.).

10   The next year of litigation was consumed with motion practice and discovery disputes. In

11   May 2019, in the *Thimmegowda* action, Big Fish moved to compel arbitration, *see*

12   *Thimmegowda* Dkt. 33, and Aristocrat and Churchill Downs moved to dismiss for lack of

13   personal jurisdiction. *See Thimmegowda* Dkt. 35. The very same day, Big Fish and Churchill

14   Downs moved to compel arbitration in the *Kater* matter. *See* Dkt. 100. With these motions

15   pending, the Parties engaged in protracted negotiations over the manner and scope of discovery,

16   which ultimately resulted in a sixteen-part discovery and scheduling agreement. *See* Dkt. 118.

17   On September 12, 2019, Defendants' arbitration and jurisdiction motions were terminated with

18   leave to refile when Judge Leighton stayed both cases pending the Ninth Circuit's disposition of

19   an arbitration interlocutory appeal of an arbitration issue in a related case, *Wilson v. Huuuge,*

20   *Inc.*, No. 18-cv-05276 (W.D. Wash.). *See* Dkt. 121.

21   By the fall, the cases veered further into waters uncharted in the class action space. In

22   October 2019, Big Fish launched a pop-up in its games that—if clicked—purported to bind its

23   players to the "Dispute Resolution Provision," requiring them to arbitrate any claims against

24   Defendants and to cut the relevant statutes of limitations. Dkt. 218 ¶ 3. In response, Plaintiffs

25   moved for a temporary restraining order to enjoin Big Fish from displaying the pop-up. *See* Dkt.

26   122. After briefing and argument, Judge Leighton granted Plaintiffs' motion in part, labeling Big

27   Fish's pop-up "coercive and misleading." Dkt. 137 at 7. But in the same stroke, Judge Leighton

1   ordered the Parties to propose language regarding any future similar pop-up windows, *see id.*,

2   and after the Parties submitted competing proposals, the Court approved Defendants' proposal.

3   Dkt. 145. With this Court-approved language in hand, Defendants aggressively presented their

4   players with revised pop-ups in December 2019 (and then again in February 2020 and April

5   2020)—aimed at preventing putative class members, *en masse*, from participating in this

6   litigation. Dkt. 218 ¶ 4.

7       Plaintiffs responded to this development in "enterprising" fashion, *see* Mar. 4, 2020 Hr'g

8   Tr. at 5:9. Specifically, because the Court-approved language allowed putative class members to

9   opt out of the arbitration provision, Plaintiffs' counsel established a website to help those class

10  members opt out of Big Fish's Dispute Resolution Provision by sending Big Fish's legal

11  department a postcard with the click of a button. *See* Dkt. 159. Within days of the website's

12  launch, scores of putative class members had opted out of Big Fish's Dispute Resolution

13  Provision. *See* Dkt. 218 ¶ 6. Defendants moved the Court for a Rule 23(d) protective order to

14  immediately shut down Class Counsel's website, *see* Dkt. 164, but that motion was denied. *See*

15  Dkt. 185. Both Parties appealed to the Ninth Circuit and both appeals were dismissed for lack of

16  appellate jurisdiction. *See* Dkts. 188, 189.

17      In the midst of this dispute, Plaintiffs moved to certify a class under Fed. R. Civ. P.

18  23(b)(2) and to preliminarily enjoin the sale of virtual chips in Big Fish's games. *See* Dkt. 176.

19  On March 4, 2020, prior to Defendants' response date, Judge Leighton denied Plaintiffs' motion

20  without prejudice, spelling out a clear roadmap for the next steps in the litigation: Defendants'

21  renewed arbitration and personal jurisdiction motions would come first, and in the meantime, the

22  Parties would cooperate on a stipulated briefing schedule, ESI Protocol, Protective Order, and

23  limited discovery. *See* Dkt. 185.

24      The Parties fought tooth and nail on each point. They could not reach agreement on a

25  briefing schedule and proposed competing schedules to the Court. *See* Dkt. 186; Dkt. 187. They

26  could not reach agreement on an ESI Protocol and Protective Order, so Plaintiffs moved for entry

27  of the District's model orders. *See* Dkt. 192. And they could not agree on the scope of discovery

1   ahead of the renewed motions, so Plaintiffs moved to compel outstanding jurisdictional

2   discovery requests. *See* Dkt. 191. Ultimately, the Court entered Defendants' briefing schedule

3   and granted both of Plaintiffs' contested motions, ordering Defendants to produce a bevy of

4   internal documents and communications. *See id.*; Dkt. 213. On April 10, 2020, Defendants filed

5   their renewed arbitration and jurisdiction motions, which the Parties fully briefed. *See* Dkt. 205.

6   It was at this point that the Parties agreed to attempt to resolve these cases through mediation.

7       Settlement talks began in earnest in April 2020. The Parties agreed to schedule a

8   mediation session on May 22, 2020 with Judge Layn Phillips (ret.). *See* Dkt. 218 ¶ 12. From that

9   point forward, over the next several weeks, the Parties were in near-daily communication with

10  the Phillips ADR team and each other, as the Parties sought to crystallize the disputed issues,

11  produce focal information and data, and narrow down potential frameworks for resolution. *Id.*

12  ¶ 13. During this period, Defendants provided Plaintiffs with several sets of detailed

13  transactional data, the Parties exchanged more than fifty (50) pages of briefing on the core facts,

14  legal issues, litigation risks, and potential settlement structures, and the Parties supplemented that

15  briefing with extensive written and telephonic correspondence, mediated by the Phillips ADR

16  team, clarifying each other's positions in advance of the mediation. *See id.*

17      On May 22, 2020, the Parties participated in a full-day (indeed, more than twelve-hour-

18  long) video-mediation. *See id.* ¶ 14. Following several rounds of arms-length negotiations

19  facilitated by Judge Phillips, the Parties agreed to a settlement in principle, which was

20  memorialized in the form of a binding term sheet. *See id.*; Dkt. 214. But the negotiations didn't

21  end there: over the next two months, the Parties worked out the details of a fulsome final

22  settlement agreement, exchanged several rounds of a working settlement document and

23  supporting exhibits, met and conferred telephonically to flesh out the remaining disputed

24  provisions, and together met and conferred with Apple Inc., Google LLC, and Facebook, Inc.

25  (collectively, the "Platform Providers") to help design a robust Notice Plan. *See* Dkt. 218 ¶ 16.

26  On July 23, 2020, the Parties executed the Settlement Agreement before the Court. *See id.* ¶ 29.

27

**IV.     Class Counsel's Litigation-Adjacent Efforts On Behalf Of The Class.**

       As a necessary extension of the traditional litigation work necessitated by these cases,

Class Counsel has for years undertaken all manner of litigation-adjacent work for the benefit of

the Class. These efforts are organized into three categories and summarized below.

       *First*, Class Counsel went to great lengths to protect this litigation from collateral

administrative attacks. Just two weeks after the Ninth Circuit's mandate issued in *Kater*, Big Fish

dispatched its Covington & Burling lawyers—*i.e.*, the same lawyers defending *Kater*—to the

WSGC session in Tacoma to present a "Petition for a Declaratory Order" asking the Commission

to declare that Big Fish's games "do[] not constitute gambling within the meaning of the

Washington Gambling Act, RCW 9.46.0237." Dkt. 79-5 at 1. At each of the three public

hearings that followed—in July 2018 (in Tacoma), August 2018 (in Pasco), and October 2018 (in

Olympia)—Class Counsel appeared before the Commission, and Class Counsel presented live

argument at both the Tacoma and Pasco hearings. *See* Logan Decl. ¶ 10. Class Counsel

supplemented these appearances with a formal letter to the Commission (ahead of the Tacoma

hearing) and, on the Commission's request, with an eighteen-page comment for the

Commission's consideration (between the Tacoma and Pasco hearings). *Id.* The WSGC

ultimately declined to enter a Declaratory Order. *See* Dkt. 74-1. And even after the initial

declaratory order proceedings, Class Counsel continued to represent the interests of the Class in

additional flare-ups before the WSGC, including in similar declaratory order proceedings

initiated by The Stars Group. *See* Logan Decl. ¶ 11.

       *Second*, Class Counsel has been the frontline opposition to Defendants' attempt to change

Washington's gambling laws. Starting in early 2019, the International Social Gaming

Association ("ISGA") provided legislators draft legislation that would amend Washington's

gambling statutes with the effect (and specific intent) of gutting these lawsuits. *See id.* ¶ 12. Over

time, these efforts gained steam, with Senators Mark Mullet and John Braun, as well as

Representatives Zack Hudgins, Brandon Vick, Bill Jenkin and Brian Blake, collectively

sponsoring four (4) bills threatening to kill these cases by "clarifying" that players who lose

money playing social casinos cannot recover under the RMLGA. H.B. 2720, 66th Leg., Reg.

Sess. (Wash. 2020); S.B. 6568, 66th Leg., Reg. Sess. (Wash. 2020); H.B. 2041, 66th Leg., Reg

Sess. (Wash. 2019); S.B. 5886, 66th Leg., Reg. Sess. (Wash. 2019). Local and national media

covered these efforts and left no doubt as to what the ISGA hoped to accomplish. *See, e.g.*,

Phillip Conneller, *Washington State Social Gaming Legislation Could Rescue Big Fish Casino*

*From Legal Trouble*, CASINO.ORG (Jan. 29, 2020), *available at* https://bit.ly/39dKtWM.

In response, Class Counsel engaged the lobbying firm Peggen & Mara Political

Consulting LLP—experts in Washington tribal and gambling laws—to help Class Counsel (i)

stay on top of all administrative and legislative developments in the Washington gaming

industry; (ii) understand the intricacies of Washington's specific legislative process, including

the nuances of—and procedures for—bill drafting; (iii) understand who the relevant lawmakers

and stakeholders in Washington's gaming industry were, what those lawmakers and stakeholders

cared about, and how Class Counsel could educate those lawmakers and stakeholders about

social casinos; and (iv) work with legislative groups, task forces, and other interested parties in

in Washington's gaming industry, including the Washington Indian Gaming Association

("WIGA"). *See* Logan Decl. ¶ 13.

Class Counsel then used this information and expertise to amplify the Class's interests

and concerns. Class Counsel drafted memos and prepared handouts for a variety of stakeholders,

including State Senators and Representatives, the WIGA, the Washington Trial Attorneys'

Association, the Public Interest Research Group, and other organizations dedicated to remedying

problem gambling. *Id.* ¶ 14.

Class Counsel also personally met with lawmakers in the Washington Senate and House,

met with officials in the Executive branch, and provided in-person testimony to the Washington

Legislature. *Id.* ¶ 15. For example, in January 2019—after Class Counsel got wind that

Defendants and the ISGA were planning to gut Washington's gambling statutes (in what would

become the failed H.B. 2041 and S.B. 5886)—Class Counsel met in-person with Representative

Shelley Kloba, then-Representative (and now Senator) Derek Stanford, Lieutenant Governor

1   Cyrus Habib, and several other government officials. *Id.* ¶ 16. On January 28, 2020, Class

2   Counsel met with Senator Stanford at the State Capitol—following Class Counsel's written and

3   in-person testimony before the House Civil Rights & Judiciary Committee in (successful)

4   opposition to H.B. 2720. *Id.* ¶ 17.

5          Class Counsel's efforts went beyond in-person testimony and meetings with legislative

6   and executive officials. On March 21, 2019, Class Counsel sent formal correspondence to

7   Senator Mark Mullet ahead of a planned work session before the Senate and Financial

8   Institutions, Economic and Trade Committee about the *Kater* matter—in which Defendants

9   Aristocrat and Big Fish Games had been invited, but Class Counsel had not. *Id.* ¶ 18. In August

10  2019, Class Counsel traveled to Anacortes—on Swinomish Tribe land—to speak at a monthly

11  WIGA meeting, in opposition to the ISGA-backed bills. *Id.* ¶ 19. And in early 2020, Class

12  Counsel coordinated the submission of more than 200 letters to Washington State

13  Representatives from Big Fish Casino players across the country and spoke with local press

14  about the ISGA's renewed efforts to gut these lawsuits. *See id.* ¶ 20; *see also* Melissa Santos,

15  *'Free' casino apps prey on addiction, users say, and WA lawmakers are considering a*

16  *crackdown*, CROSSCUT (Feb. 7, 2020), *available at* https://bit.ly/3hfFxDl. These efforts held the

17  line. Each bill introduced over the past two years has stalled.

18         *Third*, beyond Class Counsel's work on legislative and administrative fronts, Class

19  Counsel also helped its clients sound the alarm on social casinos to the public at large by helping

20  clients share their stories with local and national media, including in the following pieces:

21  •   *Harpooned by Facebook*, REVEAL-CENTER FOR INVESTIGATIVE REPORTING (Aug.
        3, 2019), *available at* https://bit.ly/39NIdri (featuring radio interview with Class
22      Representative Suzie Kelly)

23  •   *How social casinos leverage Facebook user data to target vulnerable gamblers*,
        PBS NEWSHOUR (Aug. 13, 2019), *available at* https://to.pbs.org/3lPRd1m
24      (featuring television interview with Class Representative Suzie Kelly)

25  •   Melissa Santos, *'Free' casino apps prey on addiction, users say, and WA*
        *lawmakers are considering a crackdown*, CROSSCUT (Feb. 7, 2020), *available at*
26      https://bit.ly/3hfFxDl (featuring Class Representative Suzie Kelly, Class Member
        Jill Interrante, and Class Counsel Alexander Tievsky)

27

Motion for Final Approval
CASE NOS. 15-CV-612 & 19-CV-199 - 11

- *Addicted to losing: How casino-like apps have drained people of millions*, NBC NEWS (Sept. 14, 2020), *available at* https://nbcnews.to/39Lo1X1 (featuring interviews with Class Members).

## V.     The Settlement Now Before The Court.

Following all of these efforts, and with the assistance of the Judge Phillips, Class Counsel reached a Settlement with Defendants that provides a non-reversionary cash recovery of $155 million from which every class member who has ever lost money playing Defendants' social casino games is entitled to recover a substantial portion of their losses back. *See* Dkt. 218-1 § 1.32 (the "Agreement"). Class members with higher levels of losses are entitled to recover increasingly higher percentages of their losses, and the upper echelons of "VIP" players stand to recover more than half of their losses. *See id.* §§ 1.36, 2.1(c). The Settlement also requires Defendants to implement meaningful prospective relief, including by providing addiction-related resources within their social casino games and by creating and honoring a self-exclusion policy akin to what one might expect to soon see at the Emerald Queen or the Muckleshoot casinos. *See id.* § 2.2.

### THE TERMS OF THE SETTLEMENT AGREEMENT

For the Court's convenience, the key terms of the Agreement are briefly summarized as follows:

**A.     Settlement Class Definition:** The Settlement Class is defined as follows: "all persons in the United States who played Big Fish Casino, Jackpot Magic Slots, or Epic Diamond Slots on or before Preliminary Approval of the Settlement."[3] *See* Agreement § 1.33.

**B.     Monetary Benefits:** Defendants agreed to establish a $155,000,000.00 Settlement Fund from which each Settlement Class Member who files a valid claim will be entitled to recover a cash payment, after deducting administrative expenses, any fee award to Class

---

[3]     Excluded from the Settlement Class are (1) any Judge or Magistrate presiding over this action and members of their families, (2) the Defendants, Defendants' subsidiaries, parent companies, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former officers, directors, and employees, (3) persons who properly execute and file a timely request for exclusion from the class, and (4) the legal representatives, successors or assigns of any such excluded persons. *See* Agreement § 1.33.

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

1    Counsel, and any incentive payments to the Class Representatives. *See id.* §§ 1.32, 1.35. No

2    portion of the Settlement Fund will revert to Defendants. *Id.* § 2.1(j). Any Settlement Class

3    Member checks not cashed within 90 days of issuance will be either be placed in a second

4    distribution fund or donated to a Court-approved *cy pres* recipient. *Id.* § 2.1(i)*.* As described in

5    detail in the Plan of Allocation, the amount of each Settlement Class Member's payment will

6    vary based on the Settlement Class Member's total losses (those with higher loss amounts are

7    eligible to recover a greater percentage of their losses), whether the Settlement Class Member is

8    potentially subject to Big Fish's Dispute Resolution Provision, and overall Settlement Class

9    Member participation levels. *See id.* §§ 1.36, 2.1(c); Exhibit E. Based on its experience, Angeion

10   Group (the "Settlement Administrator") anticipates that participating Settlement Class Members

11   in the highest category of Lifetime Spending Amounts will recover the majority of their losses,

12   and that participating class members in the smallest category of Lifetime Spending Amounts will

13   recover more than 10% of their losses. *See* Dkt. 219, ¶ 53. Settlement Class Members will be

14   able to quickly and easily estimate the amount of their potential payment on the Settlement

15   Website. *See* Agreement § 4.2(c). Based on preliminary claims data, Class Counsel expect

16   recoveries to fall within the range originally projected by the Claims Administrator.

17        **C.    Prospective Relief:** Defendants have agreed to establish a voluntary self-

18   exclusion policy that will allow players to exclude themselves from further gameplay. *See*

19   Agreement § 2.2. Defendants must also make a link to that policy prominently available within

20   the games, and their customer service representatives will provide the link to players who contact

21   them and reference or exhibit video game behavior disorders. *See id.* Defendants have also

22   agreed to other prospective relief measures, including changes to game mechanics such that

23   when players run out of virtual chips, they won't need to purchase additional chips or wait to

24   receive free additional chips to keep playing Defendants' games. *See id.*

25        **D.    Release:** In exchange for the monetary relief described above, Defendants and

26   other entities, including the Platform Providers Facebook, Apple, Google, and Amazon will be

27   released from all claims raised in these cases relating to the operation of their casino style games

1   and the sale of virtual chips in those games, including claims that the games were illegal

2   gambling or the chips were "things of value." The full release is contained at *id.* § 1.27.

3       **E.   Attorneys' Fees and Expenses Requests & Incentive Award Requests:**

4   Contemporaneously with the filing of this motion, Class Counsel are filing a motion for

5   attorneys' fees, expenses, and incentive awards.

6                              **ARGUMENT**

7   **I.    The Court Need Not Revisit Class Certification.**

8           A threshold inquiry at final approval is whether the Class satisfies the requirements of

9   Federal Rule of Civil Procedure 23(a) and (b). *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011,

10  1019-1022 (9th Cir. 1998). Because no relevant facts have changed since the Court certified the

11  Settlement Class, Dkt. 221, the Court need not revisit class certification here. *See, e.g.*, *Aikens v.*

12  *Panatte, LLC*, No. 2:17-cv-01519, Dkt. 54 (W.D. Wash. Feb 5, 2019) (Lasnik, J.).

13  **II.   Notice Was Successful And Satisfied Due Process.**

14          Prior to granting final approval to this Settlement, the Court must consider whether the

15  Class members received "the best notice that is practicable under the circumstances, including

16  individual notice to all members who can be identified through reasonable effort." Fed. R. Civ.

17  P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). "The rule does

18  not insist on actual notice to all class members in all cases." *Mullins v Direct Digital LLC*, 795

19  F.3d 654, 665 (7th Cir. 2015); *see also Juris v. Inamed Corp.*, 685 F.3d 1294, 1321 (11th Cir.

20  2012) (noting that "even in Rule 23(b)(3) class actions, due process does not require that class

21  members actually receive notice" and collecting cases). Although what constitutes the "best

22  notice practicable" is case-specific, the Federal Judicial Center has noted that a notice campaign

23  that reaches 70% of a class is often reasonable. Federal Judicial Center, *Judges' Class Action*

24  *Notice & Claims Process Checklist & Plain Language Guide* 3 (2010), *available at*

25  https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf.

26          The Court already provisionally approved the Notice Plan proposed by the Class

27  Representatives and Class Counsel. Dkt. 221 at 5-6. That plan utilized both direct and

publication notice to the Settlement Class. *Id.* To provide direct notice to all who were eligible to submit a claim for payment from the Settlement, Class Counsel worked with Counsel for Defendants and also subpoenaed a variety of third parties to obtain contact information for everyone with a Lifetime Spending Amount of greater than zero (*i.e.*, those who are entitled to make a claim against the Settlement Fund). *See generally* Declaration of Steven Weisbrot ("Weisbrot Decl.") As the Court is well aware, this was not an easy process. Class Counsel engaged in extensive negotiations with the Platform Providers. Apple, Google, and Facebook ultimately provided Class Counsel with sufficient data to effectuate the Notice Plan. Class Counsel was forced to move to compel the necessary data from Amazon. Dkt. 224. Ultimately, after two orders from this Court (*see* Dkts. 250, 256)—and even then further negotiations— Amazon provided the necessary information. *See* Weisbrot Decl. ¶¶ 22-26.

Once that data was collected, it was transmitted to Angeion Group, the Settlement Administrator, to compile a complete Class List. The Defendants and Platform Providers ultimately provided Angeion with contact information for approximately 2.8 million accounts. Once duplicate emails were removed, Angeion created a notice list of 2,228,215 emails. *See id.* ¶ 13. Angeion sent out two rounds of email notice. In the first round (which did not include Settlement Class Members whose information was provided by Amazon, given the timing of Amazon's data production), 1,074,024 emails were successfully delivered. *See id.* ¶ 14. A large portion of the emails sent in this round were prevented by Google from being successfully delivered (a so-called "soft bounce"). *See id.* ¶ 15. Angeion adjusted its strategy for email delivery on the second round of email notice, and those changes worked: during the follow-up reminder notice campaign, Angeion sent emails to 2,150,037 email addresses (those associated with an account that had not yet submitted a claim), and 2,059,603 (or 95.8%) were successfully delivered. *See id.* ¶ 27.

Additionally, using the information provided by Defendants and the Platforms, Angeion performed a "reverse look-up" to find mailing information for every account with at least $100 in Lifetime Spending Amount. *See id.* ¶ 12. That analysis yielded 122,521 postal addresses. *Id.*

1   That data was combined with address information provided by the Platforms. *See id.* ¶ 13.

2   Angeion sent postcard notice to each of these individuals via First Class U.S. Mail. All told,

3   Angeion sent postcard notice to 230,234 addresses. *See id.* ¶ 17.

4         As of December 9, 2020, 2,213 Postcard Notices were returned by the USPS with a

5   forwarding address. *Id.* ¶ 20. Angeion updated its database with the new addresses and Postcard

6   Notices were forwarded to the new addresses. *Id.* Also as of December 9, 2020, 21,079 Postcard

7   Notices were returned as undeliverable by the USPS without a forwarding address. *Id.* ¶ 21.

8   Angeion conducted address verification searches ("skip traces") in an attempt to locate updated

9   addresses. *Id.* Angeion identified 15,392 updated addresses via skip tracing and updated its

10  database with the new addresses to be remailed. *Id.*

11        Direct notice was to be supplemented by online publication notice in the form of digital

12  advertisements targeted to be seen by individuals most likely to be part of the Settlement Class.

13  As an Angeion employee averred at preliminary approval, digital advertisements were placed

14  using leading technology intended to target members of the Settlement Class. *See* Dkt. 219 ¶ 32.

15  This program was designed to reach an overinclusive population, and was projected to have

16  around an 80% reach of the entire class. *See* Weisbrot Decl. ¶¶ 34, 36. That aspect of the Notice

17  Plan has been successfully implemented. The publication notice was published in a full-page ad

18  in PC Gamer magazine, which has an estimated circulation of 50,800. *See id.* ¶ 42. Given the

19  extent to which social casino players are active on Facebook, Angeion also purchased sponsored

20  ads on Facebook. *See id.* ¶ 38. The Facebook ads have generated 43,071,747 impressions. *See id.*

21  In addition, traditional internet banner ads were purchased. *See id.* ¶ 40. To date, those ads have

22  generated 36,428,084 impressions. *Id.* The banner ads began running on November 9, 2020 and

23  will run for 60 consecutive days. *Id.*

24        Finally, all forms of notice accurately described the Settlement and directed the recipient

25  to the Settlement Website, where Class Members can review the Plan of Allocation, use a slider

26  tool to estimate in real time how much of their losses they are projected to recover through the

27  Settlement, and file a claim. *See* Agreement § 4.2(c); Dkt. 217 at 9.

1    These early numbers confirm what the Court already provisionally found: the Notice Plan

2    here constituted the "best practicable notice" under the circumstances, and was reasonably

3    calculated to apprise interested Settlement Class Members of their rights under the Settlement.

4    Apart from one hiccup with soft-bounces on the first-round email notice (which was promptly

5    rectified), there have been no issues noticing the Settlement Class, and initial figures confirm the

6    estimates provided to the Court at preliminary approval. The Court should therefore find that the

7    Notice Plan ultimately complied with Due Process.

8    **III.    The Court Should Finally Approve The Settlement.**

9        To approve the settlement of a class action as fair, reasonable, and adequate, Rule 23(e)

10   requires Court to consider "whether (A) the class representatives and class counsel have

11   adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief

12   provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and

13   appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including

14   the method of processing class-member claims; (iii) the terms of any proposed award of

15   attorney's fees, including timing of payment; and (iv) any agreement required to be identified

16   under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other."

17   These factors largely encompass those identified by the Ninth Circuit for evaluating a class

18   settlement. *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)

19   (quoting *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)).

20       The Committee Notes to the recent revision of Rule 23 make clear that the newly

21   enumerated factors were not intended to replace approval factors already used in courts around

22   the country, but "rather to focus the court and the lawyers on the core concerns of procedure and

23   substance that should guide the decision whether to approve the proposal." Thus, courts examine

24   the new Rule 23 factors alongside the traditional *Churchill* factors relevant to the particular case,

25

26

27

1  mindful that there is considerable overlap between the two. *See, e.g.*, *Walters v. Target Corp.*,

2  No. 3:16-cv-1678-L-MDD, 2020 WL 6277436, at *5 (S.D. Cal. Oct. 26, 2020).[4]

3      **A.      Class Counsel and the Class Representatives have adequately represented
            the Class and support the Settlement.**

4

5      Class Counsel's representation of the Class' interests here was not just adequate; it was

6  extraordinary. Class Counsel filed this case, in 2015, asserting its own novel interpretation of

7  Washington gambling law as applied to the brand-new social casino industry. After the district

8  court dismissed the case with prejudice (echoing a chorus of other federal district courts who at

9  first could not see how social casinos could constitute gambling), Class Counsel nevertheless

10  appealed and obtained a landmark decision from the Ninth Circuit. Upon remand, Class Counsel

11  had to defend Washington's gambling laws from repeated attacks both in the WSGC and in the

12  Washington State Legislature. Class Counsel also employed novel and "enterprising" tactics to

13  fend off Defendants' repeated attempts to force Plaintiffs and the Class to arbitration, leading to

14  a dizzying array of motions seeking injunctions and protective orders. *See* Mar. 4, 2020 Hr'g Tr.

15  at 5:9. All the while, Class Counsel dispensed with motion after motion from Defendants' fleet

16  of large law firms. Time and time again, Class Counsel held the line and marched the case closer

17  to class certification and trial, ultimately leading to the Settlement now before the Court. All of

18  these efforts demonstrate that Class Counsel provided more than adequate service to the Class in

19  this case.

20      Class Representatives Kater, Kelly, and Thimmegowda likewise adequately represented

21  the Class. Each remained in regular communication with Class Counsel, timely responded to

22  requests for information, closely reviewed papers, answered written discovery, provided

23  documents to aid in Class Counsel's prosecution of the case, closely reviewed the terms of the

24  Settlement, discussed the Settlement with Class Counsel, and signed the Settlement because they

25  believe it is fair and in the best interests of the Class. *See* Declaration of Cheryl Kater ("Kater

26  _____

27  [4]      There is no governmental participant here, so that factor is neutral. Further, to date, there are no agreements
         that must be identified under Rule 23(e)(3), nor do counsel anticipate reaching any such agreements.

1    Decl.") ¶ 5; Declaration of Suzie Kelly ("Kelly Decl.") ¶ 5; Declaration of Manasa

2    Thimmegowda ("Thimmegowda Decl.") ¶ 5. Those services were far more than adequate.

3         The Court may also consider Class Counsel's support of the Settlement, which can be

4    considered and also favors approval. *In re Bluetooth*, 654 F.3d at 946. It is well-established that

5    "[t]he recommendations of plaintiffs' counsel should be given a presumption of reasonableness."

6    *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (quotations omitted).

7    Class Counsel here are the only lawyers with experience prosecuting these types of claims, and it

8    is their considered judgment that this Settlement represents an outstanding result for the

9    Settlement Class.

10        **B.    The Settlement was negotiated at arm's length.**

11        To say the Settlement here was negotiated at arm's length and was the product of non-

12   collusive negotiations—as the Court has already preliminarily found—would be quite the

13   understatement. *See* Dkt. 221 at 4. The Settlement was reached only after an intense, 12-hour

14   mediation, followed by months of further negotiations about the mechanics, supports a finding

15   that there was not a hint of collusion here. *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965

16   (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive,

17   negotiated resolution."); *Helde v. Knight Transp., Inc.*, No. 2:12-cv-00904 RSL, Dkt. 191 at 2

18   (W.D. Wash. May 24, 2017) (granting preliminary approval where "Settlement Agreement

19   resulted from extensive arm's-length negotiations, with participation of an experienced

20   mediator"); *Gragg v. Orange CAB Co., Inc.*, No. 12-cv-0576 RSL, 2017 WL 785170, at *1

21   (W.D. Wash. Mar. 1, 2017) (same). The Parties reached this Settlement only after years of

22   intense litigation marked by round after round of contested issues, with Class Counsel and

23   defense counsel agreeing on almost nothing of substance over life of the case.

24        Moreover, this Settlement contains none of the red flags the Ninth Circuit has identified

25   as indicative of possible collusion: (1) "when counsel receive a disproportionate distribution of

26   the settlement, or when the class receives no monetary distribution but class counsel are amply

27   rewarded," (2) "when the parties negotiate a 'clear sailing' arrangement," and (3) "when the

1  parties arrange for fees not awarded to revert to defendants rather than be added to the class

2  fund." *In re Bluetooth* 654 F.3d at 947 (quotations omitted). Class Counsel's fee will be

3  determined separately, but as explained in Class Counsel's fee petition, they seek a percentage

4  recovery that is consistent with Washington law and Ninth Circuit precedent, reflects their work

5  here, and is proportionate. Moreover, the Settlement does not contain a "clear sailing"

6  agreement; Defendants are free to object to Class Counsel's fee petition if they so desire.

7  Agreement § 8.1. And there is no reverter here. All Settlement funds will go to Class Members,

8  less Class Counsel's fees and any administrative costs. *Id.* § 1.35. This consideration clearly

9  supports final approval.

10        **C.      The amount offered in Settlement is adequate, taking into account the
11                  strength of Plaintiffs' case, and the risks inherent in further litigation.**

12        Even before the revised Rule 23 highlighted that the Court should consider the amount

13  offered in settlement, courts recognized that the size of any settlement, compared to the

14  likelihood of full recovery, "is generally considered the most important" factor in evaluating a

15  settlement. *See Bayat v. Bank of the West*, No. C-13-2376 EMC, 2015 WL 1744342, at *4 (N.D.

16  Cal. Apr. 15, 2015). Here, an evaluation of the risks present in this litigation, combined with an

17  assessment of the scope of relief, shows that the Settlement easily qualifies as fair, reasonable,

18  and adequate.

19                  **i.      The Settlement Class would have faced significant delay before it
20                            could have recovered anything on the merits.**

21        Class Counsel has always been confident about prevailing on the merits of these cases.

22  The key legal questions, particularly under the RMLGA, are straightforward, and have, in Class

23  Counsel's view, been conclusively answered by the Ninth Circuit's decision in the appeal in the

24  *Kater* matter. Nevertheless, the case presented some legal risks. For instance, several of the

25  defendants in this and related cases have raised the contention that the regular provision of free

26  chips within their gambling games meant that the chips themselves were not "things of value."

27  *See, e.g.*, *Benson v. DoubleDown Interactive, LLC*, No. 18-cv-525, Dkt. 103 (W.D. Wash. June

17, 2020) (seeking to certify issue to the Washington Supreme Court). Plaintiffs, of course, disagree, and this Court dismissed that contention at every turn, relying on the Ninth Circuit's decision in *Kater*. But it is also true that the opinion in *Kater* specifically notes that the court did not consider Defendants' specific arguments about the regular provision of free chips. *See* 886 F.3d at 787.

But as Plaintiffs explained at preliminary approval, the principal risk here was legislative, *i.e.*, the chance that Defendants' efforts at changing the law, either through the Washington Legislature or the WSGC, would succeed before this matter reached judgment, and leave Settlement Class Members with nothing. Plaintiffs' counsel have thus far fended off the ISGA's phalanx of well-heeled lobbyists, but Defendants and their ISGA comrades are formidable opponents. If these cases do not settle now, each legislative cycle the class will be at risk of having their claims eviscerated in the name of "remov[ing] . . . economic uncertainty" by "clarifying" that proposed class members cannot recover under the RMLGA. H.B. 2720, 66th Leg., Reg. Sess. (Wash. 2020).

This legislative risk is particularly acute here because it is practically inevitable that this case would take years to reach judgment. Pending at the time the Parties settled was, of course, a renewed motion to compel arbitration, the denial of which would lie an immediate appeal as of right. *See* 9 U.S.C. § 16. Such an appeal would itself take at least a year. The Parties have thus far fought tooth and nail over every aspect of discovery, and there is every reason to believe that would have continued had the case not settled. Such discovery fights would inevitably prolong the discovery period here, after which the Parties would heavily contest class certification and, perhaps, summary judgment, and then trial. The history of the case so far also suggests that any trial verdict was bound to be appealed, further lengthening the proceedings.

Courts have regularly recognized that the prospect of significant delay while a case works its way to judgment is reason to favor immediate settlement. After all, one dollar today is worth significantly more than one dollar three years from now. *Rodriguez*, 563 F.3d at 966 ("Inevitable appeals would likely prolong the litigation, and any recovery by class members, for years. This

1   factor, too, favors the settlement."); *Ikuseghan v. Multicare Health Sys.*, No. 3:14-cv-05539

2   BHS, 2016 WL 3976569, at *4 (W.D. Wash. July 25, 2016) ("[T]he outcome of trial and any

3   appeals are inherently uncertain and involve significant delay. The Settlement avoids these

4   challenges."). But delay is especially problematic here. The longer the case survives, the more

5   opportunities Defendants and their allies would have to effect retroactive change to the law.

6           ii.     **Given the risks involved with further litigation, the amount offered in
7                   Settlement is outstanding.**

8           The cornerstone of this Settlement is a $155 million non-reversionary common fund,

9   which will be used to help Settlement Class Members recoup their losses. That is an

10  "astounding" recovery. Rubenstein Decl. ¶ 2. It is a significant enough sum that Class Members

11  with the largest Lifetime Spending Amounts stand to recover more than 50% of their losses, and

12  that no participating class member is likely to recover less than 10% of their losses. Dkt. 219

13  ¶ 53. By way of example, Class Representatives Thimmegowda, Kater, and Kelly, who have

14  previously estimated their losses at approximately $4,000, $40,000, and $400,000, are according

15  to those estimates projected to recover $500-$1,000 (Thimmegowda), $10,000-$20,000 (Kater),

16  and $200,000-$300,000 (Kelly). *Id.* ¶ 52.

17          It is difficult to compare this recovery to the recovery provided for under other

18  comparable settlements, given that this case has no true peers to be reasonably measured against.

19  On the facts, the closest comparator is almost certainly *In re Apple In-App Purchase Litigation*,

20  in which the class alleged that certain apps offered within Apple's App Store were "highly

21  addictive, designed deliberately so, and tend to compel children playing them to purchase large

22  quantities" of in-game currency, "amounting to as much as $100 *per purchase* or more." 2013

23  WL 1856713, at *1 (emphasis added). But there, the settlement established no common fund at

24  all, the default recovery for participating class members was five dollars (yes, $5), and with

25  adequate proof some claiming class members could claim refunds for a single 45-day period of

26  purchases. *Id.* at *5. Similarly, in *Kim v. Tinder, Inc.*, the class alleged unfair pricing with regard

27  to in-app purchases in a popular dating app. No. CV 18-3093-JFW(ASX), 2019 WL 2576367, at

1   *2 (C.D. Cal. June 19, 2019). The settlement established no common fund at all, and

2   participating class members received 50 free "Super Likes" (*i.e.*, coupons) in addition to an

3   option to select a $25 cash payment (as an alternative to other coupon offers). *Id.* Simply put,

4   there is just no comparison between the settlements that have ever previously been reached in

5   factually-similar cases and the Settlement currently before the Court.

6          Perhaps the better measuring stick for this Settlement are class action settlements in the

7   consumer privacy space, given that those settlements often resolve large (statutory) damages

8   claims and are premised on novel interpretations of law as applied to allegations of internet-

9   based misconduct. Consumer privacy settlements, too, are notorious for failing to provide

10  consumers with real-world relief for the damages they have suffered. For example, *In re Google*

11  *Referrer Header Privacy Litigation*, 869 F.3d at 740 approved the settlement where all of the

12  money was to go to *cy pres*, with no cash relief for the class at all. *Gaos*, 139 S. Ct. at 1045. And

13  even in consumer privacy settlements that do provide monetary relief and have been adjudged to

14  be fair and reasonable by district courts, the relief is often primarily in-kind. *See, e.g.*, *In re*

15  *Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 324 (N.D. Cal. 2018) (explaining that less than

16  10% of the "fund" was available for cash payments, with the rest being reserved to purchase

17  credit monitoring services); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-

18  02752-LHK, 2020 WL 4212811, at *22 (N.D. Cal. July 22, 2020) (cash relief made available

19  only to class members with existing credit monitoring, out-of-pocket losses, and who paid

20  Yahoo! for premium services).

21         And beyond the cash recovery, the Settlement provides for substantial non-monetary

22  benefits. The Settlement requires Big Fish to implement meaningful prospective relief, including

23  by providing addiction-related resources within its social casino games and by creating and

24  honoring a meaningful self-exclusion policy. *See* Agreement § 2.2. Given the fervor with which

25  Defendants have long insisted that their games are not gambling, these in-game changes are a

26  monumental achievement for the Settlement Class. They represent the first steps toward much-

27  needed self-regulation within the social casino industry and given Big Fish's prominence in the

1    social casino industry, other industry players have and will continue to follow suit.

2         These measures also highlight that resolving this case now is itself a benefit. Recall that

3    Plaintiffs allege that many members of the Settlement Class are problem gamblers, whose

4    addictions cause real-world problems like devastating credit card bills. Had the case not settled,

5    Settlement Class Members would have continued to suffer these and other similar harms,

6    perhaps with devastating and irreversible consequences in some cases. Bringing this litigation to

7    a beneficial conclusion now will forestall these harms from occurring, a potentially incalculable

8    benefit to some Settlement Class Members.

9         In sum, the amount offered in the Settlement, when compared with the risks and expense

10   of further litigation, strongly supports final approval.

11        **D.      The Settlement treats Settlement Class Members equitably.**

12        The revised Rule 23 further asks courts to assess whether the proposed settlement "treats

13   class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). The Rule's revised

14   text makes clear that *equal* treatment is not required, but fair treatment is instead the goal. The

15   Settlement here achieves that goal.

16        As the Court explained at preliminary approval, and as hashed out in detail in the Plan of

17   Allocation, a Settlement Class Member's total recovery will depend on the extent of their losses

18   (*i.e.*, those with greater losses will recover a higher proportion of their losses), whether the

19   Settlement Class Member opted out of Big Fish's Dispute Resolution Provision after seeing the

20   pop-up displayed in late 2019 and early 2020, and on the number of claims. Dkt. 221 at 3-4. The

21   Plan of Allocation therefore distributes Settlement funds according to those who have suffered

22   the greatest harm, and those with the stronger legal claims.

23        Allocating settlement funds in this way achieves an equitable result. Settlement Class

24   Members with tens or hundreds of thousands of dollars in losses have frequently suffered serious

25   collateral harms, such as alienation from friends or family, or the accrual of huge debts, that were

26   not suffered by those who may have purchased $10 or $20 worth of chips. And even though all

27   Settlement Class Members have equally strong RMLGA claims, Settlement Class Members with

Motion for Final Approval
CASE NOS. 15-CV-612 & 19-CV-199 - 24

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

1   huge losses who accessed Defendants' VIP tiers and interacted with a VIP host may have a

2   stronger CPA claim to release here. Likewise, those who did not opt out of Defendants'

3   purportedly mandatory dispute resolution provision still have a strong RMLGA claim, and while

4   Class Counsel do not believe the provision is or was binding, if those Class Members had been

5   compelled to arbitration they could have seen their losses cut by, for instance, a provision in the

6   Terms of Use which purports to bind users to a shorter limitations period than is codified in

7   Washington law. As explained above, in Class Counsel's view, the Class stands largely on equal

8   footing. But a clear-eyed assessment of the risks that lay ahead demonstrates that certain claims

9   are stronger than others, something appropriately reflected in the Plan of Allocation. *See In re*

10  *Equity Funding Corp. of Am. Securities Litig.*, 603 F.2d 1353, 1365 (9th Cir. 1979) (concluding

11  that the district court's approval of certain offsets "in [a] Plan of Allocation was a component of

12  its duty to insure the equitable distribution of the settlement proceeds"); 2 McLaughlin on Class

13  Actions § 6.23 (17th ed. 2020) ("Allocation formulas, including certain discounts for certain

14  types of claims within a class, may properly take into consideration the comparative strengths

15  and values of different categories of the settled and released claims.").

16      Likewise, the provision of service awards for the Named Plaintiffs is consistent with the

17  equitable treatment of class members. Cheryl Kater and Manasa Thimmegowda each seek an

18  award of $10,000, as explained below. This modest award reflects their service to the Class.

19  Each put their name to a lawsuit that advanced a novel theory and that ultimately allowed injured

20  individuals to recoup thousands of dollars in losses. While that is typical of class plaintiffs, the

21  risk of reputational injury here is higher, given the subject matter of the lawsuit. Kater and

22  Thimmegowda also provided significant formal and informal discovery that allowed Class

23  Counsel to determine the best size and structure of any settlement. They also reviewed pleadings

24  and participated in the settlement process. Each estimates that they spent dozens of hours in

25  service to the Settlement Class. As explained in the separate motion for incentive awards, an

26  award of this size is in line with other awards given to class representatives, and fairly reflects

27  their service to the Settlement Class. Given that their efforts were key to ensuring that the

1  Settlement Class recovered anything, the modest proposed incentive award for Kater and

2  Thimmegowda is fully consistent with equity.

3        Suzie Kelly seeks an award of $50,000. Despite its size, this award, too, is equitable, in

4  light of Kelly's extraordinary contributions to the Settlement Class. As explained elsewhere in

5  this brief, and in other papers related to this Settlement, the field of battle in this litigation

6  extended far beyond the courtroom. Significant effort was expended on both sides to lobby

7  regulators and legislators. Suzie Kelly was instrumental in these efforts. Of the dozens of

8  individuals Class Counsel spoke to who had incurred six-figure losses to the casino gambling

9  apps at issue in this cluster of cases, most were unwilling to attach their name to their story, and

10  only Kelly was willing to serve as Class Representative. But these stories were among the most

11  powerful and were key to Class Counsel's efforts to preserve the protections that Washington

12  law provides. More, Kelly agreed to an on-camera interview with PBS Newshour in which she

13  shared her story with the world, including details about her addiction, and the harms it had led

14  her to cause to those around her. That step has proven to be a great personal sacrifice for Kelly,

15  as her decision to share her story continues to be a source of personal hardship. It is Class

16  Counsel's considered judgment, however, that Kelly's decision to share her story was

17  instrumental in helping Class Counsel negotiate the instant Settlement. Thus, Kelly's

18  extraordinary personal service to the Class deserves recognition. Given Kelly's extraordinary

19  service to the Settlement Class, a $50,000 award to her also is fully consistent with equity.

20        In sum, the Settlement treats all Class Members equitably relative to each other,

21  supporting final approval.

22        **E.**    **Class Counsel had completed sufficient discovery to reach an informed
   judgment about the benefits of settling, and the quality of the Settlement.**

23

24        Next, the Parties "had enough information to make an informed decision about the

25  strength of their cases and the wisdom of settlement." *Rinky Dink Inc. v. World Bus. Lenders,*

26  *LLC*, No. C14-0268-JCC, 2016 WL 4052588, at *5 (W.D. Wash. Feb. 3, 2016). The Parties only

27  agreed to mediate after more than five years of contentious litigation, and consequently mediated

1    with a crystal-clear understanding of the strengths and weaknesses of the Parties' claims and

2    defenses. *See* Dkt. 218 ¶ 26. And while the Parties did not conduct a substantial volume of

3    formal discovery prior to mediation, proposed Class Counsel independently undertook massive

4    informal discovery efforts throughout these cases. *See id.* Those efforts involved frequent

5    communications with members of the proposed class, the collection of large numbers of

6    documents possessed by proposed class members (*e.g.*, emails, text messages, and in-game chat

7    exchanges with Defendants' "VIP Hosts"), informal communications and/or attempts with

8    Defendants' former employees, and more. *See id.*

9         Moreover, in the weeks before the mediation, Defendants provided Plaintiffs with several

10   sets of detailed transactional data for virtual chip purchases; the Parties exchanged reams of

11   briefing on the core facts, legal issues, litigation risks, and potential settlement structures; and the

12   Parties supplemented that briefing with extensive written and telephonic correspondence,

13   mediated and shuttled by the Phillips ADR team, clarifying each other's positions in advance of

14   the mediation. *See id.* ¶ 13. The May 22, 2020 mediation session lasted more than twelve hours.

15   *See id.* ¶ 14. It was only at the end of that long day, and with the skilled assistance of Judge

16   Phillips and his Phillips ADR team, that the Parties were able to hash out a settlement. *See id.* By

17   then, the Parties were fully informed on all pertinent issues and capable of assessing the benefits

18   of the settlement now before the Court. *See id.* ¶ 15; *Ikuseghan*, 2016 WL 3976569, at *3

19   (approving settlement reached "between experienced attorneys who are familiar . . . with the

20   legal and factual issues of this case in particular"). This factor, too, thus supports final approval.

21        **F.   The reaction of the Settlement Class has been favorable.**

22        Finally, current claim data indicates that the Class has responded favorably to the

23   Settlement, warranting final approval. Thus far, the Settlement Administrator has received more

24   than 50,000 claims. Weisbrot Decl. ¶ 44. Astoundingly, for a settlement of this size, and given

25   the breadth of publication notice about the Settlement, only one person has opted out and nobody

26   has filed an objection. *Id.* ¶ 45. Such low opposition to the Settlement speaks volumes regarding

27   the fairness and adequacy of the Settlement. "When few class members object, a court may

1  appropriately infer that a class action settlement is fair, adequate, and reasonable." *Schneider v.*

2  *Wilcox Farms, Inc.*, No. 07-CV-01160-JLR, 2009 WL 10726662, at *3 (W.D. Wash. Jan. 12,

3  2009). Courts in this district have found that class reaction supported final approval even with

4  significantly higher exclusion and objection rates. *See Pelletz v. Weyerhouser Corp.*, 255 F.R.D.

5  537, 543-44 (W.D. Wash. 2009) (lauding "positive response" of Settlement Class of 110,000 to

6  140,000 members where 19 excluded themselves from the settlement, and 3 objected); *Clemans*

7  *v. New Werner Co.*, No. 3:12-cv-5186, 2013 WL 12108739, at *5 (W.D. Wash. Nov. 22, 2013)

8  (in settlement involving class of 300, one objection and four exclusions were filed, court found

9  that "the overwhelming non-opposition to and participation in the Settlement [are] strong

10  indications of Class Members' support for the Settlement as fair, adequate, and reasonable."); *see*

11  *also Rodriguez*, 563 F.3d at 967 (concluding that the district court "had discretion to find a

12  favorable reaction" when 54 of 376,301 class members objected to settlement); *Churchill Vill.*,

13  361 F.3d at 577 (affirming approval of class action settlement where 45 of 90,000 class members

14  objected). Given the high participation rates here, and near total absence of any opposition to the

15  Settlement, the Court should find that the reaction of the Settlement Class also favors final

16  approval.[5]

17                                          **CONCLUSION**

18          The Court should finally certify the Settlement Class and grant final approval to the

19  instant Settlement.

20                                                  Respectfully submitted,

21

22  Dated: December 14, 2020              By: /s/ Alexander G. Tievsky

23                                          Alexander G. Tievsky, WSBA #57125
                                            atievsky@edelson.com
24                                          EDELSON PC
                                            350 N LaSalle Street, 14th Floor
25                                          Chicago, IL 60654

26  _____

27  [5]      Consistent with the Court's order at Dkt. 223, Class Counsel intend to file a supplemental brief with final
    claims numbers and projected recoveries after the claims deadline and prior to the final fairness hearing.

Tel: 312.589.6370 / Fax: 312.589.6378

By: /s/ Todd Logan

Rafey S. Balabanian*
rbalabanian@edelson.com
Todd Logan*
tlogan@edelson.com
Brandt Silver-Korn*
bsilverkorn@edelson.com
Edelson PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300/Fax: 415.373.9435

By: /s/ Cecily C. Shiel

TOUSLEY BRAIN STEPHENS PLLC
Cecily C. Shiel, WSBA #50061
cshiel@tousley.com
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600

*Plaintiffs' Attorneys and Class Counsel*
*Admitted *pro hac vice*